*41*

United States District Court
Southern District of Texas
FILED

JUN 2 7 2002

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS,<br>**Plaintiff** | § § § | Civil Action |
| **v.** | § § § | No. B-01-34 |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS,<br>INSPECTOR DAN SERNA, INDIVIDUALLY,<br>INSPECTOR RUBEN MARES, INDIVIDUALLY,<br>INSPECTOR SAM GUTIERREZ, INDIVIDUALLY,<br>LA FERIA WRECKER SERVICE,<br>DOUBLE A WRECKER CO.,<br>T & T TOWING SERVICE,<br>T AND T WRECKER SERVICE,<br>TIM WILKINSON IRON & METAL INC.,<br>**Defendants** | § § § § § § § § § § § | **JURY** |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, JOHN OCIE ROBERTS, plaintiff in the above-entitled and numbered cause, and moves the court to grant plaintiff partial summary judgment against defendants CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, INSPECTOR DAN SERNA, INDIVIDUALLY, INSPECTOR RUBEN MARES, INDIVIDUALLY, INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, LA FERIA WRECKER SERVICE, DOUBLE A WRECKER CO., T & T TOWING SERVICE and T AND T WRECKER SERVICE, jointly and severally, and in support whereof, would show unto the court as follows:

1.      Summary judgment is proper in this case because there is no genuine issue of any material fact and because Plaintiff JOHN OCIE ROBERTS is entitled to judgment as a matter of law. Specifically, the ordinance upon which the defendants relied in seizing and taking plaintiff's personalty from 1726 North Commerce Street, Harlingen, Cameron County, Texas, is unconstitutional, for it, as written and as ap-

plied, violates the plaintiff's due process rights, all in violation of the United States Constitution and the Constitution of the State of Texas. The ordinance in question provides for arbitrary notice, which amounts to no notice at all. The ordinance allows the seizing official to chose whom to send notice to, either (a) the owner of the personalty that is to be seized, or (b) the realty owner. Nothing in the ordinance provides any guiding principles in the making of this choice, nor does the oridinance in question assure that the owner to be affected by the proposed city action, to wit the personalty owner, be given notice or afforded a hearing. It does not require that notice be given to the owner of the personalty to be seized and disposed of, even when the identity and whereabouts of the personalty owner is known.

2.    In the case at bar, defendant CITY OF HARLINGEN, CAMERON COUNTY, TEXAS [hereinafter sometimes referred to as "CITY"] knew the whereabouts of the owner of the personalty that it sought to, and did in fact, seize. Yet, defendant CITY's officials, at the direction of Dan Serna, chose not to send notice to the personalty owner and opted, instead, by arbitrary choice, to send notice to the realty owner. The realty owner did not own the personalty that the CITY sought to, and did, in fact, seize from 1726 North Commerce Street, Harlingen, Cameron County, Texas. The said personalty belonged to JOHN OCIE ROBERTS. Furthermore, no notice whatsoever was sent to the owner, JOHN OCIE ROBERTS, at 1726 North Commerce Street, Harlingen, Cameron County, Texas. No notice was given to the owner despite the fact that he regularly and routinely operated his business and frequented the said premises during the year of seizure at 1726 North Commerce Street, Harlingen, Cameron County, Texas. The owner, JOHN OCIE ROBERTS, could have easily been found by CITY at the said premises; however, CITY chose not to give the owner of the personalty notice. Consequently, the owner of the personalty, JOHN OCIE ROBERTS, was deprived of his personalty without due process of law. No

notice and no opportunity to be heard were afforded JOHN OCIE ROBERTS. JOHN OCIE ROBERTS never knew what complaint the CITY had that would authorize the CITY to do what it did, wipe out his inventory completely and shut down him down.

3.     This motion is based on the attached brief in support/memorandum of points and authorities, the attached summary judgment evidence, and all pleadings and papers on file. In addition, the following exhibits are attached hereto, incorporated herein and moved and offered in evidence in support of this motion for summary judgment:

| Exhibit | Description |
|---|---|
| A | Chapter 93, City of Harlingen -- Ordinance in Question |
| B | Affidavit of John Ocie Roberts in Support of Plaintiff's Motion for Partial Summary Judgment |
| C | Affidavit of John Ocie Roberts in Opposition to Jose A. Garcia's Motion for Summary Judgment |
| D | Excerpts from the City of Harlingen's Sworn Answers to Interrogatories |
| E | Excerpts from the February 26, 2002, Oral Deposition of Dan Serna, Taken in this Case |

4.     WHEREFORE, PREMISES CONSIDERED, Plaintiff JOHN OCIE ROBERTS prays that this Court declare the ordinance in question which does not specifically state who is to be given notice if the City desires to seize and remove personalty from a private citizen's place of business or residence, and grant summary judgment in favor of Plaintiff JOHN OCIE ROBERTS on the issue of liability, and for such other and further relief which the Plaintiff may be justly or equitably entitled to or which the court deems appropriate under the circumstances.

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT _____ No. B-01-34

Respectfully submitted,

*HUGO XAVIER DE LOS SANTOS*
*Attorney at Law & C.P.A.*

Date:  June 27, 2002

By: _____
        HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.
        Texas Bar Identification #05653300
        U.S. Southern District Id. #11259

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227      FAX# (210) 737-1556

Attorney for John Ocie Roberts, Plaintiff

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT        No. B-01-34

## CERTIFICATE OF SERVICE

I, HUGO XAVIER DE LOS SANTOS, ESQ., attorney for John Ocie Roberts, Plaintiff, hereby certify that I served all other parties in this action with a correct copy of PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT     in a manner consistent with the FED.R.CIV.P. on June 27, 2002.

Further, this is to certify that all service via mail was by certified mail, return receipt requested [RRR], by depositing this document in an official depository of the United States Postal Service after enclosing this document in a postpaid, properly addressed envelope. In addition, all service by telephonic document transfer was accomplished before 5:00 o'clock p.m. on the aforesaid date.

*City of Harlingen, Cameron County, Texas, Inspector Dan Serna, Individually, Inspector Ruben Mares, Individually, Inspector Sam Gutierrez, Individually, Defendants:*

c/o Mr. Ricardo J. Navarro, Esq.
222 E. Van Buren, Suite 405
Harlingen, Texas 78550-6804

*Method:*        U.S. Certified Mail, Return Receipt Requested
                 USPS Postal Receipt #7001 2510 0009 2698 3382


*La Feria Wrecker Service, Inc., Defendant:*

Mr. Michael R. Ezell, Esq.
312 East Van Buren/P.O. Box 2878
Harlingen, Texas 78551

*Method:*        U.S. Certified Mail, Return Receipt Requested
                 USPS Postal Receipt #7001 2510 0009 2698 3375


*La Feria Wrecker Service, Inc., Defendant:*

Mr. Michael R. Ezell, Esq.
312 East Van Buren/P.O. Box 2878
Harlingen, Texas 78551

*Method:*        U.S. Certified Mail, Return Receipt Requested
                 USPS Postal Receipt #7001 2510 0009 2698 3375

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT       No. B-01-34

*HUGO XAVIER DE LOS SANTOS*
*Attorney at Law*

By: _____
        HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.
        Texas Bar Identification #05653300
        U.S. Southern District Id. #11259

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227       FAX# (210) 737-1556

Attorney for John Ocie Roberts, Plaintiff

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T  "A"

# CITY OF HARLINGEN
# ORDINANCE IN QUESTION

# CHAPTER 93: NUISANCES

Section

93.01    Stagnant water prohibited

93.02    Accumulation of carrion, filth, and the like prohibited

93.03    Excessive growth or accumulation of weeds and rubbish prohibited; wildlife habitat area exempted

93.04    Abatement required; notice

93.05    Service of notice

93.06    Correction or removal of conditions by city

93.07    Filing of statement of expenses incurred

93.08    Collection of expenses; lien

93.99    Penalty

## § 93.01  STAGNANT WATER PROHIBITED.

It shall be unlawful for the owner of any lot or other real property in the city to allow or permit holes or places where water may accumulate and become stagnant to be or remain on such lot or premises or to allow or permit the accumulation of stagnant water thereon, or to permit the same to remain thereon.
('73 Code, § 18-69) (Ord. 60-22, passed, 8-3-60; Am. Ord. 60-34, passed 12-21-60)  Penalty, see § 93.99

## § 93.02  ACCUMULATION OF CARRION, FILTH, AND THE LIKE PROHIBITED.

It shall be unlawful for any person who shall own or occupy any house, buildings, establishment, lot or yard, or other real property in the city to permit or allow any carrion, filth, or other impure or unwholesome matter to accumulate or remain thereon.
('73 Code, § 18-70) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)  Penalty, see § 93.99

**§ 93.03  EXCESSIVE GROWTH OR ACCUMULATION OF WEEDS AND RUBBISH PROHIBITED; WILDLIFE HABITAT AREA EXEMPTED.**

(A) *Generally.* It shall be unlawful for any person, firm, or corporation who shall own or occupy any lot or other real property within the city to allow weeds, rubbish, brush, or other unsightly, objectionable, or insanitary matter to accumulate or grow on such lot or property. Any person owning a parcel of property of one acre or more and whose property abuts a lot on which is maintained a single- or multi-family residence adjacent to which there is no dedicated street or alley can remedy or remove the condition by mowing of 150 feet in depth along that portion of the parcel that fronts upon the residential property line.

(B) *Wildlife habitat area; exemption.* In addition, any person owning a parcel of one acre or more can request in writing to the City Commission that the parcel be designated a wildlife habitat area and thus will be exempt from the requirements of this section regarding the removal of weeds and brush. The criteria and requirements are as follows:

(1) *Definitions.* For the purposes of this division, the following terms are hereby defined:

(a) *MANAGEMENT PLAN.* A detailed plan describing what steps the property owner will take to maintain the wildlife habitat area.

(b) *QUALIFIED WILDLIFE OR PLANT EXPERT.* A person recognized by both the private parcel owner and the city as an expert on local wildlife or plant life.

(c) *WILDLIFE HABITAT AREA.* A parcel so designated by a majority vote of the City Commission.

(d) *WILDLIFE HABITAT AREA SIGN.* An official on-site sign that will be used to designate an approved wildlife habitat area. The design and wording of this official sign will be subject to a majority vote of the City Commission.

(2) *Designation as a wildlife habitat area; criteria.*

(a) The parcel must be a minimum of one acre in size.

(b) The parcel must be clear of rubbish, junk, or litter.

(c) Property taxes on the parcel must be current.

(3) *Procedures.*

(a) The applicant must submit a written request to the City Secretary's office. This request must include a written statement from a qualified wildlife or plant expert detailing the reasons why the parcel should be designated as a wildlife habitat area and a detailed management plan addressing the maintenance of the habitat area.

0002

(b) The City Secretary shall schedule a City Commission hearing on the request and notify all property owners within 200 feet of the parcel. The qualified wildlife or plant expert shall represent the applicant at this hearing. The City Commission may designate the parcel as a wildlife habitat area by a majority vote.

(c) If the parcel is so designated, the City Manager shall cause to be erected wildlife habitat area signs on the parcel. A sign must face each public street. All costs incurred during the construction and installation of the signage will be paid by the parcel owner.

(d) Once designated as a wildlife habitat area, the Health Department shall periodically inspect the property to ensure compliance with the approved maintenance plan. If noncompliance is found, the wildlife habitat designation can be removed by a majority vote of the City Commission, and the owner of the parcel shall thereafter comply with the requirements of this section by removing weeds and brush thereon. Property owners may make a written request to the City Commission to remove the wildlife habitat area designation, and the removal of such designation shall be granted by the Elective Commission.

(e) The owner of any wildlife habitat area must maintain the area clear of all rubbish, junk, and litter.
('73 Code, § 18-71) (Ord. 60-34, passed 12-21-60; Am. Ord. 86-82, passed 11-5-86; Am. Ord. 90-45, passed 5-2-90; Am. Ord. 91-50, passed 10-15-91)  Penalty, see § 93.99

## § 93.04  ABATEMENT REQUIRED; NOTICE.

Whenever any condition described in this chapter is found to exist on any premises or real property within the city, the owner of such premises or real property shall be notified by the city, in writing, to correct, remedy, or remove the conditions within ten days after such notice and it shall be unlawful for any person to fail to comply with such notice.
('73 Code, § 18-72) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)  Penalty, see § 93.99

## § 93.05  SERVICE OF NOTICE.

The notice provided for in this section shall be served personally on the owner to whom it is directed or shall be given by letter addressed to such owner at his last known post office address. In the event personal service cannot be made and the owner's address is unknown, such notice shall be given by publication at least two times within ten consecutive days in a newspaper of general circulation published within the city.
('73 Code, § 18-73) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)

Case 1:01-cv-00034    Document 41    Filed in TXSB on 06/27/2002    Page 11 of 104

## § 93.06  CORRECTION OR REMOVAL OF CONDITIONS BY CITY.

In the event the owner of any lot, premises, or real property upon which a condition described in this chapter exists fails to correct, remedy, or remove such condition within ten days after notice to do so is given in accord with this chapter, the city may do such work or make such improvements as are necessary to correct, remedy, or remove such conditions, or cause the same to be done, and pay therefor and charge the expenses incurred thereby to the owner of such lot. Such expenses shall be assessed against the lot or real estate upon which the work was done or the improvements made. The doing of such work by the city shall not relieve such person from prosecution for failure to comply with such notice in violation of § 93.04.

('73 Code, § 18-74) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)

## § 93.07  FILING OF STATEMENT OF EXPENSES INCURRED.

Whenever any work is done or improvements are made by the city under the provisions of § 93.06, the City Manager or City Health Officer, on behalf of the city, shall file a statement of the expenses incurred thereby with the County Clerk. Such statement shall give the amount of such expenses and the date or dates on which the work was done or the improvements were made.

('73 Code, § 18-75) (Ord. 60-22, passed 8-3-60)

## § 93.08  COLLECTION OF EXPENSES; LIEN.

After the statement provided for in § 93.07 is filed, the city shall have a privileged lien on the lot or real estate upon which the work was done or improvement made, to secure the expenses thereof. Such lien shall be second only to tax liens and liens for street improvements, and in accord with TEX. HEALTH & SAFETY CODE §§ 342.001 through 342.007. For any such expenditures and interest, suit may be instituted and recovery and foreclosure of the lien may be had in the name of the city and the statement of expenses made in accord with § 93.07, or a certified copy thereof, shall be prima facie proof of the amount expended for such work or improvements.

('73 Code, § 18-76) (Ord. 60-22, passed 8-3-60)

## § 93.99  PENALTY.

Any person who shall violate any of the provisions of this chapter shall be guilty of an offense and upon conviction shall be fined as provided in § 10.99 of this code and each and every day's violation shall constitute a separate and distinct offense, in case the owner or occupant of any lot, lots, or premises under the provisions of this chapter shall be a corporation, and shall violate any provisions of this chapter, the president, vice-president, secretary, treasurer of such corporation, or any manager, agent, or employee of such corporation shall be also severally liable for the penalties herein provided.

('73 Code, § 18-77) (Ord. 60-22, passed 8-3-60)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
|       Plaintiff | § | |
| | § | |
|   **v.** | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
|       Defendants | § | JURY |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T  "B"

## Affidavit of John Ocie Roberts
## in Support of
## Plaintiff's Motion for
## Partial Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

THE STATE OF TEXAS              §
COUNTY OF CAMERON               §

On June 17, 2002, JOHN OCIE ROBERTS, first being duly sworn, deposes and says:

1.    "I, JOHN OCIE ROBERTS, reside in the city of La Feria, county of Cameron, Texas. Following the City of Harlingen's taking of my property at 1726 North Commerce Street, Harlingen, Cameron County, Texas, I was forced to retire and am now presently retired. The name of my business at 1726 North Commerce Street, Harlingen, Cameron County, Texas was 'The Bargain Barn'. I am of sound mind and understand that this statement is made under oath. I have personal, first hand knowledge of the facts set forth herein unless otherwise stated. I have never been convicted of a felony or crime of moral turpitude. I am over the age of twenty-one years. I am competent and fully capable of making the following statements.

2.    "My business that was known as 'The Bargain Barn' was a business concern which extended about one half acre of warehouse and about an acre of open outside merchandise.

3.    "On January 1, 2000, I suffered a loss due to a fire. My warehouse was totally burned down; however, many items survived the blaze, such as an antique bell of about almost three (3) feet in size made of heavy bronze and dated in the early years of the 1800's. In addition, none of my merchandise inventory,

including numerous antiques, located outside the building was damaged by the fire. I continued to operate my business with respect to the inventory kept on the business lot as before.

4.     "After the fire on January 1, 2000, although I suffered a fire loss which destroyed my business records and some of my inventory of antiques, I continued doing business. I still had a substantial inventory of antiquities which were kept on my business lot, which was fenced and gated, and kept under lock and key.

5.     "After the fire on January 1, 2000, I began packing salvaged antiques from the burned building on trailers in order to remove whatever items I could salvage.

6.     "Suddenly and without any prior knowledge, warning or notice, whatsoever, the City of Harlingen came in and onto my business premises located at 1726 North Commerce Street, Harlingen, Cameron County, Texas, and began removing and proceeded to and did in fact remover, seize and take all of my business merchandise inventory, personalty. The City wiped me out completely. They broke the lock on the front gate and entered the fenced and gated premises without my consent.

7.     "By taking all of my personalty, which was my merchandise inventory, from 1726 North Commerce Street, Harlingen, Cameron County, Texas, the City of Harlingen effectively shut me down.

8.     "The City of Harlingen has even removed my fence and my gates.

9.     "At no time did I receive any notice from the City of Harlingen or its officials, including Dan Serna, Ruben Mares, and Sam Gutierrez, that the City of Harlingen planned or proposed or otherwise intended to take any of my personalty at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

10.    "During the year 1999, prior to their taking of my property in 2000, I received no notice, whatsoever, from the City of Harlingen.

11.    "During the year 2000, prior to their taking of my property, I received no notice, whatsoever, from the City of Harlingen.

12.    "Dan Serna did not hand me or otherwise notify me that the City of Harlingen was planning to take my personalty located at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

13.    "Ruben Mares did not hand me or otherwise notify me that the City of Harlingen was planning to take my personalty located at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

14.    "Sam Gutierrez did not hand me or otherwise notify me that the City of Harlingen was planning to take my personalty located at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

15.    "During 2000, up until the time that the City of Harlingen began seizing, taking and removing my property from 1726 North Commerce Street, Harlingen, Cameron County, Texas, I was at this location on a regular basis. Anyone desir-

ing to serve me with notice or to speak with me about any problems that the City may have claimed that it had with respect to my business operations could have readily sought me out at this location.

16.     "I confronted both the city officials and the police chief and officers as to why they were taking my inventory. I asked and demanded that they cease and desist from taking any more of my property. I was warned and promised arrest or criminal prosecution if I interfered with the city officials and their continued seizure of my merchandise and personally located at 1726 North Commerce Street, Harlingen, Cameron County, Texas. I was told I could do nothing with my own merchandise. The City seized and took everything I owned, including substantial numbers of antiques. Among the personalty that the City took were antiques that were *not* motor vehicles.

17.     "I discovered that the City, the police and the various wrecker services took my trailers loaded with inventory.

18.     "Up until June 25, 2002, although I had often asked or inquired, no one had told me the whereabouts of any of my property which the City seized, took and removed from my business, all of which was done without any warning or notice to me. On the contrary, the City of Harlingen had reported that all of the personalty taken had been demolished. This latter statement has proven to be untrue, false and misleading.

19.     "Through the present date and time of this affidavit, none of my property has been returned to me by any of the defendants.

20.     "I was later given notice of the removal of items; however, by that time, almost all of my personalty had been removed and taken by the defendants.

21.     "I attempted to bring a temporary restraining order to preserve my personalty; however, the state district judges refused to act.

22.     "According to what Mr. Dan Serna stated in the deposition, the City of Harlingen sent notice of the need to remove the items to the owner of the real estate, said owner being the railroad. I am not the owner of the real property. I am *not* the railroad.

23.     "From what I am able to comprehend from Mr. Serna's deposition, the notices stated that if the area was not cleaned up of debris, grass and junk, the city would remove everything.

24.     "I never received any notice, nor did I have any knowledge of such a decision or letter from the City of Harlingen.

25.     "I did not have 'junk' on my premises. I also kept and maintained the premises on a regular basis. I had the grass cut or mowed periodically. I also cut or had the grass mowed on as needed basis. Furthermore, I did everything reasonably possible to keep my business premises free of 'debris'.

26.     "I wrote a letter to the City of Harlingen, and I spoke to various officials and asked to be placed on the agenda, but I was refused. The City of Harlingen has

approved of and ratified Mr. Serna's actions against me and my personalty.

27.    "I lost my entire outside inventory and parts of the inventory of antiquities which I was able to salvage from the building, which inventory I had been collecting for years in order to set up a business to sell antiques and "hard to find" items. I relied on this business for my support and had hoped that it would provide for my retirement.

28.    "All of the above statements are true and correct."

Further, affiant sayeth not.

FURTHER AFFIANT SAYETH NAUGHT

John Ocie Roberts

STATE OF TEXAS

COUNTY OF CAMERON


SWORN TO, SUBSCRIBED, AND ACKNOWLEDGED by John Ocie Roberts before me on June 27, 2002.

Notary Public, State of Texas

My commission expires: 4-23-2006

ALMA R BARROSO
Notary Public
STATE OF TEXAS
My Comm. Exp. 04-23-2006

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T   "C"

# Affidavit of
# John Ocie Roberts in Opposition to
# Jose A. Garcia's
# Motion for Summary Judgment



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
|            Plaintiff | § | |
| | § | |
|    v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE | § | |
| DOUBLE A WRECKER CO. | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
|            Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN OPPOSITION TO JOSE A. GARCIA'S
MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| COUNTY OF CAMERON | § |

On June 17, 2002, JOHN OCIE ROBERTS, first being duly sworn, deposes and says:

1.   "I, JOHN OCIE ROBERTS, reside in the city of La Feria, county of Cameron, Texas. Following the City of Harlingen's taking of my property at 1726 North Commerce Street, Harlingen, Cameron County, Texas, I was forced to retire and am now presently retired. The name of my business at 1726 North Commerce Street, Harlingen, Cameron County, Texas was 'The Bargain Barn'. I am of sound mind and understand that this statement is made under oath. I have personal, first hand knowledge of the facts set forth herein unless otherwise stated. I have never been convicted of a felony or crime of moral turpitude. I am over the age of twenty-one years. I am competent and fully capable of making the following statements.

2.   "I was in the business of buying and selling antiquities, including antique motor vehicles, since 1964 until 2000. Although I am officially retired from the business of purchasing and selling antiquities, I continue to keep informed with

respect to the value and resale prices of antiquities. I am, from to time, called upon to give my opinion concerning the fair market value and the restorability of various antiquities by persons in the business of buying and selling antiquities. I am considered an expert in the evaluation for restoration purposes, and in the valuation, of antiquities by my peers and the people in the business. I have specialized knowledge and expertise in this field that I have gained over my years of experience.

3.    "I have also been involved in, among other things, the business of motor vehicle repair, motor vehicle body work and repair, antique restoration, heavy equipment sales, repair and restoration, and in businesses that use heavy equipment, for over forty (40) years. I also have specialized knowledge and expertise in these field that I have gained over my years of experience.

4.    "I have been a businessman in the City of Harlingen for many years, and am familiar with most of the local merchants. The business run and operated by Mr. Jose A. Garcia is commonly known as "Double A" and also as "T & T". Attached hereto, marked Exhibit "Roberts-A", is a true and correct copy of a photograph that I took which accurately and fairly depicts the sign that I took a picture of, which sign was located at the business owned and operated by Mr. Garcia. Mr. Garcia's business sign says, "DOUBLE A T & T", etc. It does not say "T & T Care Center" like Mr. Garcia alleges in his affidavit. This location is at 501 W. Jackson, Harlingen, Cameron County, Texas.

5.    "Antique motor vehicles like my Ford Thunderbird which Mr. Garcia wrongfully took from me, are bought and sold not only by collectors of such vehicles but also by the producers of motion pictures, in Hollywood and other parts of the country and globe. These vehicles often times are included in the plots and themes of motion pictures, and will command a high price because of the fact that they are in demand and their supply is rare.

6.    "Mr. Garcia also has business location on Tyler, near Commerce and the old railroad station. The address of this location is 202 W. Tyler, Harlingen, Cameron County, Texas.

7.    "Mr. Garcia lists his businesses in the Southwestern Bell business pages and he includes "Wrecker Services" under the "T&T" name. Attached hereto, marked Exhibit "Roberts-B", is a true and correct copy of the page and cover of the Southwestern Bell telephone directory that contains Mr. Garcia's business listing.

8.    "I have read the affidavit of JOSE A. GARCIA, dated May 28, 2002, which he submitted with his company's motion for summary judgment. There are several statements that are not true or correct in this affidavit.

9.    "Mr. Garcia suggests in his affidavit that the antique, Ford Thunderbird is the only vehicle that he took from my property. This is not true. In addition to the antique Ford Thunderbird, Mr. Garcia and/or someone under his direct supervision or employ took, at the very least, two (2) antique pick-up trucks, one being an International. These two (2) pick-up trucks are depicted in the photographs which I took, and which are attached hereto, marked Exhibits "Roberts-A" and "Roberts-C", the same being incorporated herein by reference.

AFFIDAVIT OF JOHN OCIE ROBERTS                                          No. B-01-34

10.    "Although I have come into contact with JOSE A. GARCIA, he has never told me that I could take any of the vehicles that he took from any of his business locations. Mr. Garcia also never advised, informed or otherwise told me the whereabouts of the "Ford Thunderbird". The unsworn, unauthenticated photographs that his attorney attached to Mr. Garcia's motion for summary judgment do not depict either of the two business premises belonging to Mr. Garcia of which I have knowledge or familiarity. In addition, nowhere in his motion or his affidavit, does Mr. Garcia tell me or the court the location of the place where the photographs were taken, which is where he has secreted my Ford Thunderbird.

11.    "When Mr. Garcia and/or his employee took my property, they completely ignored the posted signs and painted fence posts, warning that trespassing was prohibited. At the time, I had the fence posts at my business property commonly known as 1726 North Commerce Street, Harlingen, Cameron County, Texas, appropriately painted; moreover, I had locks and gated fences; in addition, I had numerous warning signs posted throughout the property, including at the entry gates, stating that the property was "POSTED PRIVATE PROPERTY" and "NO TRESPASSING", along with the language promulgated by Texas law. At no time was I shown any search warrant or seizure warrant authorizing the taking or removal of my property from my said business location. At no time did I authorize, or give my consent to, Mr. Garcia for him to take any of my property.

12.    "Mr. Garcia has never told me that I was free to retrieve or take any of the property that he took from me.

13.    "Mr. Garcia has never provided me with any documents showing, or an accounting of, the various items of personalty that he took from me. On information and belief, Mr. Garcia has never provided the City of Harlingen with an accounting of the various items of personalty that he and/or his employees took from my business, nor has he informed them of the whereabouts of the various items he took. Mr. Garcia has most certainly never informed or advised me of the whereabouts of the property he took from my business. Mr. Garcia has never sent me any notices, nor any letters advising me of the whereabouts of my property. Furthermore, Mr. Garcia threatened me with criminal charges if he ever saw me go to his place of business.

14.    "As of this day, I do not know the whereabouts of my antique, Ford Thunderbird, which Mr. Garcia wrongfully took from me.

15.    "The photographs that Mr. Garcia's attorney submitted with Mr. Garcia's motion for summary judgment, show that the vehicle depicted has no tires. When Mr. Garcia and/or his employee took my antique Ford Thunderbird, it had wheels and the tires. I had kept the tires fully inflated and properly maintained. Mr. Garcia has evidently taken the tires off and placed the vehicle directly on the ground. Placing an antique vehicle like my Ford Thunderbird directly on the ground without tires causes the antique vehicle to rust substantially on an accelerated basis. Therefore, despite his allegation, Mr. Garcia has damaged my antique Ford Thunderbird, which he continues to secret from me.

16.   "When Mr. Garcia took my antique Ford Thunderbird, it had a fair market value of at least NINE THOUSAND UNITED STATES DOLLARS ($9,000.00).

17.   "The antique Ford Thunderbird that Mr. Garcia took from my business without my consent was not a 1970's Thunderbird.  It was a 1963 model year, Ford Thunderbird.

18.   "I have sustained damages because of Mr. Garcia's negligence and/or intentional wrongful conduct, for which I now sue him.

19.   "All of the above statements are true and correct."

<u>AFFIDAVIT OF JOHN OCIE ROBERTS</u>                         No. B-01-34

## CERTIFICATE OF SERVICE

I, HUGO XAVIER DE LOS SANTOS, ESQ., attorney for John Ocie Roberts, Plaintiff, hereby certify that I served all other parties in this action with a correct copy of AFFIDAVIT OF JOHN OCIE ROBERTS IN OPPOSITION TO JOSE A. GARCIA'S MOTION FOR SUMMARY JUDGMENT  in a manner consistent with the FED.R.CIV.P. on June 17, 2002.

Further, this is to certify that all service via mail was by certified mail, return receipt requested [RRR], by depositing this document in an official depository of the United States Postal Service after enclosing this document in a postpaid, properly addressed envelope.   In addition, all service by telephonic document transfer was accomplished before 5:00 o'clock p.m. on the aforesaid date.

*City of Harlingen, Cameron County, Texas, Inspector Dan Serna, Individually, Inspector Ruben Mares, Individually, and Inspector Sam Gutierrez, Individually, Defendants*

c/o Mr. Ricardo J. Navarro, Esq.
222 E. Van Buren, Suite 405
Harlingen, Texas 78550-6804

*Method:*          U.S. Certified Mail, Return Receipt Requested
                   USPS Postal Receipt #7001 2510 0009 2698 3610


*JOSE A. GARCIA also known as Double A Wrecker Co., T & T Towing Service. T and T Wrecker Service, Defendant(s)*

c/o Mr. Curtis Bonner, Esq.
P.O. Box 288
Harlingen, Texas 78551-0288

*Method:*          U.S. Certified Mail, Return Receipt Requested
                   USPS Postal Receipt #7001 2510 0009 2698 3627

AFFIDAVIT OF JOHN OCIE ROBERTS _____ No. B-01-34

*La Feria Wrecker Service, Defendant*

c/o Mr. Michael R. Ezell, Esq.
312 East Van Buren/P.O. Box 2878
Harlingen, Texas 78551

*Method*:     U.S. Certified Mail, Return Receipt Requested
              USPS Postal Receipt #7001 2510 0009 2698 3597

*HUGO XAVIER DE LOS SANTOS*
*Attorney at Law*

By: _____
        HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.
        Texas Bar Identification #05653300
        U.S. Southern District Id. #11259

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227      FAX# (210) 737-1556

Attorney for John Ocie Roberts, Plaintiff

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
|        Plaintiff | § | |
| | § | |
|     v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE  A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
|        Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN OPPOSITION TO JOSE A. GARCIA'S
MOTION FOR SUMMARY JUDGMENT

# E X H I B I T  "ROBERTS-A"





IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN OPPOSITION TO JOSE A. GARCIA'S
MOTION FOR SUMMARY JUDGMENT

# E X H I B I T  "ROBERTS-B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN OPPOSITION TO JOSE A. GARCIA'S
MOTION FOR SUMMARY JUDGMENT

# E X H I B I T  "ROBERTS-C"





IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
|         Plaintiff | § | |
| | § | |
|     v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
|         Defendants | § | JURY |

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T  "D"

# Excerpts from the
City of Harlingen's
Sworn Answers to Interrogatories

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOHN OCIE ROBERTS                          *
                                           *
VS                                         *        C.A. NO. B-001-34
                                           *
CITY OF HARLINGEN, ET AL                   *

CITY DEFENDANTS' OBJECTION & RESPONSES
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES
_____

To:  Plaintiff, through counsel of record,
     Mr. Hugo Javier De Los Santos
     LAW OFFICE OF HUGH JAVIER DE LOS SANTOS
     6800 Park Ten Blvd Ste 123-N
     San Antonio, Texas 78213

     Comes now DEFENDANTS DAN SERNA, and the CITY OF HARLINGEN
(hereafter "CITY DEFENDANTS")  and file these Objections and
Responses to Plaintiff's First Set of Interrogatories pursuant to
the Federal Rules of Civil Procedure.

     SIGNED this  5th  day of October , 2001.

                              Respectfully submitted,

                              DENTON, NAVARRO & BERNAL
                              a Professional Corporation
                              Bank of America Building
                              222 E. Van Buren, Ste. 405
                              Harlingen, Texas 78550
                              956/421-4904
                              956/421-3621 (Facsimile)

                         By: _____
                              RICARDO J. NAVARRO
                              Attorney In Charge
                              State Bar No.14829100
                              So. Dist. ID No. 5953
                              MAURO F. RUIZ
                              State Bar No. 24007960
                              So. Dist. ID No. 23774
                              ATTORNEY FOR CITY DEFENDANTS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of this document has been sent by Certified Mail/Return Receipt Requested unless otherwise indicated, to the person(s) listed below on this 5th day of October, 2001.

Mr. De Los Santos          **By CMRRR No. 7000 1670 0013 4633 8344**
LAW OFFICES OF HUGO XAVIER DE LOS SANTOS
6800 Park Ten Blvd Ste. 123-N
San Antonio, Texas 78213

RICARDO J. NAVARRO
MAURO F. RUIZ

Roberts-Defendants Harlingen and Serna's Objections and Responses to Interrogatories                    Page 2

description, involved in the preparation of your responses and answers to these interrogatories. Be sure you state each person's full name, business and home address and phone number, date of birth, social security number and driver's license number(s) and the state(s) of issuance. If more than one person is supplying the answers to these Interrogatories, identify which of these persons is answering each Interrogatory.

**ANSWER:** Dan Serna
Environmental Health Director
Health Department
502 E. Tyler
Harlingen, Texas 78550

2.    Please state the following:

(a)    your current full legal name and all the names which you have ever been known by;

Dan Serna

(b)    your current address and each address you have had during the last ten (10) years;

Dan Serna can be reached as the Health Department address above.

(c)    your social security number;

Objection. This discovery request is outside the scope of discovery as it is not relevant and not likely to lead to the discovery of admissible and relevant information. Said request is also burdensome.

(d)    your date of birth;

April 1, 1963

(e)    your driver's license number(s);

Objection. This discovery request is outside the scope of discovery as it is not relevant and not likely to lead to the discovery of admissible and relevant information. Said request is also burdensome.

gross aggregate limit and the amount remaining for this claim at this time, after reduction for payment of other claims.)

**ANSWER:**    Defendants will produce copy of the City's risk pool coverage.

9.    For each and every defense which you now assert or will assert in this action, please state fully, in detail, each and every factual basis for each and every such defense.

**ANSWER:**    The nature of this lawsuit, in which Plaintiff asserts federal state constitutional violations, and numerous state-law based causes of action, including negligence, conversion, trespass, penal code violations, against a municipality and its agents affords these Defendants the affirmative defenses set forth in Defendants' Answer to Plaintiff's Third Amended Original Complaint, including governmental immunity, qualified immunity, official immunity, legislative immunity, statutory caps, notice, and failure to exhaust remedies.

The City is not liable for intentional torts as per the Texas Tort Claims Act. Moreover, there is no evidence that the City engaged in a pattern and practice of violating the constitutional rights of its residents.

The individual defendant, Dan Serna, is entitled to qualified immunity and official immunity from suit and liability.

10.    Please identify and describe your position with and/or relationship with each of your co-defendants.

**ANSWER:**    Mr. Roy Rodriguez holds the position of Harlingen City Manager and is my supervisor.  I, Dan Serna, supervise Sam Gutierrez and Ruben Mares.  Connie De La Garza is the current Mayor of Harlingen.

11.    Please identify all occasions upon which you have had any face to face meetings and/or telephone conferences with MR. ROBERTS during the period beginning January 1, 1998 through the present.  (In your answer, for each such occasion, please: identify the purpose and nature of the visit or meeting; state whether the meeting or visit was in person or on the phone or by some other means; state the place where each such meeting/visit was held or the location where you were present while on the

a.   Identify each such witness and state the name and
     address of his employer or the organization with which
     he is associated in any professional capacity;

b.   State the field in which each such witness is to be
     offered as an expert, along with a summary of his
     qualifications within the field in which he/she is
     expected to testify;

c.   State the substance of the facts to which each such
     witness is expected to testify;

d.   State the substance of the opinions to which each such
     witness is expected to testify, along with the mental
     impressions and opinions held by such expert, a summary
     of the grounds for each opnion, the date and addresses
     of all reports rendered by such expert(s), and the
     facts known to the expert, regardless of when the
     factual information was acquired, which relates to or
     forms the basis of the mental impressions and opinions
     held by the expert;

e.   Provide disclosure of any materials prepared by any
     expert used or to be used for consultation, even if it
     was prepared in anticipation of litigation, if it has
     been reviewed by an expert who may be called as a
     witness; and

f.   Provide disclosure of any materials prepared for or
     presented to any such expert witness for his review in
     connection with this action or matter related to this
     action.

(Your answer to this interrogatory should provide all
information that is discoverable pursuant to Rules 26 (a)(2),
26(b)(1), 26(b)(4)(B) of the Federal Rules of Civil Procedure.)

**ANSWER:**   None at this time, however, City Defendants will
              supplement if necessary.

15.  Do you consider yourself to be an expert of any type?  If so,
     please explain fully.

**ANSWER:**   No.


16.  Please state everything you did at the Premises, and
identify the person that ordered or otherwise instructed you to go

Roberts Defendants Harlingen and Serna's Objections
and Responses to Interrogatories                        Page 8

to the Premises, at any time during the period beginning January 1, 1998 through the present.

ANSWER:    Pursuant to my instructions, inspectors of the Health Department were told to clean the premises made the subject of this lawsuit in July 2000.

17.  Please describe and identify all lawsuits and claims that have been filed against you that deal, concern or involve your position as a public servant, as an employee of the CITY OF HARLINGEN, CAMERON COUNTY, TEXAS or any other city, municipality, township, pueblo, or town, or as an inspector for the Harlingen Police Department or any other peace officer organization, and/or involved claims against you that dealt with the same or similar subject matter as is addressed in Plaintiff's Original Petition. (You are requested to please disclose the date, location and basic facts of, and the involved, including their legal representatives and insurers, the identity of all victims, the number of any lawsuit file and the court in which it as filed, the attorneys record in such lawsuit, and the outcome or final  disposition of each including the amount paid or judgment rendered.)


ANSWER:    None.


18.  Please identify each and every person or entity who you believe or contend is a potential party to this lawsuit and state the complete factual basis for your belief or contention that the individuals or entities listed are potential parties to this lawsuit.

ANSWER:    None at this time.

19.  Identify all persons or entities that have possession, custody, or control of documents relevant to this lawsuit and the documents over which they have possession, custody, or control.

ANSWER:    Other than the named non-City of Harlingen defendants, none.

20.   Please identify all persons that you spoke with about the taking (in any form or manner) of MR. ROBERTS's Personalty at the Premises, prior to the first occasions that you went to the Premises for the purpose of actually conducting, participating and/or supervising the seizing, confiscating, condemning, moving, relocating, transporting, impounding, or otherwise taking of MR. ROBERTS's Personalty at the Premises.

**ANSWER:**   I had conversations regarding the cleanup of the premises with City Manager Roy Rodriguez, City Attorney Brendan Hall, health inspectors Gutierrez and Mares, and Ruben Diaz of Public Works.

21.   Please identify all conferences and/or meetings, public, open, private and/or closed session, or otherwise, that you attended or participated in at any time during the period beginning January 1, 1998 through the present, at which the Premises, MR. ROBERTS'S Personalty at the Premises were discussed.

**ANSWER:**   I had conversations regarding the cleanup of the premises with City Manager Roy Rodriguez, City Attorney Brendan Hall, health inspectors Gutierrez and Mares, and Ruben Diaz of Public Works.

22.   Please identify all inventories you either ordered, instructed or recommended be made, kept or otherwise maintained, or that you participated in the actual making or keeping, of the personal property that was seized, confiscated, condemned, moved, relocated, transported, impounded, or otherwise taken or removed form the Premises by the Harlingen Police Department, or anyone acting on behalf of or at the instruction or request of the police department of the CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, at any time during the period beginning January 1, 1998 through the present, and state when and where you last saw each such inventory.

**ANSWER:**   See Videotape attached as Exhibit K to City Defendants' Responses to Plaintiff's Requests for Production; City Defendants' Response No. D to Plaintiff's Requests for Production.

23.   Please identify all persons that accompanied you on each occasion that you went to the Premises at any time during the period beginning January 1, 1998 through the present, and for each such person, state each and every occasion that you were went or were at the Premises, the date and time of same, and the purpose for your visit to the Premises and what you actually did at the Premises.

Roberts-Defendants Harlingen and Serna's Objections
and Responses to Interrogatories                        Page 10

**ANSWER:**   Dan Serna visited the premises on numerous occasions, but does not recall the persons who accompanied him and the dates and times of the visits.

24.   Please identify all reports, memoranda and documents that you made, drafted, prepared, recorded, taped, or otherwise generated or turned over to the Harlingen Police Department or CITY OF HARLINGEN, CAMERON COUNTY, TEXAS that has anything to do with the Premises, MR. ROBERTS and/or MR. Robert's Personalty at the Premises, and state when and where you last saw each such report, memoranda and document.

**ANSWER:**   See City Defendants Responses to Plaintiff's Requests for Production.

25.   To the extent not already identified, identify all documents to which reference was made in the course of preparing answers to these interrogatories.

**ANSWER:**   See City Defendants' Responses to Plaintiff's Requests for Production.

**END OF INTERROGATORIES**

VERIFICATION

STATE OF TEXAS        §

    BEFORE ME, the undersigned Notary Public, on this day personally appeared DANIEL SERNA who after duly identifying himself to me, stated under oath that he read the foregoing Answers to Interrogatories, that the Answers are his own and that these Answers were true and correct.

_____
DANIEL SERNA

    SUBSCRIBED AND SWORN TO BEFORE ME on this 5th day of _October_____ 2001.

NORMA G. DELGADO
Notary Public, State of Texas
My Commission Expires
NOV. 5, 2002

_____
Notary Public, State of Texas

STATE OF TEXAS              ]

COUNTY OF WILLACY      ]

     I hereby certify that all the foregoing copies of the above mentioned documents are true and correct copies, and are all incorporated by reference as if fully copied within the body of the brief.

John Ocie Roberts

SWORN TO, SUBSCRIBED AND ACKNOWLEDGED by John Ocie Roberts before me on June 27, 2002.

Notary Public, State of Texas

Leonor Hilda Ramirez
Printed Name
My Commission Expires: 10/15/2002

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
|         Plaintiff | § | |
| | § | |
|     v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
|         Defendants | § | JURY |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T   "E"

# Excerpts from the
# February 26, 2002, Oral Deposition of
# Dan Serna
# Taken in this Case

SEALED DOCUMENT

1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2              BROWNSVILLE DIVISION

3  JOHN OCIE ROBERTS,              *
          PLAINTIFF               *
4                                 *
   V.                             *      CIVIL ACTION
5                                 *      NO. B-001-34
   CITY OF HARLINGEN, CAMERON     *
6  COUNTY, TEXAS, CONNIE          *
   DE LA GARZA, INDIVIDUALLY,     *
7  CHIEF OF POLICE MICHAEL        *
   BLAKE, INDIVIDUALLY, ACTING    *
8  CITY MANAGER ROY RODRIGUEZ,    *
   INDIVIDUALLY, INSPECTOR DAN    *
9  SERNA, INDIVIDUALLY, LT. JIM   *
   SCHEOPNER, INDIVIDUALLY,       *
10 INSPECTOR RUBEN MARES,         *
   INDIVIDUALLY, INSPECTOR SAM    *
11 GUTIERREZ, INDIVIDUALLY,       *
   LA FERIA WRECKER SERVICE,      *
12 DOUBLE A WRECKER CO.,          *
   T AND T WRECKER SERVICE, TIM   *
13 WILKINSON IRON & METAL, INC.,  *
          DEFENDANTS             *       JURY

14

15  *************************************************

16              ORAL DEPOSITION OF

17                 DAN SERNA

18            FEBRUARY 26 , 2002

19  *************************************************

20              ORIGINAL

21     ORAL DEPOSITION of DAN SERNA produced as a witness

22  at the instance of the Plaintiff  and duly sworn, was

23  taken in the above-styled and numbered cause on the

24  26th day of February, 2002, from 10:30 a.m. to

25  5:10 p.m., before Carolyn Newman, CSR in and for the

2

1  State of Texas, reported by oral stenography, at the

2  offices of Denton, Navarro & Bernal, 222 East Van Buren,

3  Suite 405, Harlingen, Texas, pursuant to the Texas Rules

4  of Civil Procedure and the provisions stated on the

5  record or attached hereto.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2   FOR THE PLAINTIFF, John Ocie Roberts

3         Mr. Hugo Xavier de los Santos
          ATTORNEY AT LAW
4         6800 Park Ten Boulevard, Suite 123 N.
          San Antonio, Texas  78213

5   FOR THE DEFENDANTS, City of Harlingen, Cameron County,
6   Texas, Connie de la Garza, Chief of Police Michael
    Blake, Acting City Manager Roy Rodriguez, Inspector Dan
7   Serna, Lt. Jim Scheopner, Inspector Ruben Mares,
    Inspector Sam  Gutierrez

8
          Mr. Ricardo J. Navarro
9         DENTON, NAVARRO & BERNAL
          222 East Van Buren, Suite 405
10        Harlingen, Texas  78550

11  ALSO PRESENT:

12        Mr. John Ocie Roberts, Plaintiff

13        Mr. Marte Guillen, Legal Assistant

14

15

16

17

18

19

20

21              * * * * * * * * * * * *

22

23

24

25

4

```
1                            INDEX
2                                                      PAGE
3    Appearances  . . . . . . . . . . . . . . .          3
4    DAN SERNA
5        Examination by Mr. de la Santos . . . . . .     5
6    Changes and Signature . . . . . . . . . . .        232
7    Reporter's Certificate . . . . . . . . . .         233
8
9                        EXHIBITS INDEX
10   NO.              DESCRIPTION                        PAGE
11   1    City Defendants' Objection & Responses to
          Plaintiff's First Set of Interrogatories .     26
12   2        Verification . . . . . . . . . . .          26
13
14
15
16
17
18
19
20
21
22
23
24
25
```

DAN SERNA,

2 having been first duly sworn, testified as follows:

3                        E X A M I N A T I O N

4 BY MR. DE LOS SANTOS:

5      Q.   Good morning, sir.

6      A.   Good morning.

7      Q.   My name is Hugo Xavier de los Santos.  I'm the

8 attorney for Mr. John Roberts, the plaintiff in this

9 case.  Do you understand that, sir?

10     A.   I do.

11     Q.   And you and I met for the first time here this

12 morning immediately preceding this deposition; is that

13 correct?

14     A.   That is correct.

15     Q.   I've never seen or met you before today; is

16 that right?

17     A.   That is correct.

18     Q.   However, you do know and have met Mr. John

19 Roberts, the plaintiff in this case, who is sitting to

20 my left over there at the end of the table; is that

21 correct?

22     A.   That is correct.

23     Q.   Sir, what is your full name?

24     A.   Daniel Serna.

25     Q.   No middle name?

1    A.    No.

2    Q.    And your address, sir?

3         MR. NAVARRO:  Business address.

4    Q.    (BY MR. DE LOS SANTOS)  Well, where do you

5    live -- what city do you live in?  Do you live in town?

6         MR. NAVARRO:  Town is fine.

7    A.    Harlingen.

8    Q.    (BY MR. DE LOS SANTOS)  And where do you work?

9    A.    The City of Harlingen.

10   Q.    And do you work at the municipal building, or

11   do you work somewhere else?

12   A.    The City Annex at 502 East Tyler.

13   Q.    And how long have you officed at the City

14   Annex?

15   A.    I would say approximately six years.

16   Q.    And what is your job title and position?

17         (Pause in proceedings at 10:32 a.m.)

18   A.    Environmental health and public buildings

19   director.

20   Q.    (BY MR. DE LOS SANTOS)  And how long have you

21   held that title?

22   A.    The title of environmental health director I've

23   held for approximately six years, public buildings

24   director in addition to that, three and a half.

25   Q.    So you actually hold two titles, then; is that

1    correct?

2        A.    Correct.

3        Q.    Do you get compensated for two different jobs,

4    or are you compensated for just one job?

5        A.    Just one salary for both.

6        Q.    When you received the additional title of

7    public buildings director, was there any change in your

8    salary?

9        A.    Yes.

10       Q.    An increase?

11       A.    Yes.

12       Q.    And was there any increase in the number of

13   hours that you had to work?

14       A.    No.

15       Q.    But you did take on additional duties and --

16       A.    -- and responsibilities.

17       Q.    -- responsibilities?  Sir, have you ever had

18   your deposition taken before today?

19       A.    Once, yes.

20       Q.    And when was that?

21       A.    I can't recall now.

22       Q.    Was it more than a year ago?

23       A.    It was -- I cannot recall.

24       Q.    What kind of case was it in that you gave --

25       A.    Regarding one of the employees involved in an

18

1    A.    That sounds about right.

2    Q.    And then you started with the City in about

3    1990?

4    A.    I believe it was '90.

5    Q.    Do you have any other jobs or business

6    interests?

7    A.    No.

8    Q.    In the position of public buildings director,

9    what are the general duties of the director?

10    A.    Supervise the maintenance employees,

11    maintenance staff on maintaining City-owned buildings and

12    facilities.

13    Q.    On a day-to-day basis, does the percentage of

14    time that you spend as public building's director versus

15    environmental health director vary a lot, or is it that

16    you do mostly one as opposed to the other?

17    A.    It varies depending on the need.

18    Q.    Is there an assistant director in either one of

19    those two departments?

20    A.    No.

21    Q.    So you're the main person; is that correct?

22    A.    That's correct.

23    Q.    And in your office how many employees work

24    under you?

25    A.    The question would be for public buildings and

1  environmental health or just --

2      Q.    At this time, it's for both, correct.

3      A.    I believe there's 32 employees.

4      Q.    And that would include laborers as well as

5  foremen and persons with other positions?

6      A.    That's correct.

7      Q.    Of the 32 people, how many are in environmental

8  health?

9      A.    That would include animal control.  That would

10  be 8, 9, 10, 11.

11      Q.    And how many folks are working under you in the

12  public buildings section?

13      A.    11.

14      Q.    Now, earlier I asked you what the duties of --

15  were as the environmental health director and you told

16  me you oversaw City ordinances and application of

17  ordinances or regulation of ordinances insofar as food

18  establishments and nuisance involve -- including the

19  overgrown-weed-lot ordinance and the junk-vehicle

20  ordinance, but you didn't mention animal control.  Is

21  animal control one other section?

22      A.    It is a section of environmental health, and

23  that is also my responsibility.

24      Q.    Okay.  Are there any other major items like

25  that?

1      A.    No, just those.

2      Q.    And when we say "food establishments," are we

3  talking about restaurants as well as grocery stores or

4  just restaurants?

5      A.    Both.

6      Q.    Sir, did you obtain a bachelor's degree?

7      A.    No.

8      Q.    Did you attend and finish high school at

9  Harlingen High School?

10     A.    Yes, I did.

11     Q.    You graduated about 1980?

12     A.    '81.

13     Q.    And who is your immediate superior or

14  supervisor?  Who do you report to?

15     A.    Roy Rodriguez.

16     Q.    And what is Mr. Rodriguez's position?

17     A.    The City manager.

18     Q.    Was Mr. Rodriguez the City manager in the first

19  half of the year of the year 2000?

20     A.    No.

21     Q.    Did you report and have as your supervisor the

22  City manager during the first half of the year 2000?

23     A.    I reported to the assistant City manager.

24     Q.    And who was that?

25     A.    Roy Rodriguez.

1       Q.   And why did you report to the assistant City

2   manager at the time as opposed to the city manager?

3       A.   That was the way the organization was set up at

4   that time.

5       Q.   When did it change?

6       A.   When Roy took over as City manager.

7       Q.   And when was that?

8       A.   A little -- I would say about a

9   year-and-three-months ago.

10       Q.   So that would take us to the fall or so of the

11   year 2000; does that sound right?

12       A.   That seems about right.

13       Q.   When was the first time that you ever meet --

14       A.   Excuse me.

15       Q.   Sure.  Bless you.  When was the first time you

16   ever met John Ocie Roberts?

17       A.   I don't remember --

18       Q.   Did --

19       A.   -- to be honest.

20       Q.   Did you meet Mr. Roberts for the first time

21   through your position with the City of Harlingen or did

22   you meet him socially somewhere?

23       A.   No, it was through the position.

24       Q.   Were you at the time acting as director of

25   either of these two departments, or was it prior to the

1    time that you took on either of the two directorships?

2        A.   Acting as director of environmental health.

3        Q.   Had you ever met Mr. Roberts while you were the

4    housing rehab specialist?

5        A.   No.

6        Q.   Had you ever met Mr. Roberts while you were the

7    construction project coordinator?

8        A.   No.

9        Q.   Had you ever met Mr. Roberts while you were a

10   building inspector?

11       A.   No.

12       Q.   As a building inspector back in the year 1990,

13   did you ever have occasion to go to the property located

14   at 1726 North Commerce?

15       A.   Not that I recall.

16       Q.   Are you familiar with the property located at

17   1726 North Commerce?

18       A.   Yes.

19       Q.   And what is 1726 North Commerce?

20       A.   At the present time?

21       Q.   Okay.  Let's start with the present time.

22       A.   At the present time, it's a vacant piece of

23   property at the corner of Markowsky and Commerce.

24       Q.   When is the last time that you went to that

25   particular property?

1    A.   I drove by that property I would say last week

2  sometime on my way to the animal shelter.

3    Q.   And does that property lie between the animal

4  shelter and your office on a route that you would

5  usually take?

6    A.   There's -- that -- that is one route that I

7  usually -- I can take, yeah.  There's other routes.

8    Q.   And would it be fair to say that you'd take

9  that route on a regular basis, not necessarily all the

10  time, but often?



11    A.   I would say maybe once every two weeks, once --

12  once a week.

13    Q.   Have you noticed whether or not the grass is

14  growing or there are weeds growing on this particular

15  lot?

16    A.   On occasion.

17    Q.   And when's the last time you saw grass or weeds

18  to the extent that you would believe that it would

19  constitute -- in violation of the City ordinance?  I

20  believe your ordinance number is 93 -- Chapter 93.

21    A.   That I can remember it's probably been a little

22  while.

23    Q.   When you say "a little while," are we talking

24  about months or years?

25    A.   No, months.

1   file.

2       Q.   Do you-all keep any memos or notes or

3   transcripts or anything else?

4       A.   Inspectors will from time to time make notes in

5   their logs, and they -- they maintain those.

6       Q.   So the inspectors themselves have logs that are

7   part of the City records; is that correct?

8       A.   That's correct.

9       Q.   And in those logs is a place where the

10  inspector will write down notes and things like that of

11  what he does and what he hears and says and that type of

12  thing?

13      A.   Just simple notes, which properties to mail

14  out, which ones are overgrown, which ones are in

15  violation prior to creating the master list.

16      Q.   Does anybody keep a diary on any particular

17  property on a regular basis?

18      A.   I'm not aware of any diary.

19      Q.   Insofar as the City of Harlingen is concerned,

20  what departments, if any, are you aware of that are

21  responsible for making sure that this Section 93 is

22  complied with?

23      A.   The environmental health department.

24      Q.   That's your department?

25      A.   That is my department.

27

1    Q.    Would you know or have knowledge of any other

2  department that would have any responsibility for making

3  sure that Chapter 93 is complied with?

4    A.    There is -- the planning department has a

5  code enforcement officer that from time to time will

6  address a nuisance in assisting.

7    Q.    That would be from the building codes

8  department?

9    A.    Planning department.

10    Q.    Planning department.  And who is the director

11  of the planning department?

12    A.    Michelle McCoy.

13    Q.    Was she the planning department director back

14  in the first half of the year 2000?

15    A.    Yes, she was.

16    Q.    Was she also the planning department director

17  in the second half of the year 2000?

18    A.    Yes, she was.

19    Q.    Did she participate or have anything to do with

20  the property at 1726 North Commerce during the year

21  2000?

22    A.    No.

23    Q.    Did she have anything to do with or participate

24  in any of the proceedings that the City took against the

25  property at 1726 North Commerce during the year 2000?

1   A.   No.

2   Q.   Did she have anything to do with the City's

3   dealings with Mr. John Ocie Roberts during the year

4   2000?

5   A.   No.

6   Q.   Was your department the department that was

7   responsible on behalf of the City of Harlingen to send

8   out any and all notices required by Chapter 93 and/or

9   any other ordinance or law or statute that the City

10  would rely on in connection with its dealing with John

11  Ocie Roberts during the year 2000?

12  A.   That's correct.

13  Q.   In your answers to discovery -- written

14  discovery in this case, I received a package entitled

15  "Answers to Interrogatories" that actually is entitled,

16  quote, "City Defendants'," plural possessive, "Objection

17  and Responses to Plaintiff's," single possessive, "First

18  Set of Interrogatories" dated October 5, 2001, and I'm

19  showing you this document.  I'm going to ask the court

20  report to mark it as Deposition Exhibit No. 1.  Have you

21  seen this document before today, sir?

22       (Serna Exhibit 1 marked)

23  A.   I'm sure I have.  I just don't remember.

24       (Serna Exhibit 2 marked)

25  Q.   BY MR. DE LOS SANTOS)  Sir, I removed from

1  that document what I'm going to ask the court reporter

2  to mark as Deposition Exhibit No. 2, which was the very

3  last page to that document, and I would like to direct

4  your attention to Deposition Exhibit No. 2, and I'm

5  pointing here to a line that bears a signature above the

6  name Daniel Serna.  Is that your signature, sir, above

7  the name Daniel Serna?

8       A.   That is my signature.

9       Q.   It indicates here that you are swearing that

10  the answers set forth in that document, Deposition

11  Exhibit No. 1, are true and correct and you did so on

12  October 5 of 2001 before this notary, Norma G. Delgado.

13  Do you see that, sir?

14       A.   I do there.

15       Q.   And did you do that?

16       A.   Yes.

17       Q.   And did you do that in front of Ms. Delgado?

18       A.   Yes, I did.  I remember now.

19       Q.   May I, sir?

20       A.   Sure.

21            THE WITNESS:  Do you have a copy?  I don't

22  have a copy.

23            MR. NAVARRO:  You don't have a copy?

24            THE WITNESS:  I'm sure I do.  It's in here

25  somewhere.

34

1  the time he was the assistant City manager, correct?

2      A.   That's correct.

3      Q.   And you told me that you also spoke with City

4  attorney Brendan Hall and health inspectors Gutierrez

5  and Mares and Ruben Diaz of public works.  Was there

6  anybody else that you spoke with about taking the

7  property belonging to Mr. Roberts that was located at

8  1726 North Commerce prior to the first occasions that

9  you actually went to the premises for the purposes of

10 actually taking the property?

11     A.   I believe that's everybody.

12         MR. NAVARRO:  And, Counsel, with respect

13 to City Attorney Hall, we have no objection to questions

14 relating to factual dates of contact with Mr. Hall.  The

15 substance of any conversations --

16         MR. DE LOS SANTOS:  If I ask the question,

17         do you object?

18         MR. NAVARRO:  -- with Attorney Hall,

19 we'll -- we'll object on attorney-client privilege.

20         MR. DE LOS SANTOS:  All right, sir.

21     Q.   (BY MR. DE LOS SANTOS)  Mr. Serna, as the

22 director of your department, you have told me that your

23 department was in charge.  So as the director, you would

24 have been in charge of handling the situation, if you

25 will, involving 1726 North Commerce and/or Mr. Roberts,

3

1  correct?

2      A.    Correct.

3      Q.    When was it that the City decided or that you

4  decided -- or let me back up.  Whose decision at the

5  City of Harlingen would it have been to undertake or to

6  commence an undertaking against either Mr. Roberts or

7  1726 North Commerce insofar as what you perceived was a

8  Chapter 93 violation?

9      A.    It would be mine along with agreement from our

10  City attorney.

11      Q.    So you would have been the individual to make

12  the decision to proceed, and you would have sought

13  counsel from the City attorney?

14      A.    Correct.

15      Q.    Did you, in fact, make that decision in the

16  year 2000, or did you make it prior to the year 2000,

17

18      A.    Notices had been sent to this property dating

19  way back to '96.

20      Q.    When was the first time that you sought the

21  counsel of the City attorney insofar as this property i

22  concerned or Mr. Roberts is concerned?

23      A.    With regards to the actual cleanup, I have it

24  in here, yeah.  (Witness examining documents)  I have a

25  note here on July 19th of 2000.

39

1      Q.   And you give the actual instructions to do

2  whatever is going to be done; is that right?

3      A.   That's correct.

4      Q.   You noted that early in your testimony here

5  today that -- you say that notices had been sent out

6  dating way back to, quote, "1996." Do you remember

7  saying that?

8      A.   Yes, I do.

9      Q.   When was it that you as director made the

10  decision something drastic had to be done insofar as

11  1726 North Commerce or Mr. Roberts is concerned?

12      A.   "Drastic" -- by "drastic" you mean remove the

13  debris on the property?

14      Q.   Well, let's -- let's use your definition.

15  That's -- that's appropriate. So if that's your

16  definition of drastic, I will adopt it for purposes of

17  the question. When was it that you made that decision?

18      A.   It would have been sometime around July.

19      Q.   Of what year?

20      A.   2000.

21      Q.   Would it be fair to say that prior to July of

22  2000, in particular during the years '96 through '99,

23  that you as director had not decided that, in using your

24  definition of "drastic measures," that drastic measures

25  were not necessary?

40

1    A.   Notices were sent as far as removing the debris

2  from the property.  I hadn't made that decision, no.

3    Q.   And so is it fair to say, sir, that during the

4  years '96 through '99 that you as director had the

5  opinion that taking those types of measures were not

6  necessary during the time period, '96 though 99, insofar

7  as 1726 North Commerce and John Roberts are concerned?

8    A.   There was more that went into that.  With

9  regards to the decision, it was a matter of could we do

10  it at that time, physically.

11    Q.   So then you had thoughts or inclinations or you

12  were considering taking such measures during the years

13  '96 through '99; is that correct?

14    A.   If -- if the corrections weren't made by the

15  property owner; that's correct.

16    Q.   Well, were the corrections made?

17    A.   No.

18    Q.   And yet you didn't taken any action; is that

19  correct?

20    A.   That's correct.

21    Q.   But you considered taking action; is that

22  right?

23    A.   That's correct.

24    Q.   Why did you not take action?

25    A.   Again, budgetary reasons.

48

1      Q.    And was that bill forwarded to Mr. John

2   Roberts?

3      A.    It was sent to Union Pacific as owner of the

4   property.

5      Q.    If we have the sequence of events correct, let

6   me ask you if it's true, then, that you, Mr. Serna, as

7   director of the environmental health department for the

8   City of Harlingen, were the individual that made the

9   decision in the year 2000 to clean up the property and

10   to seize personalty there at 1726 North Commerce?  But

11   the way that happened is that you made the decision, and

12   then you instructed your personnel in your department,

13   and then you also sought out the public works

14   department, Mr. Diaz ,for assistance in doing the job

15   that you decided was going to be done; is that correct?

16      A.    That's correct.

17      Q.    Did you ever at least speak with the

18   City manager, Mr. Rodriguez or with Ms. Prim, at any

19   time before you made that decision?

20      A.    I talked to Roy, assistant City manager at that

21   time.

22      Q.    And did you talk to him before you actually

23   made the decision and gave the first order to go to the

24   property and either start cleaning it up insofar as

25   cutting grass or weeds or insofar as taking personalty

1  you could also call Mr. Diaz in on this?

2       A.   No, actually, that was my idea.

3       Q.   And did you pass it by Mr. Rodriguez?

4       A.   I advised him that I was going to use public

5  works from the standpoint of trying to save some money.

6       Q.   At the time did you hold the directorship of

7  both departments that you hold today?

8       A.   Let's 2000.  Yes.

9       Q.   And how does public works differ from

10 public buildings director?

11      A.   Public works handles sanitation, streets,

12 drainage.

13      Q.   Whereas you only handle the -- the upkeep of

14 buildings?

15      A.   Upkeep of buildings.

16      Q.   Isn't it true that in January of 2000 in the

17 first of that month that there was a shooting at

18 1726 North Commerce?

19      A.   That's correct.

20      Q.   And is it also true that 1726 North Commerce is

21 a lot that's about 510 or so, maybe 520 feet long and

22 about 200-and-some-odd feet deep?

23      A.   I would say yes to that.  I'm not certain as to

24 the dimensions.

25      Q.   Okay.  I would direct your attention the

51

1    document that you produced, and let me give you the page

2    number.  It's on page 30.  Have you seen page 30 before

3    today?

4         A.    I'm certain I have.

5         Q.    And that would be true of all 196 pages that

6    you-all produced, correct?

7         A.    That's correct.

8         Q.    Now, here on page 30, this appears to be a

9    surveyor's plat or depiction of the property in

10   question -- specifically 1726 North Commerce; is it not?

11        A.    That's what it appears to be.

12        Q.    And it shows there a Markowsky Road, and it

13   shows a frontage of the property of 512 feet and

14   actually a little bit more, maybe 513 -- 512.92; is that

15   right?

16        A.    That's correct.

17        Q.    And it shows the depth of the property being

18   229.6 feet, about 230 feet deep, correct?

19        A.    That's what it shows, yes.

20        Q.    And on there it shows that there used to be an

21   existing warehouse.  Is that the area or the location of

22   the warehouse that burned down on January 1st, 2000?

23        A.    It appears that -- that way.

24        Q.    And you had visited this property on numerous

25   occasions throughout the years from 1996 through the

52

1   year 2000, and you've even driven by there as of the

2   present; is that true?

3        A.   I visited the property a few times, a few

4   occasions.  I've driven by the property on numerous

5   occasions.

6        Q.   On the few occasions that you actually visited

7   the property, what is your best estimate of the number

8   of times that you've actually been there?

9        A.   It's just a guesstimate.  I would say maybe 15,

10  20.

11       Q.   And of those 15 or 20 times, how many of those

12  visits were before you made the decision to remove

13  property or personalty belonging to Mr. Roberts from

14  1726 North Commerce?

15       A.   I would say of those 20 -- and that's just a

16  guesstimate -- I would guesstimate 10 or 15.

17       Q.   The majority of them, is that correct?

18       A.   That's correct.

19       Q.   And how many times after you made the decision

20  did you go out there?

21       A.   I'd say about five times.

22       Q.   And in the 10 or 15 visits that you had at the

23  property before making this decision, how much total

24  time did you spend at the property among all of those

25  visits?

53

1      A.    Personally?

2      Q.    Yes, sir.

3      A.    And -- and again this is just a guesstimate.  I

4  would say each visit on average five minutes with the

5  exception of the final five.

6      Q.    So is it true, then, sir, that with respect to

7  the visits that you made to the property up to the date

8  that you made the decision to remove the personalty at

9  1726 North Commerce, your visits there were limited to

10  five minutes or less, approximately?

11     A.    Approximately.

12     Q.    You may have had a ten-minute visit, you may

13  have a one-minute visit, but you most certainly didn't

14  have an hour visit, correct?

15     A.    That's correct.

16     Q.    Could you have had a half-hour visit there

17  before?

18     A.    That's possible.

19     Q.    Now, with respect to the visits that you had to

20  the property after you made the decision, the five times

21  that you indicated, were those lengthy or short?

22     A.    Some were half-an-hour to 45 minutes; others,

23  approximately 20, 25 minutes.

24     Q.    Any very brief ones like two or three minutes

25  or five minutes?

1    Q.   Isn't it true also that section 93.05 likewise

2  does not mention the environmental health department,

3  the public buildings department, the public works

4  department, any of the inspectors in your particular

5  office, nor does it mention the master list, does it?

6    A.   That's true.

7    Q.   So insofar as the routine and the procedure,

8  the policies, if you will, other than Chapter 93, the

9  City really has not promulgated or given you a schedule

10 of outlines or procedures or policies that you're to

11 follow in implementing Chapter 93; is that true?

12              (Mr. Roberts enters the room)

13    A.   Other than direction to enforce the ordinance.

14    Q.   (BY MR. DE LOS SANTOS)  Is it true?

15    A.   True.

16    Q.   When you say "direction to enforce the

17 ordinance," did you receive that in writing?

18    A.   The environmental health director position is a

19 position within the ordinance, an established position,

20 and it's to enforce these ordinances given to me by the

21 City Manager.

22              MR. DE LOS SANTOS:  I'm going to object

23 because it's not responsive.

24    Q.   (BY MR. DE LOS SANTOS)  Did you receive the

25 direction to enforce Chapter 93 in writing?

1          MR. NAVARRO:  He just answered the

2  question.

3          MR. DE LOS SANTOS:  It's either yes or no

4  Counsel.

5          MR. NAVARRO:  No, it's not.  He's

6  testified that it's his job to enforce the ordinance.

7  That's his direction.

8      A.   My job description dictates.

9      Q.   (BY MR. DE LOS SANTOS)  All right.  So then

10  it's in your job description?

11     A.   And it is in writing.

12     Q.   And did you sign your job description?

13     A.   I accepted the position.

14     Q.   And did you sign it?

15     A.   I signed accepting the position assuming

16  responsibility for the job description and the

17  responsibility.

18     Q.   And did you take an oath to fulfill your job?

19     A.   An oath?

20     Q.   Yes, sir.

21     A.   Just --

22     Q.   An oath of office?

23     A.   -- just an agreement on the acceptance of the

24  position.

25     Q.   Did you get requested or required to file an

123

1   taller than 24 inches.  They're cultivating the plants.

2   We're talking strictly grass, something that would

3   harbor rodents, that would pose a nuisance.

4       Q.   A lot of the palm trees in the Valley in the

5   old days, they were not cultivated and they just grew at

6   will.  So would those be considered weeds?

7       A.   We wouldn't cut those down, no.

8       Q.   Is there a rule, a procedure, or anything in

9   writing that the City promulgates to define weeds?

10      A.   Simply overgrown weeds, something that's not

11  cultivated.

12      Q.   But it's -- that's not a --

13           MR. DE LOS SANTOS:  I'm going to object,

14  sir, as not responsive.

15      Q.   (BY MR. DE LOS SANTOS)  Is there a rule or a

16  procedure in writing that the City has that defines the

17  word "weeds" as it's meant to defined for purposes of

18  93.03(A)?

19      A.   It's not defined in the ordinance, no.

20      Q.   Is it defined anywhere else?

21      A.   No.

22      Q.   Is the word "rubbish" defined anywhere?

23      A.   Not in the ordinance.

24      Q.   And is the word "brush" defined anywhere by the

25  City of San -- of Harlingen with respect to 93.03(A)?

1    A.   Not in the ordinance, no.

2    Q.   Anywhere else?

3    A.   No.

4    Q.   Is the word "unsightly matter" defined

5  anywhere?

6    A.   No.

7    Q.   Has the City of Harlingen ever heard the term

8  "Beauty is in the eyes of the beholder"?

9    A.   I have.

10   Q.   You might consider my gut unsightly, but I

11 think it's beautiful.  In either event I hope I don't

12 get cited for 93.03(A) violation.  Maybe we can cite

13 your lawyer's office building.

14            MR. NAVARRO:  We'll let you have some fun

15 with your sidebar remarks, but --

16            MR. DE LOS SANTOS:  There you go.  We will

17 move on.

18            THE WITNESS:  And you notice I left it

19 alone.  I -- I didn't --

20   Q.   (BY MR. DE LOS SANTOS)  I appreciate that

21 smile.  All right, sir.  Let's move on with the serious

22 questions.  I apologize.

23            "Any person," it says here, "firm or

24 corporation".  Do you have any definitions for "persons,

25 firm, or corporation" in writing from the City of

126

1    Q.    "Unsanitary matter," have you ever seen the

2  definition for that?

3    A.    No.

4    Q.    And when you say "accumulate," if

5  Mayor De La Garza has a couple of weeds in his yard, are

6  we going to cite him, or how many weeds does he have to

7  have by the time you decide you're going to cite

8  somebody?

9    A.    As a rule if they're over 12 inches, he'll

10  receive a notice, and he has.

11    Q.    For just one weed?

12    A.    If it's overgrown, it's overgrown.

13    Q.    And when you say "overgrown," I don't see that

14  word in this 93(A) anywhere, do you?

15    A.    No.

16    Q.    Who decided that it there was overgrown?

17    A.    That's something we

18  decided as a policy.

19    Q.    When did you decide that?

20    A.    It's been decided before I got to the

21  department.

22    Q.    Who told you?

23    A.    It was passed on.  Once I took over that was

24  just the typical.

25    Q.    Who passed it on to you?

136

1   how many of those does the City of Harlingen claim that

2   Mr. Roberts actually received?

3       A.   All of them.

4       Q.   And what proof, if any, does the City of

5   Harlingen have that Mr. Roberts received the notice that

6   is on page 5?

7       A.   Most of these notices were not returned, and

8   that is really the only proof.

9       Q.   So what you're saying is that the notice on

10  page 5 was not returned?

11      A.   No, this is a copy.  I believe this is a copy.

12      Q.   Where is there any proof on page 5 that it was

13  even mailed?

14      A.   It's not on here.

15      Q.   There's no delivery confirmation here, is

16  there, is it, on page five?

18      Q.   There's also not even a United States Postal

19  Service postmark on here, is there?

20      A.   No, that's on the originals.  These are copies.

21      Q.   Now, is there anybody's initials or anything

22  indicating here that they actually mailed it and put it

23  in a post office box?

24      A.   Page 7.

25      Q.   On page 5?

137

1        A.    Page 5.

2        Q.    Now, is what I see here on page 5 the front and

3    back of a postcard?

4        A.    Correct.

5        Q.    And here, this one is dated -- or it has a date

6    up towards the top of 1/8/99 underneath the words

7    "Harlingen, Texas."  Is that supposed to be the date

8    that this card was supposedly made?

9        A.    And mailed out, correct.

10        Q.    Well, where does it say it's been mailed out

11    that day?

12        A.    They -- they get mailed out the same day

13    they're processed.

14        Q.    Well, isn't possible that the card may not have

15    actually been mailed out?

16        A.    The possibility does exist, yes.

17        Q.    Is there a record anywhere where

18    somebody certifies that this card was actually, in fact,

19    taken to either the United States Postal Service and

20    given to the United States Postal Service postman for

21    delivery in the U.S.P.S. mails or dropped off at a

22    United States Postal Service depository so that it could

23    be mailed in the U.S.P.S.?

24        A.    This particular one, it doesn't appear so other

25    than this is just a copy.

1       Q.   Well, there's no record, is there, sir?

2       A.   I think I answered there, on this one

3  particular one.

4       Q.   Well, let's look at number 6.  You mentioned

5  the center of number 6, and for purposes of the record,

6  page 5 has nothing copied on the back of page 5,

7  correct?

8       A.   Correct.

9       Q.   Page 6, however, does have something copied on

10 the back, correct?

11      A.   Correct.

12      Q.   All right.  And page 6 again is apparently a

13 copy of three different cards; is that right?

14      A.   Correct.

15      Q.   All right.  Here's a card in the middle, which

16 is the one I think you referenced me to, and that's the

17 one that has after the word Harlingen, comma, TX you

18 have 10, dash, 23, dash, zero, zero; is that right?

19      A.   That's correct.

20      Q.   Now, is there any record anywhere that somebody

21 certifies that they actually mailed this particular card

22 or the original of it on --

23      A.   Again --

24      Q.   -- at any time?

25      A.   -- this is just a copy.  Of this particular

139

1  copy, no.

2      Q.   Now, is there any others on page 6 addressed to

3  Mr. Roberts or sent to Mr. Roberts?

4      A.   The top of the page, the carbon copy of the one

5  that went out to Southern Pacific.

6      Q.   And what address was that sent?

7      A.   I would -- I would assume that the Route 2,

8  Box --

9      Q.   You would assume?

10     A.   300.  I would assume.

11     Q.   There's no record then of what address, if any,

12 it was actually sent to, correct?

13     A.   It's the same one.  As you notice both cards,

14 that is the address it was sent to, 10/23/00, the same

15 date on both cards.

16     Q.   Is what you're saying is --

17     A.   -- this is a copy of the card.

18     Q.   Let me see if I've got this correct.  The card

19 up at the top was actually mailed to Southern Pacific,

20 and on the same day, they generated another card and

21 that's the one that's in the middle that was --

22     A.   -- sent out --

23     Q.   -- supposed to have been sent to John Roberts?

24     A.   That's correct.  That's what it appears.

25     Q.   So we have no record anywhere of anybody

140

1  certifying or confirming under oath or in writing or
2  otherwise that this -- this card -- either of these
3  three cards on page 6 were actually deposited with the
4  United States Postal Service for mailing?
5      A.  That's correct.
6      Q.  Going on to page 7 which I believe is the next
7  page you told me that you had.  On page 7 I see three
8  different cards or what appears to be three copies of
9  three different cards, and in this case, I see three
10  different postage meter marks and one official McAllen,
11  Texas, United States Postal Service mark on the one in
12  the middle.  Let me just rephrase my question now.  Sir,
13  on the card up at the top, I see -- or what appears to
14  be a copy of the card up at the top, I see a date -- or
15  what appears to be date, 4/8/99.  Is that supposed to
16  have been a date?
17      A.  Yes.
18      Q.  Then I see a meter mark.  Do you-all have a
19  meter at your office?
20      A.  Yes, we do.
21      Q.  So you have a meter there and you just run your
22  mail through that meter; is that right?
23      A.  That's right.
24      Q.  And then when you actually drop it in the mail
25  and it comes back to you, you will get a postmark like

141

1  the one here and the one in the middle where it says

2  "McAllen, Texas".  You-all didn't put that mark on

3  there, did you?

4      A.   No.

5      Q.   Your mark is the one that says, "Harlingen,"

6  correct?

7      A.   That's correct.

8      Q.   So the United States Postal Service will affix

9  their mark canceling out the postage like the one there

10  at McAllen, Texas, on the document in the middle which

11  is dated -- am I reading that correctly, December 10th,

12  1998?

13      A.   That's correct.

14      Q.   Now, I note that on the one on the top,

15  somebody put a line through the name John Roberts and

16  through the address and there's a stamp that appears to

17  be a United States Postal Service stamp that says

18  "Return to sender," and it says, "Insufficient address."

19  Do you see that?

20      A.   I -- I see that.

21      Q.   Did you-all ever make note that that address

22  was not a good address?

23      A.   That is the address we had and --

24      Q.   Where did you get that address?

25      A.   I don't know.  Apparently from -- I don't know.

1  look like these copies?

2      A.  Correct.

3      Q.  All right.  Now, the actual originals, then, on

4  these that you have, these came back in the mails, and

5  you have this P.O. Box address on here that you sent it

6  out in December, and then you sent it out to that same

7  address in April.  Isn't somebody in your office suppose

8  to check those addresses when -- when these cards are

9  coming back?

10     A.  If that is the address that we have on record,

11 that's the address that we have to use.

12     Q.  I note that the document that's on page 5, the

13 one that there's no record of anybody ever mailing it,

14 it indicates an address that's P.O. Box 1319, Houston,

15 Texas, 78251, just like the ones there on page 7, and

16 it's dated right in between the December and April one.

17 So if it was an insufficient address in those other two

18 months, are you sure it isn't possible that you have the

19 actual original back at your office marked insufficient

20 address and you just didn't find it when you went

21 looking for it?

22     A.  No, if we had it, she would have produced it --

23 we would have produced it.

24     Q.  Now, I looked at another down here on page 7,

25 "Undeliverable as addressed, unable to forward," John

144

1    Roberts, P.O. Box 1319, San Antonio, Texas.  Now, that's

2    a great city, but, you know, where did you-all get that

3    address?

4        A.    I don't know.

5        Q.    That one is apparently dated September 15th,

6    '98?

7        A.    Yes.

8        Q.    Well, back in '98, the Post Office is saying

9    "Please advise your correspondents of your correct

10   address.  Undeliverable as addressed."  Nobody in your

11   office is going to notice that somebody's telling you to

12   correct the address?

13       A.    Again, that's the address that we had on

14   record.

15       Q.    So even if you guys know it's a bad address,

16   you just keep sending them?

17       A.    We have to use the address on record.

18       Q.    And who determines the address on record?

19       A.    The Appraisal District.

20       Q.    The Appraisal District?

21       A.    In Mr. Roberts' case, apparently, that change

22   was done to -- to our system as per his request, and I

23   say that because there's a note on here, "Change per

24   Ruben."  That's Ruben Mares, the inspector.

25       Q.    Which note, sir?

145

1      A.   Okay.  Let's see, the 4/8/99, page 7 on the top

2  as to 1726 North Commerce, you have it?  It says,

3  "Change per Ruben"?  That would be my inspector, Ruben

4  Mares.  When I asked Ruben about that, evidently,

5  Mr. Roberts had made the request to change it to that

6  address.  I don't know why the request was made, but

7  that's what Ruben advised me.

8      Q.   When did Ruben advise you of that?

9      A.   Oh, this must have been sometime in '99 or

10 2000.  Again, these are generated.  Like many times I

11 don't see these notices.

12     Q.   Now, it indicates there, though, "Change per

13 Ruben 11/12/96."  So Ruben's getting instructions to

14 change this address back on November 12th of 1996 and

15 he's just now telling you about it three or four years

16 later; is that correct?

17     A.   That's correct.

18     Q.   And so he has this fresh in his memory that

19 Mr. Roberts told him to change it?

20     A.   Evidently.

21     Q.   Did he get it in writing from Mr. Roberts to

22 change the address?

23     A.   I did not ask him that.

24     Q.   How did he confirm that it was even Mr. Roberts

25 asking for the change of address and not some third

1  person who wanted to do Mr. Roberts wrong?

2      A.   Well, he knows Mr. Roberts.

3      Q.   On the phone?

4      A.   No, he knows him personally.  They've met at

5  the property.

6      Q.   Well, that's my whole point.  Does he know

7  Mr. Roberts personally back in 1996 that well to be able

8  to know that whoever may have called him in to -- that

9  supposedly that made this address change that you're

10  just verifying it like that without anything in writing?

11     A.   Well, back in '96 I don't know what he had.

12     Q.   How will does Mr. Mares know Mr. Roberts?

13     A.   I don't know how well they know each other.

14     Q.   Well enough to hate him?

15     A.   I can't answer that.

16     Q.   Sir, so, then, all the ones on page 7, you got

17  the card so Mr. Roberts, in fact, never received those,

18  correct?

19              MR. NAVARRO:  Objection.  You can answer

20  to the best of your knowledge.

21     A.   To the best of my knowledge, they cam back

22  undeliverable.

23     Q.   (BY MR. DE LOS SANTOS)  And you have them there

24  in your office?

25     A.   We should have them there in our office, yes.

147

1    Q.   Do any of those cards bear Mr. Roberts'

2  signature on them or initials?

3    A.   No.

4    Q.   Do any of those cards indicate that Mr. Roberts

5  received them?

6    A.   No.

7    Q.   Moving onto page 8, sir.  Well, let's see, you

8  did tell me page 8, and that would be the -- one in the

9  middle and the one at the bottom, correct?

10    A.   Correct.

11    Q.   Here we have one dated 4/16/99, which

12  apparently was sent eight days after the one on page 7

13  that's at the top which was 4/8/99, and this one comes

14  back on that P.O. Box 1319 as saying, "Forwarding order

15  expired."  Do you see that?

16    A.   Yes, I do.

17    Q.   And then you have that you sent in January of

18  2000 to that same address, and that was one says,

19  "Insufficient address."  Do you see that, sir?

20    A.   I do.

21    Q.   So you have both of those cards back at your

22  office, correct?

23    A.   That -- that's correct.

24    Q.   Do either of those cards have any evidence to

25  show that Mr. Roberts, in fact, received those?

148

1      A.   No.

2      Q.   And did anybody at your office make any change

3   in Mr. Roberts' address as of April of 1999?

4      A.   No.

5      Q.   And did the system address change at your

6   office with respect to Mr. Roberts as of January 2000

7   from the address that you had back in April of '99?

8      A.   January 2000?

9      Q.   Yes, sir.

10     A.   Jumping forward.

11     Q.   It's on page 8.

12     A.   It went back to the property owner.

13     Q.   No, sir, that's not my question.  My question,

14   sir, is, as of January of 2000, had you changed the

15   address that you had on your system for Mr. Roberts, the

16   address that you had back in April of '99 of P.O. 1319

17   out over there in Houston?

18     A.   We mailed the notices to the property owners as

19   of January 2000.  Does that answer your question?

20     Q.   No, sir.  It is not responsive.

21          MR. DE LOS SANTOS:  So I object.

22     Q.   (BY MR. DE LOS SANTOS)  My question is, the

23   address for John Roberts, have you changed it as of

24   January 2000.

25     A.   We do have an address for him.

149

1    Q.   As of January 2000 what is the address that you

2  had for Mr. Roberts?

3    A.   It's a route and box number.  Let me look it

4  up.  Route 2, Box 300, Rabb Road.  This went out in

5  July.

6          MR. DE LOS SANTOS:  I'll object to the

7  last part as being nonresponsive.

8          MR. NAVARRO:  The answer is responsive to

9  your question.

10         MR. NAVARRO:  I'm sorry, Counsel, it is

11 not.

12         MR. NAVARRO:  Well, it is --

13         MR. DE LOS SANTOS:  My question was --

14         MR. NAVARRO:  -- it is.

15         MR. DE LOS SANTOS:  -- very specific.

16         MR. NAVARRO:  No, it wasn't.  He --

17         MR. DE LOS SANTOS:  Yes, it was.

18         MR. NAVARRO:  -- answered the question.

19         MR. DE LOS SANTOS:  No, sir, he did not.

20 My question was very specific.  What was the address

21 that they had in January of 2000.  Now he's talking

22 about July.  I want to know about January.  It's not

23 responsive.  If they had the La Feria address in

24 January, he can tell me that.

25    A.   I don't know if we had it in January.  No, we

1  did not have it in January.  I don't believe so.  I

2  don't recall.

3       Q.   (BY MR. DE LOS SANTOS)  All right, sir.  If you

4  look at your page 8, the document that's in the center,

5  sent to Mr. Roberts at the P.O. Box in Houston.  Again,

6  insufficient address and it's returned back to you.  Is

7  that the address that you had for Mr. Roberts in January

8  of 2001 in Houston, Texas?

9       A.   That's the address that was -- that's on this

10 card, so that's the address we had.

11      Q.   Did you send any notice to Mr. Roberts in

12 January of 2000 to any other address other than

13 P.O. Box 1319, Houston, Texas 78251?

14      A.   I'll have to go through all these if you'll

15 give me some time.

16      Q.   Absolutely.

17            MR. DE LOS SANTOS:  We'll take a short

18 coffee break.

19            MR. NAVARRO:  We'll take a break.

20            (Recess from 3:05 p.m. to 3:20 p.m.)

21      Q.   (BY MR. DE LOS SANTOS)  Mr. Serna, we just took

22 another short break.  Are you ready to proceed, sir?

23      A.   Yes, I am.

24      Q.   You understand you're still under the same oath

25 and rules and so forth as we discussed earlier?

151

1       A.   Yes, I do.

2       Q.   Mr. Serna, we're going through notices that

3  were sent out that you have here in your file, and I'd

4  like to get back to that if you don't mind, please.

5  There on pages 7, 8, and 9 is where we left off.  With

6  respect to the notices that appear on page 8, are these

7  like the ones that are on page 7, that is that you have

8  the originals back at your office, the ones that appear

9  on page 8 in the center and the bottom?

10      A.   Yes.

11      Q.   And these cards also don't bear any evidence

12  that Mr. Roberts actually got either of these two; is

13  that correct?

14      A.   That's correct.

15      Q.   And the next page that you cited me was page 9.

16  I see here on page 9 that there are three -- copies of

17  three different cards respectively dated from top to

18  bottom apparently March or August 24th of '98.  Can you

19  tell you what date that is?

20      A.   It looks like 24.

21      Q.   is it August or March?

22      A.   March.

23      Q.   Of '98, an then the next one in the middle is

24  10/10/97?

25      A.   Yes.

1     Q.   Okay.  If you'll look at that notice, it also

2  has a different phone number for you or your department

3  anyway, the health department, 427-8813 as opposed to

4  427-8812, which appears on the back of page 8.  The

5  first appeared on the back of page 9.  Which is the

6  correct phone number?

7     A.   We have four numbers for that department.

8  Anyone of those numbers goes to that department.

9     Q.   So both numbers are still good?

10    A.   Yes, to this day.

11    Q.   Did they perhaps pick up an older set of cards

12  that didn't have your name on them or --

13    A.   That may have been the case.

14    Q.   Now, I note, however, that the ones on page 10

15  that date back to '96, those, in fact, had Eleazar

16  Gonzalez's name on them.

17    A.   Eleazar was still there.

18    Q.   And that's on the back of page 10, correct?

19    A.   Correct.  Yes.

20    Q.   I also note that in 1997 if you look at the

21  ones on page 9, the one for July, you have the address

22  of P.O. Box 1319.  Do you see that, sir?

23    A.   Yes.

24    Q.   Yet June 9th of '97 on page 10 you had an

25  address for John Roberts as 1726 North Commerce.  Do you

1    see that, sir?

2        A.    Yes, I do.

3        Q.    And that's the actual physical address of -- of

4    the place we're talking about, correct?

5        A.    Right.

6        Q.    Now, with respect to the three cards that are

7    on page 9, there is no evidence or documentation here or

8    anywhere else to confirm and establish that these three

9    cards were, in fact, deposited with the United States

10   Postal Service for mailing, correct?

11       A.    Correct.

12       Q.    And the same thing holds true of the cards

13   that -- or the copy of the cards that appear on page 10;

14   is that right?

15       A.    That's correct.

16       Q.    And the same thing holds true with respect to

17   the cards that appear on page 11; is that also true?

18       A.    That's correct.

19       Q.    Sir, would it make sense to send out notice to

20   the property address if you had that address for

21   Mr. Roberts at one time?

22              MR. NAVARRO:  Objection; dual questions.

23       Q.    (BY MR. DE LOS SANTOS)  You can answer.

24       A.    The property address and the mailing address

25   sometimes are different.

Q.   Would it make any sense, though, for you to send them to both addresses?

A.   That's -- that's -- that would make more sense. It is a budgetary -- within the budgetary restraints.

Q.   Now, in this particular case, on the notices that we had that were returned to you that appear there on page 8, for example, and page 7, had you seen those at anytime prior to the time that this file packet was put together in September 2001?

A.   I don't recall seeing them.

Q.   Have you --

A.   I may -- I may have.  I just don't recall.

Q.   Well, when you made the decision in July 2000 to have property removed, that is without Mr. Roberts' specific consent from the property, had you taken a look to see whether or not you had these notices in the file?

A.   For the July cleanup, we have the letters on file.  Those are the other letters that we -- -- indicated.

Q.   Well, in respect to these cards, had you noticed whether or not you had those cards at the time you made that decision?

A.   We're still talking about the cleanup of July and October, right?

Q.   That would be either July or October.  I'm

179

1  working off of this list right here.

2      Q.  Was there anything else other than the vehicles

3  that you decided to remove in July of 2000?

4      A.  No.

5      Q.  So in July of 2000, the only thing that you

6  decided to have removed from the premises of 1726 North

7  Commerce were the vehicles that were located at that

8  address belonging to Mr. Roberts in July of 2000; is

9  that correct?

10     A.  That's correct.

11     Q.  Now, the notice that you have referred me to is

12 found on pages 78 through 82 of the production

13 materials, and it appears that the first page, 78, is a

14 letter on the City of Harlingen letterhead proclaiming

15 the City of Harlingen the capital of the Lower

16 Rio Grande Valley.  While other towns here in the

17 Rio Grande Valley may agree or disagree with that,

18 that's neither here or there, but the point is that this

19 letter is addressed to South Pacific Transportation and

20 apparently dated 2/2/2000, correct?

21     A.  Correct.

22     Q.  Is there any other notice that you would have

23 relied on back in July of 2000 when you made that

24 decision?

25     A.  No, I believe this is the notice that I relied

1   on.

2        Q.   Sir, are you familiar with the statutory

3   definition in the Texas Revised Civil Statutes for

4   antique vehicles?

5        A.   For antique vehicles?

6        Q.   Yes, sir.  Are you familiar with it?

7        A.   No.

8        Q.   Have you ever read the statutory definition for

9   antique vehicles?

10       A.   No.

11       Q.   And that would be the statutory definition as

12   defined in the Texas statutes.

13       A.   No.

14       Q.   Do you have any of the Texas statutes available

15   to you at your offices?

16       A.   No, we work off of the ordinances.

17       Q.   And that's just that book that you told me

18   where you had --

19       A.   Code of ordinances.

20       Q.   -- those City ordinances, right?

21       A.   Uh-huh.

22       Q.   And the code of ordinances that you have, is it

23   a complete book or just excerpts of the ones that you

24   work with, I mean, 93, 94, and 111?

25       A.   It is a complete book.

1    Q.    That letter in this particular case is the one
2  that appears at page 78 dated February 2nd, 2000, that
3  was sent to the -- the Nebraska address; is that
4  correct?
5    A.    Sent to -- yes.
6    Q.    That's Southern Pacific Transportation,
7  correct?
8    A.    Correct, correct.
9    Q.    So no other notice was sent after the vehicles
10  were seized giving the owner an opportunity to redeem
11  the vehicles or the property, correct?
12    A.    Correct.
13    Q.    Does the City do any other type of
14  recordkeeping with respect to these vehicles other than
15  what we see here in your Exhibit D?
16    A.    No, this is the extent.
17    Q.    Do you make any reports to the Department of
18  Motor Vehicles or the Texas Department of Transportation
19  and Safety?
20    A.    We make inquires on ownership of vehicles.
21    Q.    Did you make any inquires in this case?
22    A.    Yes, we did, and you have those forms.
23    Q.    Where are those inquiries?
24    A.    I'll give you an example of one on page 48, the
25  junk-vehicle-information form in the middle of the form,

212

1  copy of what you made when you sent it, and the one on

2  page 6 is copy of what you actually got back in the mail

3  if you even sent it out?

4      A.  I don't see the postmark on that copy, so I

5  don't believe either one -- I think both of them are

6  copies.  Just one is enlarged and one's a -- was reduced

7  in size when copied.

8      Q.  So --

9      A.  For some reason -- for some reason it was

10  duplicated.

11      Q.  Is it possible that the documents that are

12  copied on pages 5 through 11 that that's a copy of the

13  record of what you actually have insofar as the actual

14  cards themselves are concerned in your file as far as

15  the ones on pages 12 through 20 are copies that were

16  made of the cards as they were attempted to be mailed or

17  were suppose to be mailed?

18      A.  That's a possibility.

19      Q.  Certainly you agree, though, that the one on

20  page 6 at the middle of the page is the same as the one

21  on the top of the page on page 20?

22      A.  Yes, I do agree to that.

23      Q.  And getting back to this property here on

24  page 30, what's across the street on Commerce from the

25  Bargain Barn?

1  me about set up across Markowsky Road, are there any

2  other structures out there?

3      A.    Not that I'm aware of.

4      Q.    Sir, I'm going to now direct your attention to

5  the document that appears on pages 21 through 30,

6  including that diagram.  What is that?

7      A.    I'm reading this, and it says, "A Commercial

8  Lease."

9      Q.    And did you take this document out of your

10  files?

11     A.    Yes, I did.

12     Q.    And is that the file that you-all had on

13  1726 North Commerce?

14     A.    This was in addition to the file.  This came

15  from the law office for Union Pacific.

16     Q.    And when did you get this?

17     A.    I don't recall when we got this.  I think

18  there's a note.  I don't remember when I got -- when I

19  received a copy of it.

20     Q.    There's a letter from the attorney --

21     A.    Marjorie Bassel.

22     Q.    -- for -- correct.  Did you get it with a

23  letter from her addressed to you?

24     A.    That may be true.

25     Q.    Or did you have it before that or after, or do

221

1       A.   Correct.

2       Q.   You didn't participate in going out and making

3  the list of these vehicles --

4       A.   That's correct.

5       Q.   -- did you?  Mr. Mares did?

6       A.   Correct.

7       Q.   Do you know whether or not this list of

8  vehicles is -- has been verified by anybody else other

9  than Mr. Mares?

10      A.   By Tony.  There was a witness.  That's --

11  that's why his signature is on the forms as well.

12      Q.   You're talking about the forms that are in

13  Exhibit D?

14      A.   Correct.

15      Q.   Now, did the City send any kind of notice after

16  it went -- and I'm going to move now to October.  After

17  it went in October to take the property, did it send any

18  kind of notice to Mr. Roberts that it was going to allow

19  him to redeem any of his property at that time?

20      A.   After the original notices, the only other

21  notice that was sent was to -- the answer to your

22  question would be no.

23      Q.   Okay.  Thank you.

24      A.   The only other notice would be to Union

25  Pacific.

1    Q.   Do you know remember that letter?

2    A.   No.

3    Q.   Well, let me locate it for you.

4         MR. GUILLEN:  It's 176.

5    Q.   (BY MR. DE LOS SANTOS)  176.  Let's see, no,

6    178.  I apologize.  Well, it's somewhere in there.

7         MR. GUILLEN:  169.

8         MR. DE LOS SANTOS:  169.  Let's see if we

9    can get this right.  Yeah, that's it, definitely.

10   Q.   (BY MR. DE LOS SANTOS)  All right.  Now I'm

11   talking about the letter that appears at page 169.  Was

12   this letter that you produced in this case a letter that

13   was in your file for 1726 North Commerce or for

14   Mr. Roberts?

15   A.   I'm sorry.  What was your question?

16   Q.   Yes.  Was this letter a letter that was in your

17   file for 1726 North Commerce pertaining to Mr. Roberts?

18   A.   Yes.

19   Q.   All right.  I note that this indicates on 7/19,

20   the very day you made your decision, all right?  It has

21   the name in handwriting, Roy, and down, apparently

22   directing it to Roy, and it says, quote, "Please CK,"

23   and it looks like this, and I would interpret that as

24   "Please check this."  "Mr. Roberts" -- and it's got a

25   phone number 797-0027 -- "states he had never received

224

1   any notice at all.  Thanks, Connie."  You see that?

2       A.   Yes, I do.

3       Q.   Do you recognize that as Connie de la Garza's

4   handwriting?

5       A.   Ah.

6       Q.   You don't know?

7       A.   No, I don't.

8       Q.   So you can't tell us either way, correct?

9       A.   No.

10      Q.   Is that true?

11      A.   That's true.

12      Q.   All right, sir.  so I would suggest to you that

13  this is Mayor de la Garza's handwriting and that he is

14  giving this to Roy de la -- Rodriguez, and it's there on

15  that date, July 19th of 2000, and it's a letter that was

16  delivered to the City of Harlingen back in May of 2000

17  indicating that he's bringing this complaint,

18  Mr. Roberts is, concerning notice on his property.  Now,

19  had you not seen this letter before you made your

20  decision?

21      A.   I'm sure I did.

22      Q.   Oh, you had considered it before you made your

23  --

24      A.   I'm-- I'm --

25      Q.   -- decision?

225

1    A.    -- sure I did see the letter.  I just don't

2    remember it now.  I still don't remember, but the date

3    on top is July 19th of 2000.

4    Q.    Correct.

5    A.    I know the date on his letter.

6    Q.    May 1st.

7    A.    I don't see a -- where it was received by the

8    City at that time.

9    Q.    And --

10    A.    It has received on May the 4th.

11    Q.    -- the City -- with this letter, the City got

12    it in May of 2000.  It had an address for Mr. Roberts

13    listed down -- what is the address that's set forth

14    there underneath his name?

15    A.    1726 North Commerce.

16    Q.    What city?

17    A.    Harlingen, Texas 78550.

18    Q.    So if this letter was in your file and you'd

19    seen it before Mr. de la Garza got it and before

20    Mr. de la Garza handed it to Roy, you had it in your

21    files at least a different address for Mr. Roberts; is

22    that right?

23    A.    Yeah.  Evidently, yeah.

24    Q.    So none of the notices, however, that you sent

25    to Mr. Roberts went to 1726 North Commerce, right,

232

## CHANGES AND SIGNATURE

### JOHN OCIE ROBERTS V. CITY OF HARLINGEN, ET AL

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 142 | 19 | yes | improper grammar for each |
| 142 | 21 | yes, these are the originals, we---we should | |
| 156 | 11 | yes | |
| 158 | 16 | for personal use? yes. | |
| 158 | 23 | at times, yes | |
| 160 | 25 | yes, I believe so. | |
| 174 | 16 | yes, they use whoever is available, correct | |
| 180 | 21 | yes | |
| 204 | 1 | yes, I do | |
| 225 | 23 | yes, evidently | |

I, DAN SERNA , have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_Daniel Serna_
DAN SERNA

THE STATE OF TEXAS        *
COUNTY OF CAMERON          *

     Before me, _Oneida P Saldivar_ , on this day personally appeared DAN SERNA, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

     Given under my hand and seal of office this 3rd day of _April_ , 2002.

[Notary Seal: ONEIDA P SALDIVAR, NOTARY PUBLIC, State of Texas, Comm. Exp. 06-22-2004]

_Oneida P Saldivar_
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

233

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   JOHN OCIE ROBERTS,              *
             PLAINTIFF               *
 4                                   *
     V.                              *        CIVIL ACTION
 5                                   *        NO. B-001-34
     CITY OF HARLINGEN, CAMERON      *
 6   COUNTY, TEXAS, CONNIE           *
     DE LA GARZA, INDIVIDUALLY,      *
 7   CHIEF OF POLICE MICHAEL         *
     BLAKE, INDIVIDUALLY, ACTING     *
 8   CITY MANAGER ROY RODRIGUEZ,     *
     INDIVIDUALLY, INSPECTOR DAN     *
 9   SERNA, INDIVIDUALLY, LT. JIM    *
     SCHEOPNER, INDIVIDUALLY,        *
10   INSPECTOR RUBEN MARES,          *
     INDIVIDUALLY, INSPECTOR SAM     *
11   GUTIERREZ, INDIVIDUALLY,        *
     LA FERIA WRECKER SERVICE,       *
12   DOUBLE A WRECKER CO.,           *
     T AND T WRECKER SERVICE, TIM    *
13   WILKINSON IRON & METAL, INC.,   *
             DEFENDANTS              *        JURY
14

15               REPORTER'S CERTIFICATION
                 DEPOSITION OF DAN SERNA
16                  FEBRUARY 26, 2002

17        I, CAROLYN NEWMAN, a Certified Shorthand Reporter

18   in and for the State of Texas, do hereby certify that

19   the facts stated by me in the caption hereto are true;

20   that the foregoing deposition transcript of DAN SERNA,

21   the witness hereinbefore named, was at the time

22   mentioned taken by me in stenograph, the said witness

23   having been by me first duly cautioned and sworn upon

24   his oath to tell the truth, the whole truth, and nothing
25
```

1  but the truth, and later transcribed from stenograph by

2  me.

3      I further certify that I am neither attorney or

4  counsel for, nor related to or employed by any of the

5  parties to the action in which this deposition is taken,

6  and further that I am not a relative or employee of any

7  attorney or counsel employed by the parties hereto, or

8  financially interest in the action.

9

10     I further certify that the above and foregoing

11 deposition transcript as set forth in typewriting is a

12 full, true and correct transcript of the proceedings had

13 at the time of taking said deposition.

14     Certified to by me this 15th day of March, 2002.

15

16

17    Taxable Per Cert.

18    1,379.95                 _____
                              Carolyn Newman
                              CAROLYN NEWMAN, Texas CSR 4193
19                            Expiration Date: 12/31/01
                              7800 IH-10 West, Suite 100
20                            San Antonio, Texas  78230
                              (210) 377-3027

21

22

23

24

25