United States District Court
Southern District of Texas
FILED

JUL 0 1 2002

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| **v.** | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE  A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

## PLAINTIFF'S FIRST AMENDED
## MOTION FOR PARTIAL SUMMARY JUDGMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, JOHN OCIE ROBERTS, plaintiff in the above-entitled and numbered cause, and moves the court to grant plaintiff partial summary judgment against defendants CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, INSPECTOR DAN SERNA, INDIVIDUALLY, INSPECTOR RUBEN MARES, INDIVIDUALLY, INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, LA FERIA WRECKER SERVICE, DOUBLE  A WRECKER CO., T & T TOWING SERVICE and T AND T WRECKER SERVICE, jointly and severally, and in support whereof, would show unto the court as follows:

1.      Summary judgment is proper in this case because there is no genuine issue of any material fact and because Plaintiff JOHN OCIE ROBERTS is entitled to judgment as a matter of law.  Specifically, the ordinance upon which the defendants relied in seizing and taking plaintiff's personalty from 1726 North Commerce Street,

Harlingen, Cameron County, Texas, is unconstitutional, for it, as written and as applied, violates the plaintiff's due process rights, all in violation of the United States Constitution and the Constitution of the State of Texas. The ordinance in question provides for arbitrary notice, which amounts to no notice at all. The ordinance allows the seizing official to chose whom to send notice to, either (a) the owner of the personalty that is to be seized, or (b) the realty owner. Nothing in the ordinance provides any guiding principles in the making of this choice, nor does the oridinance in question assure that the owner to be affected by the proposed city action, to wit the personalty owner, be given notice or afforded a hearing. It does not require that notice be given to the owner of the personalty to be seized and disposed of, even when the identity and whereabouts of the personalty owner is known. Since the ordinance in question violates the constitutional safeguards afforded to the Plaintiff, the defendants seized and removed the plaintiff's personalty from the premises without any legal authority or justification therefor. Therefore, the taking of the property was unlawful and violative of the plaintiff's legal rights.

2.     In the case at bar, defendant CITY OF HARLINGEN, CAMERON COUNTY, TEXAS [hereinafter sometimes referred to as "CITY"] knew the whereabouts of the owner of the personalty that it sought to, and did in fact, seize. Yet, defendant CITY's officials, at the direction of Dan Serna, chose not to send notice to the personalty owner and opted, instead, by arbitrary choice, to send notice to the realty owner. The realty owner did not own the personalty that the CITY sought to, and did, in fact, seize from 1726 North Commerce Street, Harlingen, Cameron County, Texas. The said personalty belonged to JOHN OCIE ROBERTS. Furthermore, no notice whatsoever was sent to the owner, JOHN OCIE ROBERTS, at 1726 North Commerce Street, Harlingen, Cameron County, Texas. No notice was given to the owner despite the fact that he regularly and routinely operated his business and fre-

quented the said premises during the year of seizure at 1726 North Commerce Street, Harlingen, Cameron County, Texas. The owner, JOHN OCIE ROBERTS, could have easily been found by CITY at the said premises; however, CITY chose not to give the owner of the personalty notice. Consequently, the owner of the personalty, JOHN OCIE ROBERTS, was deprived of his personalty without due process of law. No notice and no opportunity to be heard were afforded JOHN OCIE ROBERTS. JOHN OCIE ROBERTS never knew what complaint the CITY had that would authorize the CITY to do what it did, wipe out his inventory completely and shut down him down.

3.    This motion is based on the attached brief in support/memorandum of points and authorities, the attached summary judgment evidence, and all pleadings and papers on file. In addition, the following exhibits are attached hereto, incorporated herein and moved and offered in evidence in support of this motion for summary judgment:

| Exhibit | Description |
|---------|-------------|
| A | Chapter 93, City of Harlingen -- Ordinance in Question |
| B | Affidavit of John Ocie Roberts in Support of Plaintiff's Motion for Partial Summary Judgment |
| C | Affidavit of John Ocie Roberts in Opposition to Jose A. Garcia's Motion for Summary Judgment |
| D | Excerpts from the City of Harlingen's Sworn Answers to Interrogatories |
| E | Excerpts from the February 26, 2002, Oral Deposition of Dan Serna, Taken in this Case |

4.    WHEREFORE, PREMISES CONSIDERED, Plaintiff JOHN OCIE ROBERTS prays that this Court declare the ordinance in question which does not specifically state who is to be given notice if the City desires to seize and remove personalty from a private citizen's place of business or residence, and grant summary judgment in favor of Plaintiff JOHN OCIE ROBERTS on the issue of liability, and for such other

PLAINTIFF'S 1ST AMENDED MOT FOR PARTIAL SUM JDGMNT    No. B-01-34

and further relief which the Plaintiff may be justly or equitably entitled to or which the court deems appropriate under the circumstances.

Respectfully submitted,

**HUGO XAVIER DE LOS SANTOS**
*Attorney at Law & C.P.A.*

Date:  June 27, 2002

By: _____
HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.
Texas Bar Identification #05653300
U.S. Southern District Id. #11259

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227    FAX# (210) 737-1556

Attorney for John Ocie Roberts, Plaintiff

<u>PLAINTIFF'S 1ST AMENDED MOT FOR PARTIAL SUM JDGMNT</u>    <u>No. B-01-34</u>

## <u>CERTIFICATE OF SERVICE</u>

I, HUGO XAVIER DE LOS SANTOS, ESQ., attorney for John Ocie Roberts, Plaintiff, hereby certify that I served all other parties in this action with a correct copy of PLAINTIFF'S FIRST AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT   in a manner consistent with the FED.R.CIV.P. on June 27, 2002.

Further, this is to certify that all service via mail was by certified mail, return receipt requested [RRR], by depositing this document in an official depository of the United States Postal Service after enclosing this document in a postpaid, properly addressed envelope.   In addition, all service by tele-phonic document transfer was accomplished before 5:00 o'clock p.m. on the aforesaid date.

*<u>City of Harlingen, Cameron County, Texas, Inspector Dan Serna, Individually, Inspector Ruben Mares, Individually, Inspector Sam Gutierrez, Individually, Defendants</u>*:

c/o Mr. Ricardo J. Navarro, Esq.
222 E. Van Buren, Suite 405
Harlingen, Texas 78550-6804

*Method*:          U.S. Certified Mail, Return Receipt Requested
                        USPS Postal Receipt #7001 2510 0009 2698 3382

*<u>La Feria Wrecker Service, Inc., Defendant</u>*:

Mr. Michael R. Ezell, Esq.
312 East Van Buren/P.O. Box 2878
Harlingen, Texas 78551

*Method*:          U.S. Certified Mail, Return Receipt Requested
                        USPS Postal Receipt #7001 2510 0009 2698 3375

*<u>Double A Wrecker Co., T & T Towing Service, T and T Wrecker Service, Defendant(s)</u>*:

Mr. Curtis Bonner, Esq.
P.O. Box 288
Harlingen, Texas 78551-0288

*Method*:          U.S. Certified Mail, Return Receipt Requested
                        USPS Postal Receipt #7001 2510 0009 2698 3368

PLAINTIFF'S 1ST AMENDED MOT FOR PARTIAL SUM JDGMNT    No. B-01-34

## HUGO XAVIER DE LOS SANTOS
### Attorney at Law

By: _____
    HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.
    Texas Bar Identification #05653300
    U.S. Southern District Id. #11259

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227    FAX# (210) 737-1556

Attorney for John Ocie Roberts, Plaintiff

*****************************************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

## PLAINTIFF'S FIRST AMENDED
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T   "A"

# CITY OF HARLINGEN
# ORDINANCE IN QUESTION

# CHAPTER 93:  NUISANCES

Section

| | |
|---|---|
| 93.01 | Stagnant water prohibited |
| 93.02 | Accumulation of carrion, filth, and the like prohibited |
| 93.03 | Excessive growth or accumulation of weeds and rubbish prohibited; wildlife habitat area exempted |
| 93.04 | Abatement required; notice |
| 93.05 | Service of notice |
| 93.06 | Correction or removal of conditions by city |
| 93.07 | Filing of statement of expenses incurred |
| 93.08 | Collection of expenses; lien |
| 93.99 | Penalty |

## § 93.01  STAGNANT WATER PROHIBITED.

It shall be unlawful for the owner of any lot or other real property in the city to allow or permit holes or places where water may accumulate and become stagnant to be or remain on such lot or premises or to allow or permit the accumulation of stagnant water thereon, or to permit the same to remain thereon.
('73 Code, § 18-69) (Ord. 60-22, passed, 8-3-60; Am. Ord. 60-34, passed 12-21-60)  Penalty, see § 93.99

## § 93.02  ACCUMULATION OF CARRION, FILTH, AND THE LIKE PROHIBITED.

It shall be unlawful for any person who shall own or occupy any house, buildings, establishment, lot or yard, or other real property in the city to permit or allow any carrion, filth, or other impure or unwholesome matter to accumulate or remain thereon.
('73 Code, § 18-70) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)  Penalty, see § 93.99

## § 93.03 EXCESSIVE GROWTH OR ACCUMULATION OF WEEDS AND RUBBISH PROHIBITED; WILDLIFE HABITAT AREA EXEMPTED.

(A) *Generally.* It shall be unlawful for any person, firm, or corporation who shall own or occupy any lot or other real property within the city to allow weeds, rubbish, brush, or other unsightly, objectionable, or insanitary matter to accumulate or grow on such lot or property. Any person owning a parcel of property of one acre or more and whose property abuts a lot on which is maintained a single- or multi-family residence adjacent to which there is no dedicated street or alley can remedy or remove the condition by mowing of 150 feet in depth along that portion of the parcel that fronts upon the residential property line.

(B) *Wildlife habitat area; exemption.* In addition, any person owning a parcel of one acre or more can request in writing to the City Commission that the parcel be designated a wildlife habitat area and thus will be exempt from the requirements of this section regarding the removal of weeds and brush. The criteria and requirements are as follows:

(1) *Definitions.* For the purposes of this division, the following terms are hereby defined:

(a) *MANAGEMENT PLAN.* A detailed plan describing what steps the property owner will take to maintain the wildlife habitat area.

(b) *QUALIFIED WILDLIFE OR PLANT EXPERT.* A person recognized by both the private parcel owner and the city as an expert on local wildlife or plant life.

(c) *WILDLIFE HABITAT AREA.* A parcel so designated by a majority vote of the City Commission.

(d) *WILDLIFE HABITAT AREA SIGN.* An official on-site sign that will be used to designate an approved wildlife habitat area. The design and wording of this official sign will be subject to a majority vote of the City Commission.

(2) *Designation as a wildlife habitat area; criteria.*

(a) The parcel must be a minimum of one acre in size.

(b) The parcel must be clear of rubbish, junk, or litter.

(c) Property taxes on the parcel must be current.

(3) *Procedures.*

(a) The applicant must submit a written request to the City Secretary's office. This request must include a written statement from a qualified wildlife or plant expert detailing the reasons why the parcel should be designated as a wildlife habitat area and a detailed management plan addressing the maintenance of the habitat area.

(b)  The City Secretary shall schedule a City Commission hearing on the request and notify all property owners within 200 feet of the parcel. The qualified wildlife or plan expert shall represent the applicant at this hearing. The City Commission may designate the parcel as a wildlife habitat area by a majority vote.

(c)  If the parcel is so designated, the City Manager shall cause to be erected wildlife habitat area signs on the parcel. A sign must face each public street. All costs incurred during the construction and installation of the signage will be paid by the parcel owner.

(d)  Once designated as a wildlife habitat area, the Health Department shall periodically inspect the property to ensure compliance with the approved maintenance plan. If noncompliance is found, the wildlife habitat designation can be removed by a majority vote of the City Commission, and the owner of the parcel shall thereafter comply with the requirements of this section by removing weeds and brush thereon. Property owners may make a written request to the City Commission to remove the wildlife habitat area designation, and the removal of such designation shall be granted by the Elective Commission.

(e)  The owner of any wildlife habitat area must maintain the area clear of all rubbish, junk, and litter.
('73 Code, § 18-71) (Ord. 60-34, passed 12-21-60; Am. Ord. 86-82, passed 11-5-86; Am. Ord. 90-45, passed 5-2-90; Am. Ord. 91-50, passed 10-15-91) Penalty, see § 93.99

## § 93.04  ABATEMENT REQUIRED; NOTICE.

Whenever any condition described in this chapter is found to exist on any premises or real property within the city, the owner of such premises or real property shall be notified by the city, in writing, to correct, remedy, or remove the conditions within ten days after such notice and it shall be unlawful for any person to fail to comply with such notice.
('73 Code, § 18-72) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60) Penalty, see § 93.99

## § 93.05  SERVICE OF NOTICE.

The notice provided for in this section shall be served personally on the owner to whom it is directed or shall be given by letter addressed to such owner at his last known post office address. In the event personal service cannot be made and the owner's address is unknown, such notice shall be given by publication at least two times within ten consecutive days in a newspaper of general circulation published within the city.
('73 Code, § 18-73) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)

## § 93.06  CORRECTION OR REMOVAL OF CONDITIONS BY CITY.

In the event the owner of any lot, premises, or real property upon which a condition described in this chapter exists fails to correct, remedy, or remove such condition within ten days after notice to do so is given in accord with this chapter, the city may do such work or make such improvements as are necessary to correct, remedy, or remove such conditions, or cause the same to be done, and pay therefor and charge the expenses incurred thereby to the owner of such lot. Such expenses shall be assessed against the lot or real estate upon which the work was done or the improvements made. The doing of such work by the city shall not relieve such person from prosecution for failure to comply with such notice in violation of § 93.04.
('73 Code, § 18-74) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)

## § 93.07  FILING OF STATEMENT OF EXPENSES INCURRED.

Whenever any work is done or improvements are made by the city under the provisions of § 93.06, the City Manager or City Health Officer, on behalf of the city, shall file a statement of the expenses incurred thereby with the County Clerk. Such statement shall give the amount of such expenses and the date or dates on which the work was done or the improvements were made.
('73 Code, § 18-75) (Ord. 60-22, passed 8-3-60)

## § 93.08  COLLECTION OF EXPENSES; LIEN.

After the statement provided for in § 93.07 is filed, the city shall have a privileged lien on the lot or real estate upon which the work was done or improvement made, to secure the expenses thereof. Such lien shall be second only to tax liens and liens for street improvements, and in accord with TEX. HEALTH & SAFETY CODE §§ 342.001 through 342.007. For any such expenditures and interest, suit may be instituted and recovery and foreclosure of the lien may be had in the name of the city and the statement of expenses made in accord with § 93.07, or a certified copy thereof, shall be prima facie proof of the amount expended for such work or improvements.
('73 Code, § 18-76) (Ord. 60-22, passed 8-3-60)

## § 93.99  PENALTY.

Any person who shall violate any of the provisions of this chapter shall be guilty of an offense and upon conviction shall be fined as provided in § 10.99 of this code and each and every day's violation shall constitute a separate and distinct offense, in case the owner or occupant of any lot, lots, or premises under the provisions of this chapter shall be a corporation, and shall violate any provisions of this chapter, the president, vice-president, secretary, treasurer of such corporation, or any manager, agent, or employee of such corporation shall be also severally liable for the penalties herein provided.
('73 Code, § 18-77) (Ord. 60-22, passed 8-3-60)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| **Defendants** | § | **JURY** |

## PLAINTIFF'S FIRST AMENDED
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T  "B"

# Affidavit of John Ocie Roberts
# in Support of
# Plaintiff's First Amended Motion for
# Partial Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

FIRST AMENDED AFFIDAVIT OF JOHN OCIE ROBERTS
IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| COUNTY OF CAMERON | § |

On June 27, 2002, JOHN OCIE ROBERTS, first being duly sworn, deposes and says:

1.  "I, JOHN OCIE ROBERTS, reside in the city of La Feria, county of Cameron, Texas. Following the City of Harlingen's taking of my property at 1726 North Commerce Street, Harlingen, Cameron County, Texas, I was forced to retire and am now presently retired. The name of my business at 1726 North Commerce Street, Harlingen, Cameron County, Texas was 'The Bargain Barn'. I am of sound mind and understand that this statement is made under oath. I have personal, first hand knowledge of the facts set forth herein unless otherwise stated. I have never been convicted of a felony or crime of moral turpitude. I am over the age of twenty-one years. I am competent and fully capable of making the following statements.

2.  "My business that was known as 'The Bargain Barn' was a business concern which extended about one half acre of warehouse and about an acre of open outside merchandise.

3.  "On January 1, 2000, I suffered a loss due to a fire. My warehouse was totally burned down; however, many items survived the blaze, such as an antique bell of about almost three (3) feet in size made of heavy bronze and dated in the early years of the 1800's. In addition, none of my merchandise inventory, including numerous antiques, located outside the building was damaged by the fire. I continued to operate my business with respect to the inventory kept on the business lot as before.

4.  "After the fire on January 1, 2000, although I suffered a fire loss which destroyed my

**AFFIDAVIT OF JOHN OCIE ROBERTS**                    **No. B-01-34**

business records and some of my inventory of antiques, I continued doing business. I still had a substantial inventory of antiquities which were kept on my business lot, which was fenced and gated, and kept under lock and key.

5.    "After the fire on January 1, 2000, I began packing salvaged antiques from the burned building on trailers in order to remove whatever items I could salvage.

6.    "Suddenly and without any prior knowledge, warning or notice, whatsoever, the City of Harlingen came in and onto my business premises located at 1726 North Commerce Street, Harlingen, Cameron County, Texas, and began removing and proceeded to and did in fact remover, seize and take all of my business merchandise inventory, personalty. The City wiped me out completely. They broke the lock on the front gate and entered the fenced and gated premises without my consent.

7.    "By taking all of my personalty, which was my merchandise inventory, from 1726 North Commerce Street, Harlingen, Cameron County, Texas, the City of Harlingen effectively shut me down.

8.    "The City of Harlingen has even removed my fence and my gates.

9.    "At no time did I receive any notice from the City of Harlingen or its officials, including Dan Serna, Ruben Mares, and Sam Gutierrez, that the City of Harlingen planned or proposed or otherwise intended to seize or take any of my personalty at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

10.   "At no time during the year 2000, did I receive any notice from the City of Harlingen or its officials, including Dan Serna, Ruben Mares, and Sam Gutierrez, that the City of Harlingen was charging me with any violation of any ordinance or law.

11.   "At no time during the year 2000, did I receive any notice from the City of Harlingen or its officials, including Dan Serna, Ruben Mares, and Sam Gutierrez, that the City of Harlingen was claiming that there was any violation of any ordinance or law at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

12.   "At no time during the year 2000, did I receive any notice from the City of Harlingen or its officials, including Dan Serna, Ruben Mares, and Sam Gutierrez, advising me that I had a right to a hearing, nor otherwise advising me of any appeals procedure within the City of Harlingen *vis a vis* 1726 North Commerce Street, Harlingen, Cameron County, Texas.

13.   "During the year 1999, prior to their taking of my property in 2000, I received no notice, whatsoever, from the City of Harlingen.

14.   "During the year 2000, prior to their taking of my property, I received no notice, whatsoever, from the City of Harlingen.

15.   "Dan Serna did not hand me notice, or otherwise notify me, that the City of Harlingen was planning to take my personalty located at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

16.   "Ruben Mares did not hand me notice, or otherwise notify me, that the City of Harlingen was planning to take my personalty located at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

17.  "Sam Gutierrez did not hand me notice, or otherwise notify me, that the City of Harlingen was planning to take my personalty located at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

18.  "During 2000, up until the time that the City of Harlingen began seizing, taking and removing my property from 1726 North Commerce Street, Harlingen, Cameron County, Texas, I was at this location on a regular basis. Anyone desiring to serve me with notice or to speak with me about any problems that the City may have claimed that it had with respect to my business operations could have readily sought me out at this location.

19.  "I confronted the city officials, the police chief and officers as to why the CITY was taking my inventory. I asked and demanded that they cease and desist from taking any more of my property. I was warned and promised arrest or criminal prosecution if I interfered with the city officials and their continued seizure of my merchandise and personalty located at 1726 North Commerce Street, Harlingen, Cameron County, Texas. I was told I could do nothing with my own merchandise. The City seized and took everything I owned, including substantial numbers of antiques. Among the personalty that the City took were antiques that were *not* motor vehicles.

20.  "I discovered that the City, the police and the various wrecker services took my trailers loaded with inventory.

21.  "Up until June 25, 2002, although I had often asked or inquired, no one had told me the whereabouts of any of my property which the City seized, took and removed from my business, all of which was done without any warning or notice to me. On the contrary, the City of Harlingen had reported that all of the personalty taken had been demolished. This latter statement has proven to be untrue, false and misleading.

22.  "Through the present date and time of this affidavit, none of my property has been returned to me by any of the defendants.

23.  "I was later given 'notice' of the removal of items *after* they had been taken, seized and removed from my premises; however, by that time, almost all of my personalty had been removed, seized and taken by the defendants.

24.  "I attempted to bring a temporary restraining order to preserve my personalty; however, the state district judges refused to act.

25.  "According to what Mr. Dan Serna stated in the deposition, the City of Harlingen sent notice of the need to remove the items to the owner of the real estate, said owner being the railroad. I am not the owner of the real property. I am not the railroad.

26.  "From what I am able to comprehend from Mr. Serna's deposition, the notices stated that if the area was not cleaned up of debris, grass and junk, the city would remove everything. I never received any such notice.

27.  "I never received any notice, nor did I have any knowledge of such a decision or letter from the City of Harlingen.

28.  "I did not have 'junk' on my premises. I also kept and maintained the premises on a regular basis. I had the grass cut or mowed periodically. I also cut or had the grass mowed on as needed basis. Furthermore, I did everything reasonably possible to keep

AFFIDAVIT OF JOHN OCIE ROBERTS                                NO. B-01-34

my business premises free of 'debris'.

29.   "During 2000, I did not have rodent, insect or other vermin infestations or rodent, insect or other vermin breeding sites at 1726 North Commerce Street, Harlingen, Cameron County, Texas.

30.   "I did not receive nor had I seen the letter dated July 28, 2000, that appears on the letterhead of the City of Harlingen, signed by Dan Serna and which letter is addressed to 'Southern Pacific' until a copy of it was produced by the defendants in this case in response to the request for production submitted to the defendants by my attorney, as page 0075.   The purported signature that appears on page 0077 of the defendants' production is not mine.  I did not sign that document.  The back side of this document (page 0077) which back side appears on page 0076 does not bear an official U.S. Postal Service mark.  Thus, it appears that the said document, appearing at pages 0076 and 0077, which defendant claims is a 'domestic return receipt' or 'green card', was not actually mailed to defendant City of Harlingen by the U.S. Postal Service as is ordinarily done with return receipt cards from the place where the card is signed by the recipient.  The certified mail number referenced under 'article number' on page 0077 is the same article number referenced on the letter (pg. 0075) for the mailing to 'Southern Pacific'.

31.   "I wrote a letter to the City of Harlingen, and I spoke to various officials and asked to be placed on the agenda, but I was refused.  The City of Harlingen has approved of and ratified Mr. Serna's actions against me and my personalty.

32.   "I delivered a letter to the City of Harlingen in May, 2000, which bore my then correct mailing address of 1726 North Commerce Street, Harlingen, Cameron County, Texas.  According to the deposition testimony of Dan Serna, the City of Harlingen sent no notices whatsoever to me at that address.

33.   "I lost my entire outside inventory and parts of the inventory of antiquities which I was able to salvage from the building, which inventory I had been collecting for years in order to set up a business to sell antiques and "hard to find" items.  I relied on this business for my support and had hoped that it would provide for my retirement.

34.   "All of the above statements are true and correct."

Further, affiant sayeth not.

JUAN CARLOS RUIZ
Notary Public
State of Texas
My Comm. Exp. 05/17/2003

_John Ocie Roberts_
JOHN OCIE ROBERTS,
Affiant

SUBSCRIBED and SWORN to before me on this ___27th___ day of
_____June_____, 20_02_.

[seal]

_Juan Carlos Ruiz_
Notary Public in and for the
State of Texas

Printed/Typed Name of Notary: _Juan Carlos Ruiz_
Notary's commission expires: _05_/_17_/_2003_

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
|        Plaintiff | § | |
| | § | |
|     v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
|        Defendants | § | JURY |

## PLAINTIFF'S FIRST AMENDED
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T  "C"

# Affidavit of
# John Ocie Roberts in Opposition to
# Jose A. Garcia's
# Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVI' | § | |
| DOUBLE A WRECKER CO. | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

## AFFIDAVIT OF JOHN OCIE ROBERTS
## IN OPPOSITION TO JOSE A. GARCIA'S
## MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| COUNTY OF CAMERON | § |

On June 17, 2002, JOHN OCIE ROBERTS, first being duly sworn, deposes and says:

1.  "I, JOHN OCIE ROBERTS, reside in the city of La Feria, county of Cameron, Texas. Following the City of Harlingen's taking of my property at 1726 North Commerce Street, Harlingen, Cameron County, Texas, I was forced to retire and am now presently retired. The name of my business at 1726 North Commerce Street, Harlingen, Cameron County, Texas was 'The Bargain Barn'. I am of sound mind and understand that this statement is made under oath. I have personal, first hand knowledge of the facts set forth herein unless otherwise stated. I have never been convicted of a felony or crime of moral turpitude. I am over the age of twenty-one years. I am competent and fully capable of making the following statements.

2.  "I was in the business of buying and selling antiquities, including antique motor vehicles, since 1964 until 2000. Although I am officially retired from the business of purchasing and selling antiquities, I continue to keep informed with

AFFIDAVIT OF JOHN OCIE ROBERTS _____   No. B-01-34

respect to the value and resale prices of antiquities. I am, from to time, called upon to give my opinion concerning the fair market value and the restorability of various antiquities by persons in the business of buying and selling antiquities. I am considered an expert in the evaluation for restoration purposes, and in the valuation, of antiquities by my peers and the people in the business. I have specialized knowledge and expertise in this field that I have gained over my years of experience.

3.   "I have also been involved in, among other things, the business of motor vehicle repair, motor vehicle body work and repair, antique restoration, heavy equipment sales, repair and restoration, and in businesses that use heavy equipment, for over forty (40) years. I also have specialized knowledge and expertise in these field that I have gained over my years of experience.

4.   "I have been a businessman in the City of Harlingen for many years, and am familiar with most of the local merchants. The business run and operated by Mr. Jose A. Garcia is commonly known as "Double A" and also as "T & T". Attached hereto, marked Exhibit "Roberts-A", is a true and correct copy of a photograph that I took which accurately and fairly depicts the sign that I took a picture of, which sign was located at the business owned and operated by Mr. Garcia. Mr. Garcia's business sign says, "DOUBLE A T & T", etc. It does not say "T & T Care Center" like Mr. Garcia alleges in his affidavit. This location is at 501 W. Jackson, Harlingen, Cameron County, Texas.

5.   "Antique motor vehicles like my Ford Thunderbird which Mr. Garcia wrongfully took from me, are bought and sold not only by collectors of such vehicles but also by the producers of motion pictures, in Hollywood and other parts of the country and globe. These vehicles often times are included in the plots and themes of motion pictures, and will command a high price because of the fact that they are in demand and their supply is rare.

6.   "Mr. Garcia also has business location on Tyler, near Commerce and the old railroad station. The address of this location is 202 W. Tyler, Harlingen, Cameron County, Texas.

7.   "Mr. Garcia lists his businesses in the Southwestern Bell business pages and he includes "Wrecker Services" under the "T&T" name. Attached hereto, marked Exhibit "Roberts-B", is a true and correct copy of the page and cover of the Southwestern Bell telephone directory that contains Mr. Garcia's business listing.

8.   "I have read the affidavit of JOSE A. GARCIA, dated May 28, 2002, which he submitted with his company's motion for summary judgment. There are several statements that are not true or correct in this affidavit.

9.   "Mr. Garcia suggests in his affidavit that the antique, Ford Thunderbird is the only vehicle that he took from my property. This is not true. In addition to the antique Ford Thunderbird, Mr. Garcia and/or someone under his direct supervision or employ took, at the very least, two (2) antique pick-up trucks, one being an International. These two (2) pick-up trucks are depicted in the photographs which I took, and which are attached hereto, marked Exhibits "Roberts-A" and "Roberts-C", the same being incorporated herein by reference.

AFFIDAVIT OF JOHN OCIE ROBERTS          No. B-01-34

10. "Although I have come into contact with JOSE A. GARCIA, he has never told me that I could take any of the vehicles that he took from any of his business locations. Mr. Garcia also never advised, informed or otherwise told me the whereabouts of the "Ford Thunderbird". The unsworn, unauthenticated photographs that his attorney attached to Mr. Garcia's motion for summary judgment do not depict either of the two business premises belonging to Mr. Garcia of which I have knowledge or familiarity. In addition, nowhere in his motion or his affidavit, does Mr. Garcia tell me or the court the location of the place where the photographs were taken, which is where he has secreted my Ford Thunderbird.

11. "When Mr. Garcia and/or his employee took my property, they completely ignored the posted signs and painted fence posts, warning that trespassing was prohibited. At the time, I had the fence posts at my business property commonly known as 1726 North Commerce Street, Harlingen, Cameron County, Texas, appropriately painted; moreover, I had locks and gated fences; in addition, I had numerous warning signs posted throughout the property, including at the entry gates, stating that the property was "POSTED PRIVATE PROPERTY" and "NO TRESPASSING", along with the language promulgated by Texas law. At no time was I shown any search warrant or seizure warrant authorizing the taking or removal of my property from my said business location. At no time did I authorize, or give my consent to, Mr. Garcia for him to take any of my property.

12. "Mr. Garcia has never told me that I was free to retrieve or take any of the property that he took from me.

13. "Mr. Garcia has never provided me with any documents showing, or an accounting of, the various items of personalty that he took from me. On information and belief, Mr. Garcia has never provided the City of Harlingen with an accounting of the various items of personalty that he and/or his employees took from my business, nor has he informed them of the whereabouts of the various items he took. Mr. Garcia has most certainly never informed or advised me of the whereabouts of the property he took from my business. Mr. Garcia has never sent me any notices, nor any letters advising me of the whereabouts of my property. Furthermore, Mr. Garcia threatened me with criminal charges if he ever saw me go to his place of business.

14. "As of this day, I do not know the whereabouts of my antique, Ford Thunderbird, which Mr. Garcia wrongfully took from me.

15. "The photographs that Mr. Garcia's attorney submitted with Mr. Garcia's motion for summary judgment, show that the vehicle depicted has no tires. When Mr. Garcia and/or his employee took my antique Ford Thunderbird, it had wheels and the tires. I had kept the tires fully inflated and properly maintained. Mr. Garcia has evidently taken the tires off and placed the vehicle directly on the ground. Placing an antique vehicle like my Ford Thunderbird directly on the ground without tires causes the antique vehicle to rust substantially on an accelerated basis. Therefore, despite his allegation, Mr. Garcia has damaged my antique Ford Thunderbird, which he continues to secret from me.

AFFIDAVIT OF JOHN OCIE ROBERTS                              No. B-01-34

16.  "When Mr. Garcia took my antique Ford Thunderbird, it had a fair market value of at least NINE THOUSAND UNITED STATES DOLLARS ($9,000.00).

17.  "The antique Ford Thunderbird that Mr. Garcia took from my business without my consent was not a 1970's Thunderbird.  It was a 1963 model year, Ford Thunderbird.

18.  "I have sustained damages because of Mr. Garcia's negligence and/or intentional wrongful conduct, for which I now sue him.

19.  "All of the above statements are true and correct."

FURTHER AFFIANT SAYETH NAUGHT

John Ocie Roberts

THE STATE OF TEXAS §

COUNTY OF Willacy §

SWORN TO, SUBSCRIBED, AND ACKNOWLEDGED by John Ocie Roberts before me on June 17, 2002.

Notary Public, State of Texas

My commission expires: 10/15/2002

AFFIDAVIT OF JOHN OCIE ROBERTS _____    No. B-01-34

## CERTIFICATE OF SERVICE

I, HUGO XAVIER DE LOS SANTOS, ESQ., attorney for John Ocie Roberts, Plaintiff, hereby certify that I served all other parties in this action with a correct copy of AFFIDAVIT OF JOHN OCIE ROBERTS IN OPPOSITION TO JOSE A. GARCIA'S MOTION FOR SUMMARY JUDGMENT   in a manner consistent with the FED.R.CIV.P. on June 17, 2002.

Further, this is to certify that all service via mail was by certified mail, return receipt requested [RRR], by depositing this document in an official depository of the United States Postal Service after enclosing this document in a postpaid, properly addressed envelope.   In addition, all service by telephonic document transfer was accomplished before 5:00 o'clock p.m. on the aforesaid date.

*City of Harlingen, Cameron County, Texas, Inspector Dan Serna, Individually, Inspector Ruben Mares, Individually, and Inspector Sam Gutierrez, Individually, Defendants*

c/o Mr. Ricardo J. Navarro, Esq.
222 E. Van Buren, Suite 405
Harlingen, Texas 78550-6804

*Method*:      U.S. Certified Mail, Return Receipt Requested
USPS Postal Receipt #7001 2510 0009 2698 3610

*JOSE A. GARCIA also known as Double A Wrecker Co., T & T Towing Service, T and T Wrecker Service, Defendant(s)*

c/o Mr. Curtis Bonner, Esq.
P.O. Box 288
Harlingen, Texas 78551-0288

*Method*:      U.S. Certified Mail, Return Receipt Requested
USPS Postal Receipt #7001 2510 0009 2698 3627

AFFIDAVIT OF JOHN OCIE ROBERTS                              No. B-01-34

*La Feria Wrecker Service. Defendant*

c/o Mr. Michael R. Ezell. Esq.
312 East Van Buren/P.O. Box 2878
Harlingen, Texas 78551

*Method*:         U.S. Certified Mail, Return Receipt Requested
                  USPS Postal Receipt #7001 2510 0009 2698 3597

## HUGO XAVIER DE LOS SANTOS
**Attorney at Law**

By:

HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.
Texas Bar Identification #05653300
U.S. Southern District Id. #11259

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227     FAX# (210) 737-1556

Attorney for John Ocie Roberts, Plaintiff

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE  A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN OPPOSITION TO JOSE A. GARCIA'S
MOTION FOR SUMMARY JUDGMENT

# E X H I B I T  "ROBERTS-A"



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS,<br>　　　　　　Plaintiff | § | Civil Action |
| | § | |
| | § | |
| **v.** | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE  A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| 　　　　　　Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN OPPOSITION TO JOSE A. GARCIA'S
MOTION FOR SUMMARY JUDGMENT

# E X H I B I T  "ROBERTS-B"

# Southwestern Bell



SBC
global
network

*Keep Until February 200*

# Rio Grande Valley

## *Yellow Pages*
### Area Code 956

For phone book recycling information, call **1-800-953-44(**
Para obtener información sobre reciclaje, llame al **1-800-953-44(**



**Directory serving:**

| | |
|---|---|
| Alamo | Mission |
| Brownsville | Palmview |
| Donna | Palmhurst |
| Edcouch | Pharr |
| Edinburg | Pt. Isabel |
| Elsa | Rio Hondo |
| Harlingen | San Benito |
| Hidalgo | San Juan |
| La Villa | South Padre |
| Los Fresnos | Island |
| McAllen | Sullivan City |
| Mercedes | Weslaco |

*2001 Southwestern Bell Yellow Pages coverage area*

**SMART**pages.com.
Your online source for:
Business Listings
Shopping Guides • City Guides
*from SBC Interactive*

## C S  CARABIN & SHAW
### I N J U R Y   L A W Y E R S

- Auto Accidents
- Workers Compensation

(956) **664-272**
TOLL FREE **1-800-213-4423**

Not certified by the Texas Board of Legal Specialization • Visits with Attorney by appointment • McAllen, Corpus Christi & San Antonio

7

TANEY Edwin 5619 La Luna Cr Palm Valley Estates— ........................423-3829
HANSON C A & Sharon 2159 Shadowbrook Cr ........................428-1644
G 7852 ........................423-1598
Bernard & Nancy 5401 W Bus Hwy 83 78552 ........................364-0954
Bernard & LuAnn 1900 Grace 78550 ........................423-9525
TA 1851 Hamann 78550 ........................423-1974
Barney W Lewis Lane ........................364-1943
Laverne 1900 Grace 78550 ........................428-3649
Ollie 5401 W Bus Hwy 83 78552 ........................423-2614
Ramon 5401 W Bus Hwy 83 78552 ........................112-2996
HATTLESKI Terry B 214 N 10th St 78550 ........................428-3842
HAYZE Terry 195 Madison 78552 ........................428-9743
HEENEY Don 1500 Palm Dr W West 78552 ........................425-7783

## SWEENEY MIKE MD ........................361-3663
575 N San Houston Blvd San Benito 78586

WEET R G 495 Meadow Dr 78552 ........................423-5278
W Court 1001 Loop 499 78550 ........................423-3683
Weezy Apartments 202 E Madison St 78550 ........................425-4638
Weezy Apartments 202 E Madison St 78550 ........................425-5208

## WEEZY CONSTRUCTION ........................361-3366
1901 Sweezy Ln San Benito TX 78586

P R Almon 2129 Sorona Ct 78550 ........................425-0714
P R JOAnne Cr 78550 ........................112-0444
WEITZER Paul 218 E Filmore Dr 78556 ........................428-4721
WEITZEL John 1401 W Bus Hwy 83 78552 ........................425-1312
W-Tram Co 405 North J 78550 ........................428-6051
Wiley H 1220 Cr 78552 ........................425-9053
WING Warren 2 5401 W Bus Hwy 83 78552 ........................112-2901
WOPE J E Spangler Rd 78550 ........................423-6952
Children's Telephone Spangler Rd 78552 ........................423-0376
Martin & Adrienne 2605 E Monroe St 78550 ........................364-0090

## SYED H M MD 1720 N Ed Carey ........................423-1283

YMA's Ice Cream 2201 S F St 78550 ........................365-4966
YMANDIK Eugene 1900 Grace 78550 ........................423-2071
YMONDS Don 5401 W Bus Hwy 83 78552 ........................112-1492
ZCZEPANSKA Agnieszka 3001 Barran Cr ........................421-2533
........................364-2573

## T

TACAA 702 South M St 78550 ........................440-0714
TADIM Inc 5602 E Harrison St 78550 ........................423-1922
& C Services ........................423-8434
CEBY 732 N 77 Sunshine Strip 78550 ........................428-141
TEN Line 806 Morgan Blvd 78550 ........................425-5882
TEXSCO USA 2125 N 77 Sunshine Strip 78550 ........................428-9048
G Motors 929 S 7th St 78550 ........................428-8046
TCE 306 E Access 78550 ........................423-9109
TS Incorporated 1217 E Harrison St 78550 ........................
TLC Adult Day Care Center Home Office ........................423-6451

## TLC ADULT DAY CARE CENTER INC ........................428-0166
2730 S 77 Sunshine Strip 78550
TLC Central Kitchen 1809 Belt St 78550 ........................
F & M Sales & Environmental Systems Inc ........................399-4275
2480-W Hwy 77 San Benito 78550 ........................
F & M Sales & Environmental Systems Inc ........................364-1201
2730 S F St 78550 ........................
Main Training Center ........................
Office 2022 N 77 Sunshine Strip 78550 ........................421-3911
Fax Line ........................423-2369
T N T Photographics 708 N 77 Sunshine Strip 78550 ........................
........................425-0199
R & R Catering 201 L St 78550 ........................428-4161
R & S Images Inc 2320 S Expwy 83 78552 ........................364-1381
TSDC Early Headstart 2702 Dogwood 78550 ........................425-2473
T & T Auto Sales 202 W Tyler 78550 ........................425-7473
T & T Car Care ........................425-7449
202 W Tyler 78550 ........................425-2026
501 W Jackson 78550 ........................425-3218
Wrecker Service Brazil Rd 78552 ........................425-2828
Fax Line ........................425-9800
TAAKE Russ 1100 Grace 78550 ........................423-7724
Tabasco Bay Restaurant & Bar 711 N 77 Sunshine Strip ........................428-7200
........................78550
TABASCO Jose 1001 Avenue B 78552 ........................425-9637
TABER Francis 1900 Grace 78550 ........................423-2610
TACKETT B D 1203 N Fresno 78552 ........................423-4648

402 Doresand Rd 78552 ........................425-8836
1518 N Ed Carey 78552 ........................421-3129
Taco El Rodeo 1105 S F St 78550 ........................421-3118
TADLOCK Roy 4525 Graham Rd 78552 ........................425-3432
TAEDEY J 5401 W Bus Hwy 83 78552 ........................440-8592
TAFOLLA Antonio 2209 Kennedy Av 78550 ........................425-1341
TALLAFERRO Warren A 1401 1201 Treasure Hills Blvd ........................
........................423-1174
Talk O The Town Hair Designs 1226 Morgan Blvd ........................
........................425-5700
TALLANT June E 1000 Cooseer 78550 ........................715-1116
TALLON J J 1002 Lan Horio 78550 ........................423-9350
TAMAYO Adrian Jr 5 Palm Blvd ........................425-8923
Casimiro 26563 Palm Blvd 78551 ........................423-9145
Celia 1612 San Antonio 78550 ........................440-0442
D H 1225 S 77 Sunshine Strip 78550 ........................440-5665
Ed Austen Ln 78550 ........................423-3485
Ezequiel 934 Bonnet Blvd Bonnet 78550 ........................425-4913
George 1300 S Expressway 83 78550 ........................423-3188
Geronimo ........................425-5481
Jose J 1803 Boca Chica 78550 ........................425-5894
Larry ........................

TAMEZ Abel 317 W Polk 78550 ........................423-4113
Amy & Xavier 1842 Cherry Ct 78550 ........................425-8276
Elizodoro 2926 Clifford 78550 ........................440-0965
Elizodoro 2926 Clifford 78550 ........................440-4146
Ernesto & Gabriela 1605 Sam Houston 78550 ........................425-6167
G 2502 Wilson Rd 78552 ........................425-6167
Genoveva 217 E Lincoln St 78552 ........................425-9193
Gloria 11535 Rangerville Rd 78552 ........................425-1312
Jose E I'm 508 78550 ........................425-3871
Josefina 1802 E Jackson 78550 ........................420-0126
Julian Jr 9501 W Bus Hwy 83 78552 ........................425-7770
Mary 121 Wilson Av 78550 ........................428-2178
Mary 121 W Wilson St 78550 ........................428-6612
Melissa 1201 Holz 78550 ........................425-2198
Ofelia 1302 Farrer 78550 ........................425-2498
Ofelia G 1802 Farrer 78550 ........................425-4194
Roed D 2424 Boxwood 78550 ........................112-5254
Sandra 2802 N 7th St 78550 ........................425-4324
Trinidad 505 W Cardenas 78550 ........................428-5259
TAMMINGA Louis 1301 Sunwest Blvd 78552 ........................425-3901
TAMOGLIA T W 9501 W Bus Hwy 83 78552 ........................
TANAMACHI Walter H 1605 Sam Houston ........................

TAMBERG C L 16350 Rio Rancho Rd 78552 ........................428-0827
TANG Donald 1201 N Expwy 77 78552 ........................428-2484
TANGLER Rebecca J 2906 Treasure Hills Blvd ........................112-4221
........................425-1430
Tanglewood Driving Range & Miniature Golf ........................
Primera Rd 78552 ........................428-9955
TANGUCHI Edward 2026 Susan 78550 ........................423-6307
TANKERSLEY Aileen 1608 Sam Houston 78550 ........................412-2656
TANNEHILL Urstein 9101 W Bus Hwy 83 78552 ........................421-3493
TANNER Carol 2802 N 7th St 78550 ........................365-4973
G Grace 1209 Ferris B 78550 ........................425-8056
L 1317 Bonnet 78550 ........................423-3407
With a 1302 Grace 78550 ........................425-4946
Tasarena Rossiter B MD 608 N Ed Carey ........................364-2990
TAPIA Amador 601 S A St 78550 ........................428-3479
Art 2217 E Monroe St 78550 ........................423-1838
E Arturo 2205 Zberesi 78550 ........................425-0903
B Breaders St 78550 ........................440-0203
Juanita 91402 S 1st St 78550 ........................423-2104
Lucy 506 Ranaerville Rd 78552 ........................421-5667
Manoel Jr 906 Ranaerville Rd 78552 ........................423-1846
Maria Del Carmen 221 E McKinley St 78550 ........................425-3001
Martinez 12 E Polk Av 78550 ........................423-7035
Robert 1201 Jagan Place 78550 ........................425-4695
Rosario 2108 E Fremont 78550 ........................112-4226
Taos Signs & Aerographics 515 W Harrison St ........................
........................423-2373
Taqueria Gonzalez 622 Ranaerville Rd 78552 ........................425-8947
Taqueria Jalisco 621 S Commerce 78550 ........................428-7414
Taqueria La Mexicana Restnt 1501 E Harrison ........................
........................78552 ........................428-9575
Taqueria La Saborosita 7901 W Bus Hwy 83 ........................
........................78552 ........................364-0314
TARANGO Era G 1118 North I ........................421-4433
TARRET Earl & Norma 5401 W Bus Hwy 83 ........................421-1066
........................78552 ........................365-4046
Target One Hour Photo 1002 Dovesand Rd ........................
........................78550 ........................428-7686
Target Stores 1002 Dovesand Rd 78550 ........................421-1466
TARR A E 140 La Casa Cr 78552 ........................428-5344
TARVER M 2102 N 7th St 78550 ........................364-1573
Taste Of Paradise 2000 S Expwy 83 78550 ........................112-1442
TATE Breez 2925 Jacaranda Dr 78550 ........................428-1885
Chas B 11a-1/2 W A St 78550 ........................423-8642
Harry 117 W Elam Haven Dr 78552 ........................440-7873
TATER A 414 Mockerly 78550 ........................428-9355
Estela 606 Cassees 78556 ........................112-6674
TATUM Jerry 1900 Grace 78550 ........................365-4090
TAUBERT Beauty 1629 Bobcat Ln 78552 ........................364-0809
Gene and Heather Dr 78552 ........................428-2014
TAVEGA G ........................440-9711
Leroy 79 Los Amidos Dr 78552 ........................428-3066
TAW William 2115 E Vinson 78550 ........................423-6937
TAYLOR M J 4014 Massers 78552 ........................428-9082
TAYLOR Albert F 1 Mr S Lazas Palmas 78552 ........................425-4646
Andrew 805 E Filmore St 78550 ........................112-9637
Arthur H Edward Rd 78552 ........................425-0815
Bill & Jane 401 Parmeir Cr 78550 ........................112-9755
Bruce 2090 Sunwest Blvd 78552 ........................425-1264

## TAYLOR ERIC JR MD 2210 N Ed Carey Suite 1A
........................428-5522
TAYLOR Gene 4023 78552 ........................423-4161
Gene F 1206 Crosewell 78550 ........................423-6153
George 4525 Graham Rd 78552 ........................423-3981
H Jim 1301 N Expwy 77 78552 ........................423-9199
J Madison & Nonnell 78550 ........................440-0264
Jeanette 1305 Summerfield Ln 78550 ........................423-3956
Jim R & Olivia Fm 2994 78550 ........................112-1991
Lucian 5425 Morgan Suite J Blvd 78550 ........................423-1139
TAYLOR Lucian 5425 Brroa Heeson Palm Valley Estates ........................428-2229
........................425-4000
B 1432 Madrid 78550 ........................428-6889
Maria 2407 Pembroke 78552 ........................364-1927
Mecabee 809 E Taylor St 78550 ........................440-4036

## TAYLOR RENTAL ........................364-1014
1014 W Tyler St 78550
TAYLOR Richard F 1917 Winnecat 78552 ........................421-1649
Robert R 809 E Taylor 78550 ........................421-2992
Tony G 505 Austin 78550 ........................423-6005
Victor 5401 W Business 83 78552 ........................440-7630
W William 11535 Rangerville Rd 78552 ........................364-0336
TEAGUE Wm E 1203 N Expwy 77 78552 ........................425-7631
TEAL Jean 1201 Avenue B 78552 ........................423-3325
TEALE John 2901 June Ct 78550 ........................440-1566
TECKORIUS Edward 2303 E Harrison 78550 ........................425-3145
Tecnobrick Inc 2708 N 32nd St McAllen TX ........................
........................668-9993
Tecomate Seed Co Paloma Ln 78552 ........................364-0827
TEDER Rose 1203 N Expwy 77 78552 ........................425-7837
Teegarden John ........................423-4600
TEEGARDIN Gil & Vivian 1235 Havenford Blvd ........................
........................428-3589

## TEEGARDIN VIVIAN A DDS ........................428-5322
TEER John F Dr 1902 Lazy Lane 78552 ........................425-7423
TEES Arthur 9101 W Bus Hwy 83 78552 ........................112-9444
TE HENNEPE J E 1200 North I 78550 ........................421-4712
TEHRANI Mehdi 1712 E Monroe St 78550 ........................425-4207

TEINERT MD 506 E Madison 78550 ........................423-2642
Tezano Brick & Block Primera Rd 78552 ........................425-1926
Tezano Mart 221 N Ed Carey 78552 ........................425-6193
Tezano Towers 1174 N 78550 ........................112-9080

## TEJAS EQUIPMENT RENTAL 2702 S 77 Sunshine Strip ........................440-8222
Tejas Rentals 2702 S 77 Sunshine Strip 78550 ........................440-8222
Tex Turbine 601 S F St 78550 ........................428-6114
Tezano Offices Dozen 213 S 4th St 78550 ........................425-4270

## TELCOM EQUIPMENT INC
HARLINGEN TX TEL NO - 428-1503
Tell My People Inc 2032 N 77 Sunshine Strip ........................
........................112-1911
TELLEE Herbert 4506 N Bus Hwy 77 78552 ........................421-3680
TELLEZ Leonardo 2409 Treasure Hills Blvd ........................112-4221
TELLO Dalila 1021 N 77th 78550 ........................425-8937
Tellos 1101 N 77 Sunshine Strip 78552 ........................112-2728
Tere-Net Internet Access 1326 N Ed Carey ........................
........................364-2199
Tempie Beth Israel 1702 E Jackson 78550 ........................423-2278
TEMPLE Eugene A 1900 Grace 78550 ........................425-4036
TEMPLETON Doris 402 E Buchanan 78550 ........................423-6727
TEMPLIN B 1203 N Kingswood 78550 ........................112-2563
White & Jean 5408 Guera Dr 78552 ........................
Tenaño El Buen Samaritano Rio Rancho Rd ........................
........................112-2747
Templo Fe Esperanza Y Amor Assembly Of God ........................
........................a01 North R 78550 ........................425-3474
Tempio Jerusalem 217 W Harrison St 78550 ........................423-3065
TENA Maria Luisa 222 South L 78550 ........................428-5346
TENERRUN Eugene 5401 W Bus Hwy 83 78552 ........................421-3101
TENSSON Paul Reserve Rd 78551 ........................423-1131
Terenson Group L TD 1514 S 77 Sunshine Strip ........................
........................425-1650
TERTER K G 2901 Hane Dr 78552 ........................425-4094
TERHUNE Clason M 908 E Camai 78552 ........................428-2373
Terry Dilworth Rd 78550 ........................
Terminist International ........................
ick Sanseen 78552 ........................423-2373
- Brownsville ........................
- Brownsville Tx Tel No ........................546-9033
Terra Indunines W Fm 1925 Edinburg TX 78539 ........................380-4710
Terra Indunines Port Of Harlingen ........................112-9797
TERRAL Denis & Dixie 1011 S 16th St 78550 ........................428-2853
TERRY James 2836 Bayson Dr 78552 ........................423-4038
Jane 2801 E Harrison St 78552 ........................425-3791
Kenneth & Susan 74 78552 ........................425-4426
Peggy 45 Las Amigos Dr 78552 ........................428-2542
Robert A 1508 Coco Palm Dr 78552 ........................112-3517
Sheldon 2001 East Lane 78552 ........................428-6616
William E 8901 W Bus Hwy 83 78552 ........................440-5268
TERRYN Lois 4506 N Bus Hwy 77 78552 ........................425-4676
Terry's Clason Cafe 3811 W Bus Hwy 83 78552 ........................112-7283
TERVINO Alberto 2702 Crosewell 78550 ........................423-4134
TESKE Fran & Lian 2401 W Bus Hwy 83 78552 ........................112-7992
TESLA Wm M L T COL 1201 Treasure Hills Blvd ........................
........................425-4338
Tesoro Leonard MD 1629 Treasure Hills 78550 ........................428-4221
TETT Leon & Harrieet 4525 Graham Rd 78552 ........................365-4473
TEVELL Allison 2521 Honolula 78550 ........................112-6456
Tewell N E Paul III Veterinarian 1944 W Highway 77 ........................
........................- San Benito 78543 ........................399-3221
Tex Best Travel Centers Inc Burger King No 9444 ........................
........................425-0754
Tex-Mart No 22 109 W Tyler St 78550 ........................423-4092
Tex-Mart No 23 911 E Tyler St 78550 ........................423-4934
Tex-Mart No 18 1420 E Harrison 78550 ........................423-5901
Tex-Mart No 25 1425 E Tyler St 78550 ........................425-4900
Tex-Mart No 18 1425 E Harrison 78550 ........................425-1251
Tex-Mart No 16 2820 N 7th St 78550 ........................425-1264

## TEX-MEX PLUMBING SUPPLY ........................421-4333
1318 W Madison St 78550
Tex Steel Steel 1301 E Harrison St 78550 ........................423-9039
Texaco Xpress Lube 2302 N 77 Sunshine Strip ........................
........................423-9099
Texan Fence Co 2201 N 77 Sunshine Strip 78552 ........................425-0044
Texas Air Ambulance 1 M E Rio Hondo TX ........................748-2102
Texas Ares Medical Social Services 1014 E Harrison ........................
........................78550 ........................423-7750
Texas Ares Medical Social Services 2303 N Ed Carey ........................
........................828-6628
Texas Association Of Community Action Agencies ........................
........................702 South M St 78550 ........................440-0714
Texas Beauty Center 609 W Harrison St 78550 ........................440-0714
Texas Cafe 317 W Van Buren 78550 ........................112-7609
Texas Cash Advance & Leasing Company ........................
........................472 S 77 Sunshine Strip 78550 ........................112-7773
Texas Citizen Endeavor Union Inc 913 E Harrison ........................
........................425-4444
Texas Commerce Bank ........................See Chase Bank Of Texas NA
Texas Community Mortgage Corporation ........................
........................2302 S 77 Sunshine Strip ........................364-1194
Texas Community Mortgage Corporation ........................
........................2302 S 77 Sunshine Strip 78550 ........................364-1194
Texas Crop Insurance Services ........................
........................Harlingen Tx Tel No - 423-1245
Texas Emergency Youth Centers 604 S 77 Sunshine Strip ........................
........................425-4444
Texas Employment Commission ........................See Workforce Commission
Texas Fatherhood Initiative PO Box 12223 ........................
........................- Austin Tx 78711 ........................512-472-3237
Texas First & Every Commerce St 25 E Van Buren ........................
........................421-4491
Texas Gold Nugget 1001 N 77 Sunshine Strip 78552 ........................421-4491
Texas Gulf Railroad Inc 1206 Bus Hwy 77 78552 ........................423-4677
Texas Healthcare Pharmacy 536 N Ed Carey ........................364-1474

Texas Injury Center— ........................546-4140
2015 Price Rd Brnsv ........................546-4140

## TEXAS INSURANCE MANAGERS
410 E Harrison 78550 ........................423-6986
Texas Investments 2202 S 77 Sunshine Strip ........................
........................428-2887
Texas McAllen Mission/Church Of Jesus Christ Of Latter Day Saints— ........................
........................1202 E 1st St 78550 ........................428-2417
213 N 2nd St 78550 ........................428-4402
1202 E 1st St 78550 ........................421-1649
1712 Vernest Gard 78550 ........................112-2794

## TEXAS MEAT PURVEYORS VALLEY ........................423-4881
N Expressway 78551
Texas Municipal League ........................
Workers Compensation Claim Office ........................112-1919

## TEXAS ORGAN SHARING ALLIANCE ........................412-6311
Harlingen 2121 Pease 78550
McAllen 217 Nolana 78550 ........................630-0884
Fax Line ........................
Toll Free Dial 1 & Then ........................877-DONOR B7
Texas Real Estate 1409 E Filmore St 78550 ........................425-4625
Texas Real Estate Inspections 722 Morgan Blvd ........................
........................440-1313
Texas-Rural Legal Aid Inc 1206 E Filmore St 78550 ........................
........................423-3111
........................423-3113

## TEXAS SEAL & STRIPE ........................428-2911
Texas Star Hearing Centre 2114 Duesland Rd 78550 ........................440-0024

## TEXAS STATE BANK ........................430-5000
501 N 77 Sunshine Strip 78550
115 E Van Buren 78550 ........................423-6420
1200 N Stuart Place Rd 78552 ........................
1902 W Tyler 78552 ........................
2501 S 77 Sunshine Strip 78550 ........................430-5000
24 Hour Freedom Fone ........................365-6400
Texas State Bank 2302 N 77 Sunshine Strip ........................
........................78550 ........................430-5000
Texas State Employees Union CWA 6186 ........................
........................901 N 13th St 78550 ........................425-0251
........................423-0297

## TEXAS-STATE OF—
AIR CONTROL BOARD
Air Control Board ........................
See Natural Resource Conservation Commission
ATTORNEY GENERAL— ........................
Medicaid Fraud & Pament Abuse Hotline ........................
Toll Free Dial 1 & Then ........................800 252-8011
Child Support Enforcement 1820 W Jefferson St ........................
........................421-4351
BLIND COMMISSION— ........................
Toll Free Dial 1 & Then Austin TX ........................
........................800 252-5204 TDD and Voice
113 W Jefferson St 78550 ........................423-9411
COMMERCE DEPARTMENT— ........................
Texas Manufacturing Assistance Center(TMAC) ........................
Toll Free Dial 1 & Then ........................800 488-3622
CRIMINAL JUSTICE DEPARTMENT— ........................
District Parole Office 232 Havmore Industrial Pkwy ........................
........................428-0335
Victim Services Division— ........................
State Office ........................512 406-5424
DEPARTMENT OF HUMAN SERVICES— ........................
Program Services Offices ........................
801 N 13th St 78550 ........................
For General Information ........................423-3100
TDD Only-All Services ........................412-7650
TDD Device Only- ........................
For Changes To Your Food ........................
Stamp Case Lone Star Card ........................
Temporary Aid For Needy Families and Medicaid ........................
Community Care For The Aged and Disabled ........................
........................423-3100
Nursing Homes-San Benito ........................399-2819
Long Term Care-Regulatory-San Benito ........................399-2819
DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES— ........................
1115 East Sinton St 78387 ........................364-1411
For General Information ........................
EMPLOYMENT COMMISSION— ........................
Employment Commission ........................See Workforce Commission
HEALTH DEPARTMENT— ........................
Public Health Region 11 601 Sesame Av 78550 ........................423-0130
HEALTH PROFESSIONS COUNCIL— ........................
Toll Free Dial 1 & Then ........................800 821-3205
For Complaints Against A Health Professional ........................
Toll Free Dial 1 & Then ........................
INSURANCE DEPARTMENT— ........................
Whinstorm 430 N Ed Carey 78552 ........................421-4675
Consumer Services Offices— ........................
Claims Complaints Austin ........................
Toll Free Dial 1 & Then ........................800 252-3439
Insurance/Complaints Austin ........................
Insurance Agents & Adjusters ........................512 322-3503
Toll Free Dial 1 & Then ........................
Auto Insurance ........................
Toll Free Dial 1 & Then ........................800 578-4677

continued on next page

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| CONNIE DE LA GARZA, INDIVIDUALLY, | § | |
| CHIEF OF POLICE MICHAEL BLAKE, | § | |
| INDIVIDUALLY, ACTING CITY MANAGER | § | |
| ROY RODRIGUEZ, INDIVIDUALLY, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| LT. JIM SCHEOPNER, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE  A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

AFFIDAVIT OF JOHN OCIE ROBERTS
IN OPPOSITION TO JOSE A. GARCIA'S
MOTION FOR SUMMARY JUDGMENT

# E X H I B I T  "ROBERTS-C"



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| JOHN OCIE ROBERTS, | § | Civil Action |
| Plaintiff | § | |
| | § | |
| **v.** | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| Defendants | § | JURY |

## PLAINTIFF'S FIRST AMENDED
## MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T  "D"

# Excerpts from the
# City of Harlingen's
# Sworn Answers to Interrogatories

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOHN OCIE ROBERTS                    *
                                     *
VS                                   *    C.A. NO. B-001-34
                                     *
CITY OF HARLINGEN, ET AL             *

CITY DEFENDANTS' OBJECTION & RESPONSES
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

To:  Plaintiff, through counsel of record,
     Mr. Hugo Javier De Los Santos
     LAW OFFICE OF HUGH JAVIER DE LOS SANTOS
     6800 Park Ten Blvd Ste 123-N
     San Antonio, Texas 78213

     Comes now DEFENDANTS DAN SERNA, and the CITY OF HARLINGEN
(hereafter "CITY DEFENDANTS") and file these Objections and
Responses to Plaintiff's First Set of Interrogatories pursuant to
the Federal Rules of Civil Procedure.

     SIGNED this 5th day of October, 2001.

                              Respectfully submitted,

                              **DENTON, NAVARRO & BERNAL**
                              a Professional Corporation
                              Bank of America Building
                              222 E. Van Buren, Ste. 405
                              Harlingen, Texas 78550
                              956/421-4904
                              956/421-3621 (Facsimile)

                    By: _____
                              RICARDO J. NAVARRO
                              Attorney In Charge
                              State Bar No.14829100
                              So. Dist. ID No. 5953
                              MAURO F. RUIZ
                              State Bar No. 24007960
                              So. Dist. ID No. 23774
                              ATTORNEY FOR CITY DEFENDANTS

## CERTIFICATE OF SERVICE

        This is to certify that a true and correct copy of this
document has been sent by Certified Mail/Return Receipt Requested
unless otherwise indicated, to the person(s) listed below on this
5th day of October, 2001.

Mr. De Los Santos          **By CMRRR No.** 7000 1670 0013 4633 8344
LAW OFFICES OF HUGO XAVIER DE LOS SANTOS
6800 Park Ten Blvd Ste. 123-N
San Antonio, Texas 78213


                                    RICARDO J. NAVARRO
                                    MAURO F. RUIZ


Roberts-Defendants Harlingen and Serna's Objections
and Responses to Interrogatories                        Page 2

## INTERROGATORIES

1.   Please identify each person, including job title and description, involved in the preparation of your responses and answers to these interrogatories.  Be sure you state each person's full name, business and home address and phone number, date of birth, social security number and driver's license number(s) and the state(s) of issuance.  If more than one person is supplying the answers to these Interrogatories, identify which of these persons is answering each Interrogatory.

**ANSWER:** Dan Serna
          Environmental Health Director
          Health Department
          502 E. Tyler
          Harlingen, Texas 78550

2.   Please state the following:

     (a)   your current full legal name and all the names which you have ever been known by;

           Dan Serna

     (b)   your current address and each address you have had during the last ten (10) years;

           Dan Serna can be reached as the Health Department address above.

     (c)   your social security number;

           Objection.  This discovery request is outside the scope of discovery as it is not relevant and not likely to lead to the discovery of admissible and relevant information. Said request is also burdensome.

     (d)   your date of birth;

           April 1, 1963

     (e)   your driver's license number(s);

           Objection.  This discovery request is outside the scope of discovery as it is not relevant and not likely to lead to the discovery of admissible and relevant information. Said request is also burdensome.

Roberts-Defendants Harlingen and Serna's Objections
and Responses to Interrogatories                    Page 3

gross aggregate limit and the amount remaining for this claim at this time, after reduction for payment of other claims.)

**ANSWER:**    Defendants will produce copy of the City's risk pool coverage.

9.    For each and every defense which you now assert or will assert in this action, please state fully, in detail, each and every factual basis for each and every such defense.

**ANSWER:**    The nature of this lawsuit, in which Plaintiff asserts federal state constitutional violations, and numerous state- law based causes of action, including negligence, conversion, trespass, penal code violations,  against a municipality and its agents affords these Defendants the affirmative defenses set forth in Defendants' Answer to Plaintiff's Third Amended Original Complaint, including governmental immunity, qualified immunity, official immunity, legislative immunity, statutory caps, notice, and failure to exhaust remedies.

The City is not liable for intentional torts as per the Texas Tort Claims Act.  Moreover, there is no evidence that the City engaged in a pattern and practice of violating the constitutional rights of its residents.

The individual defendant, Dan Serna, is entitled to qualified immunity and official immunity from suit and liability.

10.    Please identify and describe your position with and/or relationship with each of your co-defendants.

**ANSWER:**    Mr. Roy Rodriguez holds the position of Harlingen City Manager and is my supervisor.  I, Dan Serna, supervise Sam Gutierrez and Ruben Mares.  Connie De La Garza is the current Mayor of Harlingen.

11.    Please identify all occasions upon which you have had any face to face meetings and/or telephone conferences with MR. ROBERTS during the period beginning January 1, 1998 through the present.  (In your answer, for each such occasion, please: identify the purpose and nature of the visit or meeting; state whether the meeting or visit was in person or on the phone or by some other means; state the place where each such meeting/visit was held or the location where you were present while on the

a.   Identify each such witness and state the name and
     address of his employer or the organization with which
     he is associated in any professional capacity;

b.   State the field in which each such witness is to be
     offered as an expert, along with a summary of his
     qualifications within the field in which he/she is
     expected to testify;

c.   State the substance of the facts to which each such
     witness is expected to testify;

d.   State the substance of the opinions to which each such
     witness is expected to testify, along with the mental
     impressions and opinions held by such expert, a summary
     of the grounds for each opnion, the date and addresses
     of all reports rendered by such expert(s), and the
     facts known to the expert, regardless of when the
     factual information was acquired, which relates to or
     forms the basis of the mental impressions and opinions
     held by the expert;

e.   Provide disclosure of any materials prepared by any
     expert used or to be used for consultation, even if it
     was prepared in anticipation of litigation, if it has
     been reviewed by an expert who may be called as a
     witness; and

f.   Provide disclosure of any materials prepared for or
     presented to any such expert witness for his review in
     connection with this action or matter related to this
     action.

(Your answer to this interrogatory should provide all
information that is discoverable pursuant to Rules 26 (a)(2),
26(b)(1), 26(b)(4)(B) of the Federal Rules of Civil Procedure.)

**ANSWER:**   None at this time, however, City Defendants will
              supplement if necessary.

15.  Do you consider yourself to be an expert of any type?  If so,
     please explain fully.

**ANSWER:**   No.

16.  Please state everything you did at the Premises, and
identify the person that ordered or otherwise instructed you to go

Roberts-Defendants Harlingen and Serna's Objections
and Responses to Interrogatories                         Page 8

to the Premises, at any time during the period beginning January 1, 1998 through the present.

ANSWER:    Pursuant to my instructions, inspectors of the Health
           Department were told to clean the premises made the
           subject of this lawsuit in July 2000.

17.  Please describe and identify all lawsuits and claims that have been filed against you that deal, concern or involve your position as a public servant, as an employee of the CITY OF HARLINGEN, CAMERON COUNTY, TEXAS or any other city, municipality, township, pueblo, or town, or as an inspector for the Harlingen Police Department or any other peace officer organization, and/or involved claims against you that dealt with the same or similar subject matter as is addressed in Plaintiff's Original Petition. (You are requested to please disclose the date, location and basic facts of, and the involved, including their legal representatives and insurers, the identity of all victims, the number of any lawsuit file and the court in which it as filed, the attorneys record in such lawsuit, and the outcome or final  disposition of each including the amount paid or judgment rendered.)


ANSWER:    None.


18.  Please identify each and every person or entity who you believe or contend is a potential party to this lawsuit and state the complete factual basis for your belief or contention that the individuals or entities listed are potential parties to this lawsuit.

ANSWER:    None at this time.

19.  Identify all persons or entities that have possession, custody, or control of documents relevant to this lawsuit and the documents over which they have possession, custody, or control.

ANSWER:    Other than the named non-City of Harlingen defendants,
           none.

20.  Please identify all persons that you spoke with about the taking (in any form or manner) of MR. ROBERTS's Personalty at the Premises, prior to the first occasions that you went to the Premises for the purpose of actually conducting, participating and/or supervising the seizing, confiscating, condemning, moving, relocating, transporting, impounding, or otherwise taking of MR. ROBERTS's Personalty at the Premises.

**ANSWER:**     I had conversations regarding the cleanup of the premises with City Manager Roy Rodriguez, City Attorney Brendan Hall, health inspectors Gutierrez and Mares, and Ruben Diaz of Public Works.

21.  Please identify all conferences and/or meetings, public, open, private and/or closed session, or otherwise, that you attended or participated in at any time during the period beginning January 1, 1998 through the present, at which the Premises, MR. ROBERTS'S Personalty at the Premises were discussed.

**ANSWER:**     I had conversations regarding the cleanup of the premises with City Manager Roy Rodriguez, City Attorney Brendan Hall, health inspectors Gutierrez and Mares, and Ruben Diaz of Public Works.

22.  Please identify all inventories you either ordered, instructed or recommended be made, kept or otherwise maintained, or that you participated in the actual making or keeping, of the personal property that was seized, confiscated, condemned, moved, relocated, transported, impounded, or otherwise taken or removed form the Premises by the Harlingen Police Department, or anyone acting on behalf of or at the instruction or request of the police department of the CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, at any time during the period beginning January 1, 1998 through the present, and state when and where you last saw each such inventory.

**ANSWER:**     See Videotape attached as Exhibit K to City Defendants' Responses to Plaintiff's Requests for Production; City Defendants' Response No. D to Plaintiff's Requests for Production.

23.  Please identify all persons that accompanied you on each occasion that you went to the Premises at any time during the period beginning January 1, 1998 through the present, and for each such person, state each and every occasion that you were went or were at the Premises, the date and time of same, and the purpose for your visit to the Premises and what you actually did at the Premises.

Roberts-Defendants Harlingen and Serna's Objections
and Responses to Interrogatories                              Page 10

ANSWER:   Dan Serna visited the premises on numerous occasions, but
          does not recall the persons who accompanied him and the
          dates and times of the visits.

24.  Please identify all reports, memoranda and documents that
you made, drafted, prepared, recorded, taped, or otherwise
generated or turned over to the Harlingen Police Department or CITY
OF HARLINGEN, CAMERON COUNTY, TEXAS that has anything to do with
the Premises, MR. ROBERTS and/or MR. Robert's Personalty at the
Premises, and state when and where you last saw each such report,
memoranda and document.

ANSWER:   See City Defendants Responses to Plaintiff's Requests for
          Production.

25.  To the extent not already identified, identify all documents
to which reference was made in the course of preparing answers to
these interrogatories.

ANSWER:   See City Defendants' Responses to Plaintiff's Requests
          for Production.

<div align="center">END OF INTERROGATORIES</div>

# VERIFICATION

STATE OF TEXAS          §

COUNTY OF CAMERON       §

    BEFORE ME, the undersigned Notary Public, on this day personally appeared DANIEL SERNA who after duly identifying himself to me, swore that the Answers to the foregoing Interrogatories were his own and that these Answers were true and correct.

_____
DANIEL SERNA

    SUBSCRIBED AND SWORN TO BEFORE ME on this 5th day of October 2001.

NORMA G. DELGADO
Notary Public, State of Texas
My Commission Expires
NOV. 5, 2002

_____
Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS,<br>　　　　　　Plaintiff | § | Civil Action |
| | § | |
| 　　v. | § | No. B-01-34 |
| | § | |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS, | § | |
| INSPECTOR DAN SERNA, INDIVIDUALLY, | § | |
| INSPECTOR RUBEN MARES, INDIVIDUALLY, | § | |
| INSPECTOR SAM GUTIERREZ, INDIVIDUALLY, | § | |
| LA FERIA WRECKER SERVICE, | § | |
| DOUBLE  A WRECKER CO., | § | |
| T & T TOWING SERVICE, | § | |
| T AND T WRECKER SERVICE, | § | |
| TIM WILKINSON IRON & METAL INC., | § | |
| 　　　　　　Defendants | § | JURY |

PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# E X H I B I T   "E"

Excerpts from the
February 26, 2002, Oral Deposition of
Dan Serna
Taken in this Case

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS,<br>　　　　　Plaintiff | §<br>§<br>§ | Civil Action |
| **v.** | §<br>§ | No. B-01-34 |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS,<br>INSPECTOR DAN SERNA, INDIVIDUALLY,<br>INSPECTOR RUBEN MARES, INDIVIDUALLY,<br>INSPECTOR SAM GUTIERREZ, INDIVIDUALLY,<br>LA FERIA WRECKER SERVICE,<br>DOUBLE  A WRECKER CO.,<br>T & T TOWING SERVICE,<br>T AND T WRECKER SERVICE,<br>TIM WILKINSON IRON & METAL INC.,<br>　　　　　Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br><br><br><br><br>JURY |

## PLAINTIFF'S  FIRST  AMENDED
## MOTION  FOR  PARTIAL  SUMMARY  JUDGMENT

# E X H I B I T   "E"

# Excerpts from the
# February 26, 2002, Oral Deposition of
# Dan Serna
# Taken in this Case

SEALED DOCUMENT

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   JOHN OCIE ROBERTS,              *
              PLAINTIFF              *
 4                                   *
     V.                              *        CIVIL ACTION
 5                                   *        NO. B-001-34
     CITY OF HARLINGEN, CAMERON      *
 6   COUNTY, TEXAS, CONNIE           *
     DE LA GARZA, INDIVIDUALLY,      *
 7   CHIEF OF POLICE MICHAEL         *
     BLAKE, INDIVIDUALLY, ACTING     *
 8   CITY MANAGER ROY RODRIGUEZ,     *
     INDIVIDUALLY, INSPECTOR DAN     *
 9   SERNA, INDIVIDUALLY, LT. JIM    *
     SCHEOPNER, INDIVIDUALLY,        *
10   INSPECTOR RUBEN MARES,          *
     INDIVIDUALLY, INSPECTOR SAM     *
11   GUTIERREZ, INDIVIDUALLY,        *
     LA FERIA WRECKER SERVICE,       *
12   DOUBLE A WRECKER CO.,           *
     T AND T WRECKER SERVICE, TIM    *
13   WILKINSON IRON & METAL, INC.,   *
              DEFENDANTS             *        JURY

14

15   ********************************************************

16                   ORAL DEPOSITION OF

17                       DAN SERNA

18                  FEBRUARY 26 , 2002

19   ********************************************************

20                       ORIGINAL

21       ORAL DEPOSITION of DAN SERNA produced as a witness

22   at the instance of the Plaintiff  and duly sworn, was

23   taken in the above-styled and numbered cause on the

24   26th day of February, 2002, from 10:30 a.m. to

25   5:10 p.m., before Carolyn Newman, CSR in and for the
```

1  State of Texas, reported by oral stenography, at the

2  offices of Denton, Navarro & Bernal, 222 East Van Buren,

3  Suite 405, Harlingen, Texas, pursuant to the Texas Rules

4  of Civil Procedure and the provisions stated on the

5  record or attached hereto.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1              A P P E A R A N C E S

 2  FOR THE PLAINTIFF, John Ocie Roberts

 3       Mr. Hugo Xavier de los Santos
         ATTORNEY AT LAW
 4       6800 Park Ten Boulevard, Suite 123 N.
         San Antonio, Texas  78213
 5
    FOR THE DEFENDANTS, City of Harlingen, Cameron County,
 6  Texas, Connie de la Garza, Chief of Police Michael
    Blake, Acting City Manager Roy Rodriguez, Inspector Dan
 7  Serna, Lt. Jim Scheopner, Inspector Ruben Mares,
    Inspector Sam  Gutierrez
 8
         Mr. Ricardo J. Navarro
 9       DENTON, NAVARRO & BERNAL
         222 East Van Buren, Suite 405
10       Harlingen, Texas  78550

11  ALSO PRESENT:

12       Mr. John Ocie Roberts, Plaintiff

13       Mr. Marte Guillen, Legal Assistant

14

15

16

17

18

19

20

21              * * * * * * * * * * * *

22

23

24

25
```

4

```
 1                          INDEX

 2                                                   PAGE

 3  Appearances  . . . . . . . . . . . . . . . .      3

 4  DAN SERNA

 5       Examination by Mr. de la Santos . . . . . .   5

 6  Changes and Signature  . . . . . . . . . . .     232

 7  Reporter's Certificate . . . . . . . . . . .     233

 8

 9                     EXHIBITS INDEX

10  NO.                DESCRIPTION                    PAGE

11   1      City Defendants' Objection & Responses to
            Plaintiff's First Set of Interrogatories  .  28
12
     2      Verification  . . . . . . . . . . . . .    28
13

14

15

16

17

18

19

20

21

22

23

24

25
```

5

```
 1                       DAN SERNA,

 2   having been first duly sworn, testified as follows:

 3                    E X A M I N A T I O N

 4   BY MR. DE LOS SANTOS:

 5        Q.   Good morning, sir.

 6        A.   Good morning.

 7        Q.   My name is Hugo Xavier de los Santos.  I'm the

 8   attorney for Mr. John Roberts, the plaintiff in this

 9   case.  Do you understand that, sir?

10        A.   I do.

11        Q.   And you and I met for the first time here this

12   morning immediately preceding this deposition; is that

13   correct?

14        A.   That is correct.

15        Q.   I've never seen or met you before today; is

16   that right?

17        A.   That is correct.

18        Q.   However, you do know and have met Mr. John

19   Roberts, the plaintiff in this case, who is sitting to

20   my left over there at the end of the table; is that

21   correct?

22        A.   That is correct.

23        Q.   Sir, what is your full name?

24        A.   Daniel Serna.

25        Q.   No middle name?
```

6

```
 1      A.   No.

 2      Q.   And your address, sir?

 3               MR. NAVARRO:   Business address.

 4      Q.   (BY MR. DE LOS SANTOS)  Well, where do you

 5 live -- what city do you live in?  Do you live in town?

 6               MR. NAVARRO:   Town is fine.

 7      A.   Harlingen.

 8      Q.   (BY MR. DE LOS SANTOS)  And where do you work?

 9      A.   The City of Harlingen.

10      Q.   And do you work at the municipal building, or

11 do you work somewhere else?

12      A.   The City Annex at 502 East Tyler.

13      Q.   And how long have you officed at the City

14 Annex?

15      A.   I would say approximately six years.

16      Q.   And what is your job title and position?

17               (Pause in proceedings at 10:32 a.m.)

18      A.   Environmental health and public buildings

19 director.

20      Q.   (BY MR. DE LOS SANTOS)  And how long have you

21 held that title?

22      A.   The title of environmental health director I've

23 held for approximately six years, public buildings

24 director in addition to that, three and a half.

25      Q.   So you actually hold two titles, then; is that
```

7

1 correct?

2     A.    Correct.

3     Q.    Do you get compensated for two different jobs,

4 or are you compensated for just one job?

5     A.    Just one salary for both.

6     Q.    When you received the additional title of

7 public buildings director, was there any change in your

8 salary?

9     A.    Yes.

10     Q.    An increase?

11     A.    Yes.

12     Q.    And was there any increase in the number of

13 hours that you had to work?

14     A.    No.

15     Q.    But you did take on additional duties and --

16     A.    -- and responsibilities.

17     Q.    -- responsibilities?  Sir, have you ever had

18 your deposition taken before today?

19     A.    Once, yes.

20     Q.    And when was that?

21     A.    I can't recall now.

22     Q.    Was it more than a year ago?

23     A.    It was -- I cannot recall.

24     Q.    What kind of case was it in that you gave --

25     A.    Regarding one of the employees involved in an

18

1       A.   That sounds about right.

2       Q.   And then you started with the City in about

3   1990?

4       A.   I believe it was '90.

5       Q.   Do you have any other jobs or business

6   interests?

7       A.   No.

8       Q.   In the position of public buildings director,

9   what are the general duties of the director?

10      A.   Supervise the maintenance employees,

11  maintenance staff on maintaining City-owned buildings

12  and facilities.

13      Q.   On a day-to-day basis, does the percentage of

14  time that you spend as public building's director versus

15  environmental health director vary a lot, or is it that

16  you do mostly one as opposed to the other?

17      A.   It varies depending on the need.

18      Q.   Is there an assistant director in either one of

19  those two departments?

20      A.   No.

21      Q.   So you're the main person; is that correct?

22      A.   That's correct.

23      Q.   And in your office how many employees work

24  under you?

25      A.   The question would be for public buildings and

19

1  environmental health or just --

2      Q.   At this time, it's for both, correct.

3      A.   I believe there's 32 employees.

4      Q.   And that would include laborers as well as

5  foremen and persons with other positions?

6      A.   That's correct.

7      Q.   Of the 32 people, how many are in environmental

8  health?

9      A.   That would include animal control.  That would

10  be 8, 9, 10, 11.

11      Q.   And how many folks are working under you in the

12  public buildings section?

13      A.   21.

14      Q.   Now, earlier I asked you what the duties of --

15  were as the environmental health director and you told

16  me you oversaw City ordinances and application of

17  ordinances or regulation of ordinances insofar as food

18  establishments and nuisance involve -- including the

19  overgrown-weed-lot ordinance and the junk-vehicle

20  ordinance, but you didn't mention animal control.  Is

21  animal control one other section?

22      A.   It is a section of environmental health, and

23  that is also my responsibility.

24      Q.   Okay.  Are there any other major items like

25  that?

20

1      A.   No, just those.

2      Q.   And when we say "food establishments," are we

3  talking about restaurants as well as grocery stores or

4  just restaurants?

5      A.   Both.

6      Q.   Sir, did you obtain a bachelor's degree?

7      A.   No.

8      Q.   Did you attend and finish high school at

9  Harlingen High School?

10      A.   Yes, I did.

11      Q.   You graduated about 1980?

12      A.   '81.

13      Q.   And who is your immediate superior or

14  supervisor?  Who do you report to?

15      A.   Roy Rodriguez.

16      Q.   And what is Mr. Rodriguez's position?

17      A.   The City manager.

18      Q.   Was Mr. Rodriguez the City manager in the first

19  half of the year of the year 2000?

20      A.   No.

21      Q.   Did you report and have as your supervisor the

22  City manager during the first half of the year 2000?

23      A.   I reported to the assistant City manager.

24      Q.   And who was that?

25      A.   Roy Rodriguez.

21

1    Q.    And why did you report to the assistant City

2  manager at the time as opposed to the city manager?

3    A.    That was the way the organization was set up at

4  that time.

5    Q.    When did it change?

6    A.    When Roy took over as City manager.

7    Q.    And when was that?

8    A.    A little -- I would say about a

9  year-and-three-months ago.

10    Q.    So that would take us to the fall or so of the

11  year 2000; does that sound right?

12    A.    That seems about right.

13    Q.    When was the first time that you ever meet --

14    A.    Excuse me.

15    Q.    Sure.  Bless you.  When was the first time you

16  ever met John Ocie Roberts?

17    A.    I don't remember --

18    Q.    Did --

19    A.    -- to be honest.

20    Q.    Did you meet Mr. Roberts for the first time

21  through your position with the City of Harlingen or did

22  you meet him socially somewhere?

23    A.    No, it was through the position.

24    Q.    Were you at the time acting as director of

25  either of these two departments, or was it prior to the

22

1  time that you took on either of the two directorships?

2      A.   Acting as director of environmental health.

3      Q.   Had you ever met Mr. Roberts while you were the

4  housing rehab specialist?

5      A.   No.

6      Q.   Had you ever met Mr. Roberts while you were the

7  construction project coordinator?

8      A.   No.

9      Q.   Had you ever met Mr. Roberts while you were a

10 building inspector?

11     A.   No.

12     Q.   As a building inspector back in the year 1990,

13 did you ever have occasion to go to the property located

14 at 1726 North Commerce?

15     A.   Not that I recall.

16     Q.   Are you familiar with the property located at

17 1726 North Commerce?

18     A.   Yes.

19     Q.   And what is 1726 North Commerce?

20     A.   At the present time?

21     Q.   Okay.  Let's start with the present time.

22     A.   At the present time, it's a vacant piece of

23 property at the corner of Markowsky and Commerce.

24     Q.   When is the last time that you went to that

25 particular property?

23

1    A.    I drove by that property I would say last week

2 sometime on my way to the animal shelter.

3    Q.    And does that property lie between the animal

4 shelter and your office on a route that you would

5 usually take?

6    A.    There's -- that -- that is one route that I

7 usually -- I can take, yeah.  There's other routes.

8    Q.    And would it be fair to say that you'd take

9 that route on a regular basis, not necessarily all the

10 time, but often?

11    A.    I would say maybe once every two weeks, once --



12 once a week.

13    Q.    Have you noticed whether or not the grass is

14 growing or there are weeds growing on this particular

15 lot?

16    A.    On occasion.

17    Q.    And when's the last time you saw grass or weeds

18 to the extent that you would believe that it would

19 constitute -- in violation of the City ordinance?  I

20 believe your ordinance number is 93 -- Chapter 93.

21    A.    That I can remember it's probably been a little

22 while.

23    Q.    When you say "a little while," are we talking

24 about months or years?

25    A.    No, months.

1    file.

2        Q.    Do you-all keep any memos or notes or

3    transcripts or anything else?

4        A.    Inspectors will from time to time make notes in

5    their logs, and they -- they maintain those.

6        Q.    So the inspectors themselves have logs that are

7    part of the City records; is that correct?

8        A.    That's correct.

9        Q.    And in those logs is a place where the

10   inspector will write down notes and things like that of

11   what he does and what he hears and says and that type of

12   thing?

13       A.    Just simple notes, which properties to mail

14   out, which ones are overgrown, which ones are in

15   violation prior to creating the master list.

16       Q.    Does anybody keep a diary on any particular

17   property on a regular basis?

18       A.    I'm not aware of any diary.

19       Q.    Insofar as the City of Harlingen is concerned,

20   what departments, if any, are you aware of that are

21   responsible for making sure that this Section 93 is

22   complied with?

23       A.    The environmental health department.

24       Q.    That's your department?

25       A.    That is my department.

27

1      Q.    Would you know or have knowledge of any other

2  department that would have any responsibility for making

3  sure that Chapter 93 is complied with?

4      A.    There is -- the planning department has a

5  code enforcement officer that from time to time will

6  address a nuisance in assisting.

7      Q.    That would be from the building codes

8  department?

9      A.    Planning department.

10      Q.    Planning department.  And who is the director

11 of the planning department?

12      A.    Michelle McCoy.

13      Q.    Was she the planning department director back

14 in the first half of the year 2000?

15      A.    Yes, she was.

16      Q.    Was she also the planning department director

17 in the second half of the year 2000?

18      A.    Yes, she was.

19      Q.    Did she participate or have anything to do with

20 the property at 1726 North Commerce during the year

21 2000?

22      A.    No.

23      Q.    Did she have anything to do with or participate

24 in any of the proceedings that the City took against the

25 property at 1726 North Commerce during the year 2000?

28

```
 1      A.   No.

 2      Q.   Did she have anything to do with the City's

 3  dealings with Mr. John Ocie Roberts during the year

 4  2000?

 5      A.   No.

 6      Q.   Was your department the department that was

 7  responsible on behalf of the City of Harlingen to send

 8  out any and all notices required by Chapter 93 and/or

 9  any other ordinance or law or statute that the City

10  would rely on in connection with its dealing with John

11  Ocie Roberts during the year 2000?

12      A.   That's correct.

13      Q.   In your answers to discovery -- written

14  discovery in this case, I received a package entitled

15  "Answers to Interrogatories" that actually is entitled,

16  quote, "City Defendants'" plural possessive, "Objection

17  and Responses to Plaintiff's," single possessive, "First

18  Set of Interrogatories" dated October 5, 2001, and I'm

19  showing you this document.  I'm going to ask the court

20  report to mark it as Deposition Exhibit No. 1.  Have you

21  seen this document before today, sir?

22           (Serna Exhibit 1 marked)

23      A.   I'm sure I have.  I just don't remember.

24           (Serna Exhibit 2 marked)

25      Q.   (BY MR. DE LOS SANTOS)  Sir, I removed from
```

1  that document what I'm going to ask the court reporter

2  to mark as Deposition Exhibit No. 2, which was the very

3  last page to that document, and I would like to direct

4  your attention to Deposition Exhibit No. 2, and I'm

5  pointing here to a line that bears a signature above the

6  name Daniel Serna.  Is that your signature, sir, above

7  the name Daniel Serna?

8       A.   That is my signature.

9       Q.   It indicates here that you are swearing that

10  the answers set forth in that document, Deposition

11  Exhibit No. 1, are true and correct and you did so on

12  October 5 of 2001 before this notary, Norma G. Delgado.

13  Do you see that, sir?

14       A.   I do there.

15       Q.   And did you do that?

16       A.   Yes.

17       Q.   And did you do that in front of Ms. Delgado?

18       A.   Yes, I did.  I remember now.

19       Q.   May I, sir?

20       A.   Sure.

21            THE WITNESS:  Do you have a copy?  I don't

22  have a copy.

23            MR. NAVARRO:  You don't have a copy?

24            THE WITNESS:  I'm sure I do.  It's in here

25  somewhere.

34

1    the time he was the assistant City manager, correct?

2        A.    That's correct.

3        Q.    And you told me that you also spoke with City

4    attorney Brendan Hall and health inspectors Gutierrez

5    and Mares and Ruben Diaz of public works.  Was there

6    anybody else that you spoke with about taking the

7    property belonging to Mr. Roberts that was located at

8    1726 North Commerce prior to the first occasions that

9    you actually went to the premises for the purposes of

10   actually taking the property?

11       A.    I believe that's everybody.

12              MR. NAVARRO:  And, Counsel, with respect

13   to City Attorney Hall, we have no objection to questions

14   relating to factual dates of contact with Mr. Hall.  The

15   substance of any conversations --

16              MR. DE LOS SANTOS:  If I ask the question,

17   I'll let you object.

18              MR. NAVARRO:   -- with Attorney Hall,

19   we'll -- we'll object on attorney-client privilege.

20              MR. DE LOS SANTOS:  All right, sir.

21       Q.    (BY MR. DE LOS SANTOS)  Mr. Serna, as the

22   director of your department, you have told me that your

23   department was in charge.  So as the director, you would

24   have been in charge of handling the situation, if you

25   will, involving 1726 North Commerce and/or Mr. Roberts,

35

1  correct?

2      A.    Correct.

3      Q.    When was it that the City decided or that you

4  decided -- or let me back up.  Whose decision at the

5  City of Harlingen would it have been to undertake or to

6  commence an undertaking against either Mr. Roberts or

7  1726 North Commerce insofar as what you perceived was a

8  Chapter 93 violation?

9      A.    It would be mine along with agreement from our

10 City attorney.

11     Q.    So you would have been the individual to make

12 the decision to proceed, and you would have sought

13 counsel from the City attorney?



14     A.    Correct.

15     Q.    Did you, in fact, make that decision in the

16 year 2000, or did you make it prior to the year 2000,

17 vis-a-vis, Mr. Roberts and/or 1726 North Commerce?

18     A.    Notices had been sent to this property dating

19 way back to '96.

20     Q.    When was the first time that you sought the

21 counsel of the City attorney insofar as this property is

22 concerned or Mr. Roberts is concerned?

23     A.    With regards to the actual cleanup, I have it

24 in here, yeah.  (Witness examining documents)  I have a

25 note here on July 19th of 2000.

39

1    Q.    And you give the actual instructions to do

2    whatever is going to be done; is that right?

3    A.    That's correct.

4    Q.    You noted that early in your testimony here

5    today that -- you say that notices had been sent out

6    dating way back to, quote, "1996."  Do you remember

7    saying that?

8    A.    Yes, I do.

9    Q.    When was it that you as director made the

10   decision something drastic had to be done insofar as

11   1726 North Commerce or Mr. Roberts is concerned?

12   A.    "Drastic" -- by "drastic" you mean remove the

13   debris on the property?

14   Q.    Well, let's -- let's use your definition.

15   That's -- that's appropriate.  So if that's your



16   definition of drastic, I will adopt it for purposes of

17   my questions.  When was it that you made that decision?

18   A.    It would have been sometime around July.

19   Q.    Of what year?

20   A.    2000.

21   Q.    Would it be fair to say that prior to July of

22   2000, in particular during the years '96 through '99,

23   that you as director had not decided that, in using your

24   definition of "drastic measures," that drastic measures

25   were not necessary?

40

1    A.    Notices were sent as far as removing the debris

2  from the property.  I hadn't made that decision, no.

3    Q.    And so is it fair to say, sir, that during the

4  years '96 through '99 that you as director had the

5  opinion that taking those types of measures were not

6  necessary during the time period, '96 though 99, insofar

7  as 1726 North Commerce and John Roberts are concerned?

8    A.    There was more that went into that.  With

9  regards to the decision, it was a matter of could we do

10  it at that time, physically.

11    Q.    So then you had thoughts or inclinations or you

12  were considering taking such measures during the years

13  '96 through '99; is that correct?

14    A.    If -- if the corrections weren't made by the

15  property owner; that's correct.

16    Q.    Well, were the corrections made?

17    A.    No.

18    Q.    And yet you didn't taken any action; is that

19  correct?

20    A.    That's correct.

21    Q.    But you considered taking action; is that

22  right?

23    A.    That's correct.

24    Q.    Why did you not take action?

25    A.    Again, budgetary reasons.

48

1    Q.   And was that bill forwarded to Mr. John

2  Roberts?

3    A.   It was sent to Union Pacific as owner of the

4  property.

5    Q.   If we have the sequence of events correct, let

6  me ask you if it's true, then, that you, Mr. Serna, as

7  director of the environmental health department for the

8  City of Harlingen, were the individual that made the

9  decision in the year 2000 to clean up the property and

10 to seize personalty there at 1726 North Commerce?  But

11 the way that happened is that you made the decision, and

12 then you instructed your personnel in your department,

13 and then you also sought out the public works

14 department, Mr. Diaz ,for assistance in doing the job

15 that you decided was going to be done; is that correct?

16   A.   That's correct.

17   Q.   Did you talk with assistant City manager or

18 City manager, Mr. Rodriguez or with Ms. Prim, at any

19 time before you made that decision?

20   A.   I talked to Roy, assistant City manager at that

21 time.

22   Q.   And did you talk to him before you actually

23 made the decision and gave the first order to go to the

24 property and either start cleaning it up insofar as

25 cutting grass or weeds or insofar as taking personalty

50

1    you could also call Mr. Diaz in on this?

2        A.   No, actually, that was my idea.

3        Q.   And did you pass it by Mr. Rodriguez?

4        A.   I advised him that I was going to use public

5    works from the standpoint of trying to save some money.

6        Q.   At the time did you hold the directorship of

7    both departments that you hold today?

8        A.   Let's 2000.  Yes.

9        Q.   And how does public works differ from

10   public buildings director?

11       A.   Public works handles sanitation, streets,

12   drainage.

13       Q.   Whereas you only handle the -- the upkeep of

14   buildings?

15       A.   Upkeep of buildings.

16       Q.   Isn't it true that in January of 2000 in the

17   first of that month that there was a substantial fire at

18   1726 North Commerce?

19       A.   That's correct.

20       Q.   And is it also true that 1726 North Commerce is

21   a lot that's about 510 or so, maybe 520 feet long and

22   about 200-and-some-odd feet deep?

23       A.   I would say yes to that.  I'm not certain as to

24   the dimensions.

25       Q.   Okay.  I would direct your attention the

1  document that you produced, and let me give you the page

2  number.  It's on page 30.  Have you seen page 30 before

3  today?

4      A.  I'm certain I have.

5      Q.  And that would be true of all 196 pages that

6  you-all produced, correct?

7      A.  That's correct.

8      Q.  Now, here on page 30, this appears to be a

9  surveyor's plat or depiction of the property in

10  question, specifically 1726 North Commerce; is it not?

11      A.  That's what it appears to be.

12      Q.  And it shows there a Markowsky Road, and it

13  shows a frontage of the property of 512 feet and

14  actually a little bit more, maybe 513 -- 512.92; is that

15  right?

16      A.  That's correct.

17      Q.  And it shows the depth of the property being

18  229.6 feet, about 230 feet deep, correct?

19      A.  That's what it shows, yes.

20      Q.  And on there it shows that there used to be an

21  existing warehouse.  Is that the area or the location of

22  the warehouse that burned down on January 1st, 2000?

23      A.  It appears that -- that way.

24      Q.  And you had visited this property on numerous

25  occasions throughout the years from 1996 through the

1  year 2000, and you've even driven by there as of the

2  present; is that true?

3      A.   I visited the property a few times, a few

4  occasions.  I've driven by the property on numerous

5  occasions.

6      Q.   On the few occasions that you actually visited

7  the property, what is your best estimate of the number

8  of times that you've actually been there?

9      A.   It's just a guesstimate.  I would say maybe 15,

10  20.

11      Q.   And of those 15 or 20 times, how many of those

12  visits were before you made the decision to remove

13  property or personalty belonging to Mr. Roberts from

14  1726 North Commerce?

15      A.   I would say of those 20 -- and that's just a

16  guesstimate -- I would guesstimate 10 or 15.

17      Q.   The majority of them; is that correct.

18      A.   That's correct.

19      Q.   And how many times after you made the decision

20  did you go out there?

21      A.   I'd say about five times.

22      Q.   And in the 10 or 15 visits that you had at the

23  property before making this decision, how much total

24  time did you spend at the property among all of those

25  visits?

53

1      A.    Personally?

2      Q.    Yes, sir.

3      A.    And -- and again this is just a guesstimate.    I

4  would say each visit on average five minutes with the

5  exception of the final five.

6      Q.    So is it true, then, sir, that with respect to

7  the visits that you made to the property up to the date

8  that you made the decision to remove the personalty at

9  1726 North Commerce, your visits there were limited to

10  five minutes or less, approximately?

11      A.    Approximately.

12      Q.    You may have had a ten-minute visit, you may

13  have a one-minute visit, but you most certainly didn't

14  have an hour visit, correct?

15      A.    That's correct.

16      Q.    Could you have had a half-hour visit there

17  before?

18      A.    That's possible.

19      Q.    Now, with respect to the visits that you had to

20  the property after you made the decision, the five times

21  that you indicated, were those lengthy or short?

22      A.    Some were half-an-hour to 45 minutes; others,

23  approximately 20, 25 minutes.

24      Q.    Any very brief ones like two or three minutes

25  or five minutes?

104

1    Q.   Isn't it true also that section 93.05 likewise

2  does not mention the environmental health department,

3  the public buildings department, the public works

4  department, any of the inspectors in your particular

5  office, nor does it mention the master list, does it?

6    A.   That's true.

7    Q.   So insofar as the routine and the procedure,

8  the policies, if you will, other than Chapter 93, the

9  City really has not promulgated or given you a schedule

10 of outlines or procedures or policies that you're to

11 follow in implementing Chapter 93; is that true?

12          (Mr. Roberts enters the room)

13   A.   Other than direction to enforce the ordinance.

14   Q.   (BY MR. DE LOS SANTOS)  Is it true?

15   A.   True.

16   Q.   When you say "direction to enforce the

17 ordinance," did you receive that in writing?

18   A.   The environmental health director position is a

19 position within the ordinance, an established position,

20 and it's to enforce these ordinances given to me by the

21 City Manager.

22          MR. DE LOS SANTOS:  I'm going to object

23 because it's not responsive.

24   Q.   (BY MR. DE LOS SANTOS)  Did you receive the

25 direction to enforce Chapter 93 in writing?

105

```
 1              MR. NAVARRO:  He just answered the
 2  question.
 3              MR. DE LOS SANTOS:  It's either yes or no,
 4  Counsel.
 5              MR. NAVARRO:  No, it's not.  He's
 6  testified that it's his job to enforce the ordinance.
 7  That's his direction.
 8      A.   My job description dictates.
 9      Q.   (BY MR. DE LOS SANTOS)  All right.  So then
10  it's in your job description?
11      A.   And it is in writing.
12      Q.   And did you sign your job description?
13      A.   I accepted the position.
14      Q.   And did you sign it?
15      A.   I signed accepting the position assuming
16  responsibility for the job description and the
17  responsibility.
18      Q.   And did you take an oath to fulfill your job?
19      A.   An oath?
20      Q.   Yes, sir.
21      A.   Just --
22      Q.   An oath of office?
23      A.   -- just an agreement on the acceptance of the
24  position.
25      Q.   Did you get requested or required to file an
```

123

1    taller than 24 inches.  They're cultivating the plants.

2    We're talking strictly grass, something that would

3    harbor rodents, that would pose a nuisance.

4         Q.   A lot of the palm trees in the Valley in the

5    old days, they were not cultivated and they just grew at

6    will.  So would those be considered weeds?

7         A.   We wouldn't cut those down, no.

8         Q.   Is there a rule, a procedure, or anything in

9    writing that the City promulgates to define weeds?

10        A.   Simply overgrown weeds, something that's not

11   cultivated.

12        Q.   But it's -- that's not a --

13             MR. DE LOS SANTOS:  I'm going to object,

14   sir, as not responsive.

15        Q.   (BY MR. DE LOS SANTOS)  Is there a rule or a

16   procedure in writing that the City has that defines the

17   word "weeds" as it's meant to defined for purposes of

18   93.03 (A)?

19        A.   It's not defined in the ordinance, no.

20        Q.   Is it defined anywhere else?

21        A.   No.

22        Q.   Is the word "rubbish" defined anywhere?

23        A.   Not in the ordinance.

24        Q.   And is the word "brush" defined anywhere by the

25   City of San -- of Harlingen with respect to 93.03(A)?

124

```
 1        A.   Not in the ordinance, no.

 2        Q.   Anywhere else?

 3        A.   No.

 4        Q.   Is the word "unsightly matter" defined

 5   anywhere?

 6        A.   No.

 7        Q.   Has the City of Harlingen ever heard the term

 8   "Beauty is in the eyes of the beholder"?

 9        A.   I have.

10        Q.   You might consider my gut unsightly, but I

11   think it's beautiful.  In either event I hope I don't

12   get cited for 93.03(A) violation.  Maybe we can cite

13   your lawyer's office building.

14                  MR. NAVARRO:  We'll let you have some fun

15   with your sidebar remarks, but --

16                  MR. DE LOS SANTOS:  There you go.  We will

17   move on.

18                  THE WITNESS:  And you notice I left it

19   alone.  I -- I didn't --

20        Q.   (BY MR. DE LOS SANTOS)  I appreciate that

21   smile.  All right, sir.  Let's move on with the serious

22   questions.  I apologize.

23             "Any person," it says here, "firm or

24   corporation".  Do you have any definitions for "persons,

25   firm, or corporation" in writing from the City of
```

126

1     Q.   "Unsanitary matter," have you ever seen the

2  definition for that?

3     A.   No.

4     Q.   And when you say "accumulate," if

5  Mayor De La Garza has a couple of weeds in his yard, are

6  we going to cite him, or how many weeds does he have to

7  have by the time you decide you're going to cite

8  somebody?

9     A.   As a rule if they're over 12 inches, he'll

10  receive a notice, and he has.

11     Q.   For just one weed?

12     A.   If it's overgrown, it's overgrown.

13     Q.   And when you say "overgrown," I don't see that

14  word in this 93(A) anywhere, do you?

15     A.   No.

16     Q.   Who decided that 12 inches was overgrown?

17     A.   That's something we did in the department.  We

18  decided as a policy.

19     Q.   When did you decide that?

20     A.   It's been decided before I got to the

21  department.

22     Q.   Who told you?

23     A.   It was passed on.  Once I took over that was

24  just the typical.

25     Q.   Who passed it on to you?

136

1  how many of those does the City of Harlingen claim that

2  Mr. Roberts actually received?

3      A.  All of them.

4      Q.  And what proof, if any, does the City of

5  Harlingen have that Mr. Roberts received the notice that

6  is on page 5?

7      A.  Most of these notices were not returned, and

8  that is really the only proof.

9      Q.  So what you're saying is that the notice on

10 page 5 was not returned?

11     A.  No, this is a copy.  I believe this is a copy.

12     Q.  Where is there any proof on page 5 that it was

13 even mailed?

14     A.  It's not on here.

15     Q.  There's no delivery confirmation here, is

16 there, sir, on page five?

17     A.  No.

18     Q.  There's also not even a United States Postal

19 Service postmark on here, is there?

20     A.  No, that's on the originals.  These are copies.

21     Q.  Now, is there anybody's initials or anything

22 indicating here that they actually mailed it and put it

23 in a post office box?

24     A.  Page 7.

25     Q.  On page 5?

137

1  A. Page 5.

2  Q. Now, is what I see here on page 5 the front and

3 back of a postcard?

4  A. Correct.

5  Q. And here, this one is dated -- or it has a date

6 up towards the top of 1/8/99 underneath the words

7 "Harlingen, Texas." Is that supposed to be the date

8 that this card was supposedly made?

9  A. And mailed out, correct.

10  Q. Well, where does it say it's been mailed out

11 that day?

12  A. They -- they get mailed out the same day

13 they're processed.

14  Q. Well, isn't possible that the card may not have

15 actually been mailed out?

16  A. The possibility does exist, yes.

17  Q. Is there a record anywhere in writing where

18 somebody certifies that this card was actually, in fact,

19 taken to either the United States Postal Service and

20 given to the United States Postal Service postman for

21 delivery in the U.S.P.S. mails or dropped off at a

22 United States Postal Service depository so that it could

23 be mailed in the U.S.P.S.?

24  A. This particular one, it doesn't appear so other

25 than this is just a copy.

138

```
 1       Q.   Well, there's no record, is there, sir?

 2       A.   I think I answered there, on this one

 3  particular one.

 4       Q.   Well, let's look at number 6.  You mentioned

 5  the center of number 6, and for purposes of the record,

 6  page 5 has nothing copied on the back of page 5,

 7  correct?

 8       A.   Correct.

 9       Q.   Page 6, however, does have something copied on

10  the back, correct?

11       A.   Correct.

12       Q.   All right.  And page 6 again is apparently a

13  copy of three different cards; is that right?

14       A.   Correct.

15       Q.   All right.  Here's a card in the middle ,which

16  is the one I think you referenced me to, and that's the

17  one that underneath the word Harlingen, comma, TX, you

18  have 10, dash, 23, dash, zero, zero; is that right?

19       A.   That's correct.

20       Q.   Now, is there any record anywhere that somebody

21  certifies that they actually mailed this particular card

22  or the original of it on --

23       A.   Again --

24       Q.   -- at any time?

25       A.   -- this is just a copy.  Of this particular
```

139

1  copy, no.

2      Q.   Now, is there any others on page 6 addressed to

3  Mr. Roberts or sent to Mr. Roberts?

4      A.   The top of the page, the carbon copy of the one

5  that went out to Southern Pacific.

6      Q.   And what address was that sent?

7      A.   I would -- I would assume that the Route 2,

8  Box --

9      Q.   You would assume?

10     A.   -- 300.  I would assume.

11     Q.   There's no record then of what address, if any,

12 it was actually sent to, correct?

13     A.   It's the same one.  As you notice both cards,

14 that is the address it was sent to, 10/23/00, the same

15 date on both cards.

16     Q.   Is what you're saying is --

17     A.   This is a copy of the card.

18     Q.   Let me see if I've got this correct.  The card

19 up at the top was actually mailed to Southern Pacific,

20 and on the same day, they generated another card and

21 that's the one that's in the middle that was --

22     A.   -- sent out --

23     Q.   -- supposed to have been sent to John Roberts?

24     A.   That's correct.  That's what it appears.

25     Q.   So we have no record anywhere of anybody

140

1  certifying or confirming under oath or in writing or

2  otherwise that this -- this card -- either of these

3  three cards on page 6 were actually deposited with the

4  United States Postal Service for mailing?

5      A.   That's correct.

6      Q.   Going on to page 7 which I believe is the next

7  page you told me that you had.  On page 7 I see three

8  different cards or what appears to be three copies of

9  three different cards, and in this case, I see three

10 different postage-meter marks and one official McAllen,

11 Texas, United States Postal Service mark on the one in

12 the middle.  Let me just rephrase my question now.  Sir,

13 on the card up at the top, I see -- or what appears to

14 be a copy of the card up at the top, I see a date -- or

15 what appears to be date, 4/8/99.  Is that supposed to

16 have been a date?

17     A.   Yes.

18     Q.   Then I see a meter mark.  Do you-all have a

19 meter at your office?

20     A.   Yes, we do.

21     Q.   So you have a meter there and you just run your

22 mail through that meter; is that right?

23     A.   That's right.

24     Q.   And then when you actually drop it in the mail

25 and it comes back to you, you will get a postmark like

141

1  the one here and the one in the middle where it says

2  "McAllen, Texas".  You-all didn't put that mark on

3  there, did you?

4       A.   No.

5       Q.   Your mark is the one that says, "Harlingen,"

6  correct?

7       A.   That's correct.

8       Q.   So the United States Postal Service will affix

9  their mark canceling out the postage like the one there

10 at McAllen, Texas, on the document in the middle which

11 is dated -- am I reading that correctly, December 10th,

12 1998?

13      A.   That's correct.

14      Q.   Now, I note that on the one on the top,

15 somebody put a line through the name John Roberts and

16 through the address and there's a stamp that appears to

17 be a United States Postal Service stamp that says,

18 "Return to sender," and it says, "Insufficient address."

19 Do you see that?

20      A.   I -- I see that.

21      Q.   Did you-all ever make note that that address

22 was not a good address?

23      A.   That is the address we had and --

24      Q.   Where did you get that address?

25      A.   I don't know.  Apparently from -- I don't know.

143

1　look like these copies?

2　　　A.　Correct.

3　　　Q.　All right.  Now, the actual originals, then, on

4　these that you have, these came back in the mails, and

5　you have this P.O. Box address on here that you sent it

6　out in December, and then you sent it out to that same

7　address in April.  Isn't somebody in your office suppose

8　to check those addresses when -- when these cards are

9　coming back?

10　　　A.　If that is the address that we have on record,

11　that's the address that we have to use.

12　　　Q.　I note that the document that's on page 5, the

13　one that there's no record of anybody ever mailing it,

14　it indicates an address that's P.O. Box 1319, Houston,

15　Texas, 78251, just like the ones there on page 7, and

16　it's dated right in between the December and April one.

17　So if it was an insufficient address in those other two

18　months, are you sure it isn't possible that you have the

19　actual original back at your office marked insufficient

20　address and you just didn't find it when you went

21　looking for it?

22　　　A.　No, if we had it, she would have produced it --

23　we would have produced it.

24　　　Q.　Now, I looked at another down here on page 7,

25　"Undeliverable as addressed, unable to forward," John

1    Roberts, P.O. Box 1319, San Antonio, Texas.  Now, that's

2    a great city, but, you know, where did you-all get that

3    address?

4        A.    I don't know.

5        Q.    That one is apparently dated September 15th,

6    '98?

7        A.    Yes.

8        Q.    Well, back in '98, the Post Office is saying

9    "Please advise your correspondents of your correct

10   address.  Undeliverable as addressed."  Nobody in your

11   office is going to notice that somebody's telling you to

12   correct the address?

13       A.    Again, that's the address that we had on

14   record.

15       Q.    So even if you guys know it's a bad address,

16   you just keep sending them?

17       A.    We have to use the address on record.

18       Q.    And who determines the address on record?

19       A.    The Appraisal District.

20       Q.    The Appraisal District?

21       A.    In Mr. Roberts' case, apparently, that change

22   was done to -- to our system as per his request, and I

23   say that because there's a note on here, "Change per

24   Ruben."  That's Ruben Mares, the inspector.

25       Q.    Which note, sir?

145

1     A.   Okay.  Let's see, the 4/8/99, page 7 on the top

2  as to 1726 North Commerce, you have it?  It says,

3  "Change per Ruben"?  That would be my inspector, Ruben

4  Mares.  When I asked Ruben about that, evidently,

5  Mr. Roberts had made the request to change it to that

6  address.  I don't know why the request was made, but

7  that's what Ruben advised me.

8     Q.   When did Ruben advise you of that?

9     A.   Oh, this must have been sometime in '99 or

10  2000.  Again, these are generated.  Like many times I

11  don't see these notices.

12     Q.   Now, it indicates there, though, "Change per

13  Ruben 11/12/96."  So Ruben's getting instructions to

14  change this address back on November 12th of 1996 and

15  he's just now telling you about it three or four years

16  later; is that correct?

17     A.   That's correct.

18     Q.   And so he has this fresh in his memory that

19  Mr. Roberts told him to change it?

20     A.   Evidently.

21     Q.   Did he get it in writing from Mr. Roberts to

22  change the address?

23     A.   I did not ask him that.

24     Q.   How did he confirm that it was even Mr. Roberts

25  asking for the change of address and not some third

ESQUIRE DEPOSITION SERVICES
7800 IH-10 WEST, SUITE 100    SAN ANTONIO, TX  78230
PHONE (210) 377-3027   FAX (210) 344-6016   1(800)969-3027

146

1  person who wanted to do Mr. Roberts wrong?

2      A.   Well, he knows Mr. Roberts.

3      Q.   On the phone?

4      A.   No, he knows him personally.  They've met at

5  the property.

6      Q.   Well, that's my whole point.  Does he know

7  Mr. Roberts personally back in 1996 that well to be able

8  to know that whoever may have called him in to -- that

9  supposedly that made this address change that you're

10 just verifying it like that without anything in writing?

11     A.   Well, back in '96 I don't know what he had.

12     Q.   How will does Mr. Mares know Mr. Roberts?

13     A.   I don't know how well they know each other.

14     Q.   Well enough to hate him?

15     A.   I can't answer that.

16     Q.   Sir, so, then, all the ones on page 7, you got

17 the card so Mr. Roberts, in fact, never received those,

18 correct?

19          MR. NAVARRO:  Objection.  You can answer

20 to the best of your knowledge.

21     A.   To the best of my knowledge, they cam back

22 undeliverable.

23     Q.   (BY MR. DE LOS SANTOS)  And you have them there

24 in your office?

25     A.   We should have them there in our office, yes.

147

1     Q.  Do any of those cards bear Mr. Roberts'

2 signature on them or initials?

3     A.  No.

4     Q.  Do any of those cards indicate that Mr. Roberts

5 received them?

6     A.  No.

7     Q.  Moving onto page 8, sir.  Well, let's see, you

8 did tell me page 8, and that would be the -- one in the

9 middle and the one at the bottom, correct?

10     A.  Correct.

11     Q.  Here we have one dated 4/16/99, which

12 apparently was sent eight days after the one on page 7

13 that's at the top which was 4/8/99, and this one comes

14 back on that P.O. Box 1319 as saying, "Forwarding order

15 expired."  Do you see that?

16     A.  Yes, I do.

17     Q.  And then you have that you sent in January of

18 2000 to that same address, and that was one says,

19 "Insufficient address."  Do you see that, sir?

20     A.  I do.

21     Q.  So you have both of those cards back at your

22 office, correct?

23     A.  That -- that's correct.

24     Q.  Do either of those cards have any evidence to

25 show that Mr. Roberts, in fact, received those?

148

1    A.    No.

2    Q.    And did anybody at your office make any change

3  in Mr. Roberts' address as of April of 1999?

4    A.    No.

5    Q.    And did the system address change at your

6  office with respect to Mr. Roberts as of January 2000

7  from the address that you had back in April of '99?

8    A.    January 2000?

9    Q.    Yes, sir.

10    A.    Jumping forward.

11    Q.    It's on page 8.

12    A.    It went back to the property owner.

13    Q.    No, sir, that's not my question.  My question,

14  sir, is, as of January of 2000, had you changed the

15  address that you had on your system for Mr. Roberts, the

16  address that you had back in April of '99 of P.O. 1319

17  out over there in Houston?

18    A.    We mailed the notices to the property owners as

19  of January 2000.  Does that answer your question?

20    Q.    No, sir.  It is not responsive.

21            MR. DE LOS SANTOS:  So I object.

22    Q.    (BY MR. DE LOS SANTOS)  My question is, the

23  address for John Roberts, have you changed it as of

24  January 2000.

25    A.    We do have an address for him.

1      Q.   As of January 2000 what is the address that you

2  had for Mr. Roberts?

3      A.   It's a route and box number.  Let me look it

4  up.  Route 2, Box 300, Rabb Road.  This went out in

5  July.

6            MR. DE LOS SANTOS:  I'll object to the

7  last part as being nonresponsive.

8            MR. NAVARRO:  The answer is responsive to

9  your question.

10            MR. NAVARRO:  I'm sorry, Counsel, it is

11  not.

12            MR. NAVARRO:  Well, it is --

13            MR. DE LOS SANTOS:  My question was --

14            MR. NAVARRO:  -- it is.

15            MR. DE LOS SANTOS:  -- very specific.

16            MR. NAVARRO:  No, it wasn't.  He --

17            MR. DE LOS SANTOS:  Yes, it was.

18            MR. NAVARRO:  -- answered the question.

19            MR. DE LOS SANTOS:  No, sir, he did not.

20  My question was very specific.  What was the address

21  that they had in January of 2000.  Now he's talking

22  about July.  I want to know about January.  It's not

23  responsive.  If they had the La Feria address in

24  January, he can tell me that.

25      A.   I don't know if we had it in January.  No, we

1  did not have it in January.  I don't believe so.  I

2  don't recall.

3      Q.    (BY MR. DE LOS SANTOS)  All right, sir.  If you

4  look at your page 8, the document that's in the center,

5  sent to Mr. Roberts at the P.O. Box in Houston.  Again,

6  insufficient address and it's returned back to you.  Is

7  that the address that you had for Mr. Roberts in January

8  of 2001 in Houston, Texas?

9      A.    That's the address that was -- that's on this

10 card, so that's the address we had.

11     Q.    Did you send any notice to Mr. Roberts in

12 January of 2000 to any other address other than

13 P.O. Box 1319, Houston, Texas 78251?

14     A.    I'll have to go through all these if you'll

15 give me some time.

16     Q.    Absolutely.

17            MR. DE LOS SANTOS:  We'll take a short

18 coffee break.

19            MR. NAVARRO:  We'll take a break.

20            (Recess from 3:05 p.m. to 3:20 p.m.)

21     Q.    (BY MR. DE LOS SANTOS)  Mr. Serna, we just took

22 another short break.  Are you ready to proceed, sir?

23     A.    Yes, I am.

24     Q.    You understand you're still under the same oath

25 and rules and so forth as we discussed earlier?

151

1    A.   Yes, I do.

2    Q.   Mr. Serna, we're going through notices that

3  were sent out that you have here in your file, and I'd

4  like to get back to that if you don't mind, please.

5  There on pages 7, 8, and 9 is where we left off.  With

6  respect to the notices that appear on page 8, are these

7  like the ones that are on page 7, that is that you have

8  the originals back at your office, the ones that appear

9  on page 8 in the center and the bottom?

10    A.   Yes.

11    Q.   And these cards also don't bear any evidence

12  that Mr. Roberts actually got either of these two; is

13  that correct?

14    A.   That's correct.

15    Q.   And the next page that you cited me was page 9.

16  I see here on page 9 that there are three -- copies of

17  three different cards respectively dated from top to

18  bottom apparently March or August 24th of '98.  Can you

19  tell you what date that is?

20    A.   It looks like 24.

21    Q.   is it August or March?

22    A.   March.

23    Q.   Of '98, an then the next one in the middle is

24  10/10/97?

25    A.   Yes.

153

1      Q.   Okay.  If you'll look at that notice, it also

2  has a different phone number for you or your department

3  anyway, the health department, 427-8813 as opposed to

4  427-8812, which appears on the back of page 8.  The

5  first appeared on the back of page 9.  Which is the

6  correct phone number?

7      A.   We have four numbers for that department.

8  Anyone of those numbers goes to that department.

9      Q.   So both numbers are still good?

10      A.   Yes, to this day.

11      Q.   Did they perhaps pick up an older set of cards

12  that didn't have your name on them or --

13      A.   That may have been the case.

14      Q.   Now, I note, however, that the ones on page 10

15  that date back to '96, those, in fact, had Eleazar

16  Gonzalez's name on them.

17      A.   Eleazar was still there.

18      Q.   And that's on the back of page 10, correct?

19      A.   Correct.  Yes.

20      Q.   I also note that in 1997 if you look at the

21  ones on page 9, the one for July, you have the address

22  of P.O. Box 1319.  Do you see that, sir?

23      A.   Yes.

24      Q.   Yet June 9th of '97 on page 10 you had an

25  address for John Roberts as 1726 North Commerce.  Do you

154

1  see that, sir?

2      A.   Yes, I do.

3      Q.   And that's the actual physical address of -- of

4  the place we're talking about, correct?

5      A.   Right.

6      Q.   Now, with respect to the three cards that are

7  on page 9, there is no evidence or documentation here or

8  anywhere else to confirm and establish that these three

9  cards were, in fact, deposited with the United States

10  Postal Service for mailing, correct?

11      A.   Correct.

12      Q.   And the same thing holds true of the cards

13  that -- or the copy of the cards that appear on page 10;

14  is that right?

15      A.   That's correct.

16      Q.   And the same thing holds true with respect to

17  the cards that appear on page 11; is that also true?

18      A.   That's correct.

19      Q.   Sir, would it make sense to send out notice to

20  the property address if you had that address for

21  Mr. Roberts at one time?

22          MR. NAVARRO:   Objection; dual questions.

23      Q.   (BY MR. DE LOS SANTOS)   You can answer.

24      A.   The property address and the mailing address

25  sometimes are different.

1    Q.    Would it make any sense, though, for you to

2 send them to both addresses?

3    A.    That's -- that's -- that would make more sense.

4 It is a budgetary -- within the budgetary restraints.

5    Q.    Now, in this particular case, on the notices

6 that we had that were returned to you that appear there

7 on page 8, for example, and page 7, had you seen those

8 at anytime prior to the time that this file packet was

9 put together in September 2001?

10    A.    I don't recall seeing them.

11    Q.    Have you --

12    A.    I may -- I may have.  I just don't recall.

13    Q.    Well, when you made the decision in July 2000

14 to have property removed, that is without Mr. Roberts'

15 specific consent from the property, had you taken a look

16 to see whether or not you had these notices in the file?

17    A.    For the July cleanup, we have the letters on

18 file.  Those are the other letters that we -- I -- I

19 indicated.

20    Q.    Well, in respect to these cards, had you

21 noticed whether or not you had those cards at the time

22 you made that decision?

23    A.    We're still talking about the cleanup of July

24 and October, right?

25    Q.    That would be either July or October.  I'm

working off of this list right here.

Q. Was there anything else other than the vehicles that you decided to remove in July of 2000?

A. No.

Q. So in July of 2000, the only thing that you decided to have removed from the premises of 1726 North Commerce were the vehicles that were located at that address belonging to Mr. Roberts in July of 2000; is that correct?

A. That's correct.

Q. Now, the notice that you have referred me to is found on pages 78 through 82 of the production materials, and it appears that the first page, 78, is a letter on the City of Harlingen letterhead proclaiming the City of Harlingen the capital of the Lower Rio Grande Valley. While other towns here in the Rio Grande Valley may agree or disagree with that, that's neither here or there, but the point is that this letter is addressed to South Pacific Transportation and apparently dated 2/2/2000, correct?

A. Correct.

Q. Is there any other notice that you would have relied on back in July of 2000 when you made that decision?

A. No, I believe this is the notice that I relied

1  on.

2      Q.   Sir, are you familiar with the statutory

3  definition in the Texas Revised Civil Statutes for

4  antique vehicles?

5      A.   For antique vehicles?

6      Q.   Yes, sir.  Are you familiar with it?

7      A.   No.

8      Q.   Have you ever read the statutory definition for

9  antique vehicles?

10     A.   No.

11     Q.   And that would be the statutory definition as

12  defined in the Texas statutes.

13     A.   No.

14     Q.   Do you have any of the Texas statutes available

15  to you at your offices?

16     A.   No, we work off of the ordinances.

17     Q.   And that's just that book that you told me

18  where you had --

19     A.   Code of ordinances.

20     Q.   -- those City ordinances, right?

21     A.   Uh-huh.

22     Q.   And the code of ordinances that you have, is it

23  a complete book or just excerpts of the ones that you

24  work with, I mean, 93, 94, and 111?

25     A.   It is a complete book.

1      Q.   That letter in this particular case is the one

2 that appears at page 78 dated February 2nd, 2000, that

3 was sent to the -- the Nebraska address; is that

4 correct?

5      A.   Sent to -- yes.

6      Q.   That's Southern Pacific Transportation,

7 correct?

8      A.   Correct, correct.

9      Q.   So no other notice was sent after the vehicles

10 were seized giving the owner an opportunity to redeem

11 the vehicles or the property, correct?

12     A.   Correct.

13     Q.   Does the City do any other type of

14 recordkeeping with respect to these vehicles other than

15 what we see here in your Exhibit D?

16     A.   No, this is the extent.

17     Q.   Do you make any reports to the Department of

18 Motor Vehicles or the Texas Department of Transportation

19 and Safety?

20     A.   We make inquires on ownership of vehicles.

21     Q.   Did you make any inquires in this case?

22     A.   Yes, we did, and you have those forms.

23     Q.   Where are those inquiries?

24     A.   I'll give you an example of one on page 48, the

25 junk-vehicle-information form in the middle of the form,

200

1    A.    I said I know that they know each other from
2  work, I would assume.
3    Q.    Certainly.  And they've known each other for
4  some time.  In other words at least they knew each other
5  back in '99?
6    A.    I would assume.
7    Q.    And Mr. Mares certainly had 1726 North Commerce
8  in his work area?
9    A.    Yes.
10    Q.    And he was assigned to that particular property
11  among others --
12    A.    Yes.
13    Q.    -- in this region --
14    A.    Yes.
15    Q.    -- or his section?
16    A.    Yes.
17    Q.    So that property being in his territory, he
18  should have been very well familiar with the Bargain --
19  how did you name it in your report, the Bargain Barn?
20    A.    Actually, I didn't name it.  I believe he did.
21    Q.    Mr. Roberts named it --
22    A.    I just took it --
23    Q.    -- but you named it --
24    A.    -- Bargain Barn.
25    Q.    -- the Bargain Barn in the report.  I mean,

212

1  copy of what you made when you sent it, and the one on

2  page 6 is copy of what you actually got back in the mail

3  if you even sent it out?

4      A.   I don't see the postmark on that copy, so I

5  don't believe either one -- I think both of them are

6  copies.  Just one is enlarged and one's a -- was reduced

7  in size when copied.

8      Q.   So --

9      A.   For some reason -- for some reason it was

10  duplicated.

11      Q.   Is it possible that the documents that are

12  copied on pages 5 through 11 that that's a copy of the

13  record of what you actually have insofar as the actual

14  cards themselves are concerned in your file as far as

15  the ones on pages 12 through 20 are copies that were

16  made of the cards as they were attempted to be mailed or

17  were suppose to be mailed?

18      A.   That's a possibility.

19      Q.   Certainly you agree, though, that the one on

20  page 6 at the middle of the page is the same as the one

21  on the top of the page on page 20?

22      A.   Yes, I do agree to that.

23      Q.   And getting back to this property here on

24  page 30, what's across the street on Commerce from the

25  Bargain Barn?

1  me about set up across Markowsky Road, are there any

2  other structures out there?

3      A.   Not that I'm aware of.

4      Q.   Sir, I'm going to now direct your attention to

5  the document that appears on pages 21 through 30,

6  including that diagram.  What is that?

7      A.   I'm reading this, and it says, "A Commercial

8  Lease."

9      Q.   And did you take this document out of your

10 files?

11     A.   Yes, I did.

12     Q.   And is that the file that you-all had on

13 1726 North Commerce?

14     A.   This was in addition to the file.  This came

15 from the law office for Union Pacific.

16     Q.   And when did you get this?

17     A.   I don't recall when we got this.  I think

18 there's a note.  I don't remember when I got -- when I

19 received a copy of it.

20     Q.   There's a letter from the attorney --

21     A.   Marjorie Bassel.

22     Q.   -- for -- correct.  Did you get it with a

23 letter from her addressed to you?

24     A.   That may be true.

25     Q.   Or did you have it before that or after, or do

```
 1        A.    Correct.

 2        Q.    You didn't participate in going out and making

 3   the list of these vehicles --

 4        A.    That's correct.

 5        Q.    -- did you?   Mr. Mares did?

 6        A.    Correct.

 7        Q.    Do you know whether or not this list of

 8   vehicles is -- has been verified by anybody else other

 9   than Mr. Mares?

10        A.    By Tony.   There was a witness.   That's --

11   that's why his signature is on the forms as well.

12        Q.    You're talking about the forms that are in

13   Exhibit D?

14        A.    Correct.

15        Q.    Now, did the City send any kind of notice after

16   it went -- and I'm going to move now to October.   After

17   it went in October to take the property, did it send any

18   kind of notice to Mr. Roberts that it was going to allow

19   him to redeem any of his property at that time?

20        A.    After the original notices, the only other

21   notice that was sent was to -- the answer to your

22   question would be no.

23        Q.    Okay.   Thank you.

24        A.    The only other notice would be to Union

25   Pacific.
```

1     Q.   And going back to the July seizure, you

2  referred me to that list of vehicles that was referenced

3  in your testimony here earlier on page 79.  My question

4  to you now is, with respect to that notice, where

5  specifically did it say that in July that's when these

6  seizures are going to take place, or is it your

7  contention that because the notice says anytime after

8  ten days; is that what I'm understanding?

9     A.   That's correct.

10    Q.   So you're saying because it says anytime after

11 ten days, since July is five months later, that's more

12 than ten days later?

13    A.   And it would have postponed had anybody filed

14 any type of appeal.

15    Q.   Now, did you not get a letter from

16 Mr. Rodriguez that had been given to him by Connie

17 de la Garza before you went and did what you did

18 indicating that Mr. Roberts had not gotten notice and

19 that he was objecting?

20    A.   A letter for Roy Rodriguez?

21    Q.   The letter is actually from Mr. Roberts;

22 however, it came to you by way of Roy Rodriguez, who is

23 the City manager if I've got the name correct, and he

24 apparently got it from Connie de la Garza.

25    A.   Okay.

223

1    Q.    Do you know remember that letter?

2    A.    No.

3    Q.    Well, let me locate it for you.

4          MR. GUILLEN:  It's 176.

5    Q.    (BY MR. DE LOS SANTOS)  176.  Let's see, no,

6    178.  I apologize.  Well, it's somewhere in there.

7          MR. GUILLEN:  169.

8          MR. DE LOS SANTOS:  169.  Let's see if we

9    can get this right.  Yeah, that's it, definitely.

10   Q.    (BY MR. DE LOS SANTOS)  All right.  Now I'm

11   talking about the letter that appears at page 169.  Was

12   this letter that you produced in this case a letter that

13   was in your file for 1726 North Commerce or for

14   Mr. Roberts?

15   A.    I'm sorry.  What was your question?

16   Q.    Yes.  Was this letter a letter that was in your

17   file for 1726 North Commerce pertaining to Mr. Roberts?

18   A.    Yes.

19   Q.    All right.  I note that this indicates on 7/19,

20   the very day you made your decision, all right?  It has

21   the name in handwriting, Roy, and down, apparently

22   directing it to Roy, and it says, quote, "Please CK,"

23   and it looks like this, and I would interpret that as

24   "Please check this."  "Mr. Roberts" -- and it's got a

25   phone number 797-0027 -- "states he had never received

224

1   any notice at all.  Thanks, Connie."  You see that?

2       A.   Yes, I do.

3       Q.   Do you recognize that as Connie de la Garza's

4   handwriting?

5       A.   Ah.

6       Q.   You don't know?

7       A.   No, I don't.

8       Q.   So you can't tell us either way, correct?

9       A.   No.

10      Q.   Is that true?

11      A.   That's true.

12      Q.   All right, sir.  so I would suggest to you that

13  this is Mayor de la Garza's handwriting and that he is

14  giving this to Roy de la -- Rodriguez, and it's there on

15  that date, July 19th of 2000, and it's a letter that was

16  delivered to the City of Harlingen back in May of 2000

17  indicating that he's bringing this complaint,

18  Mr. Roberts is, concerning notice on his property.  Now,

19  had you not seen this letter before you made your

20  decision?

21      A.   I'm sure I did.

22      Q.   Oh, you had considered it before you made your

23  --

24      A.   I'm-- I'm --

25      Q.   -- decision?

225

1    A.    -- sure I did see the letter.  I just don't

2    remember it now.  I still don't remember, but the date

3    on top is July 19th of 2000.

4    Q.    Correct.

5    A.    I know the date on his letter.

6    Q.    May 1st.

7    A.    I don't see a -- where it was received by the

8    City at that time.

9    Q.    And --

10    A.    It has received on May the 4th.

11    Q.    -- the City -- with this letter, the City got

12    it in May of 2000.  It had an address for Mr. Roberts

13    listed down -- what is the address that's set forth

14    there underneath his name?

15    A.    1726 North Commerce.

16    Q.    What city?

17    A.    Harlingen, Texas 78550.

18    Q.    So if this letter was in your file and you'd

19    seen it before Mr. de la Garza got it and before

20    Mr. de la Garza handed it to Roy, you had it in your

21    files at least a different address for Mr. Roberts; is

22    that right?

23    A.    Yeah.  Evidently, yeah.

24    Q.    So none of the notices, however, that you sent

25    to Mr. Roberts went to 1726 North Commerce, right,

232

CHANGES AND SIGNATURE

JOHN OCIE ROBERTS V. CITY OF HARLINGEN, ET AL

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 142 | 19 | yes | improper grammar for each |
| 142 | 21 | yes, these are the originals, we---we should | |
| 156 | 11 | yes | |
| 158 | 16 | for personal use? yes. | |
| 158 | 23 | at times, yes | |
| 160 | 25 | yes, I believe so. | |
| 174 | 16 | yes, they use whoever is available, correct | |
| 180 | 21 | yes | |
| 204 | 1 | yes, I do | |
| 225 | 23 | yes, evidently | |

I, DAN SERNA , have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
DAN SERNA

THE STATE OF TEXAS        *
COUNTY OF CAMERON         *

Before me, _____, on this day personally appeared DAN SERNA, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 3rd day of _____, 2002.

ONEIDA P SALDIVAR
NOTARY PUBLIC
State of Texas
Comm. Exp. 06-22-2004

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3   JOHN OCIE ROBERTS,              *
              PLAINTIFF              *
 4                                   *
     V.                              *        CIVIL ACTION
 5                                   *        NO. B-001-34
     CITY OF HARLINGEN, CAMERON      *
 6   COUNTY, TEXAS, CONNIE           *
     DE LA GARZA, INDIVIDUALLY,      *
 7   CHIEF OF POLICE MICHAEL         *
     BLAKE, INDIVIDUALLY, ACTING     *
 8   CITY MANAGER ROY RODRIGUEZ,     *
     INDIVIDUALLY, INSPECTOR DAN     *
 9   SERNA, INDIVIDUALLY, LT. JIM    *
     SCHEOPNER, INDIVIDUALLY,        *
10   INSPECTOR RUBEN MARES,          *
     INDIVIDUALLY, INSPECTOR SAM     *
11   GUTIERREZ, INDIVIDUALLY,        *
     LA FERIA WRECKER SERVICE,       *
12   DOUBLE A WRECKER CO.,           *
     T AND T WRECKER SERVICE, TIM    *
13   WILKINSON IRON & METAL, INC.,   *
              DEFENDANTS             *        JURY
14

15                  REPORTER'S CERTIFICATION
                  DEPOSITION OF DAN SERNA
16                   FEBRUARY 26, 2002

17       I, CAROLYN NEWMAN, a Certified Shorthand Reporter

18   in and for the State of Texas, do hereby certify that

19   the facts stated by me in the caption hereto are true;

20   that the foregoing deposition transcript of DAN SERNA,

21   the witness hereinbefore named, was at the time

22   mentioned taken by me in stenograph, the said witness

23   having been by me first duly cautioned and sworn upon

24   his oath to tell the truth, the whole truth, and nothing

25
```

1   but the truth, and later transcribed from stenograph by

2   me.

3       I further certify that I am neither attorney or

4   counsel for, nor related to or employed by any of the

5   parties to the action in which this deposition is taken,

6   and further that I am not a relative or employee of any

7   attorney or counsel employed by the parties hereto, or

8   financially interest in the action.

9

10       I further certify that the above and foregoing

11   deposition transcript as set forth in typewriting is a

12   full, true and correct transcript of the proceedings had

13   at the time of taking said deposition.

14       Certified to by me this 15th day of March, 2002.

15

16

17   Taxable Cost:
18   1,379.95
         *Carolyn Newman*
     CAROLYN NEWMAN, Texas CSR 4193
     Expiration Date: 12/31/01
19   7800 IH-10 West, Suite 100
     San Antonio, Texas  78230
20   (210) 377-3027

21

22

23

24

25

# CHAPTER 93: NUISANCES

Section

93.01    Stagnant water prohibited
93.02    Accumulation of carrion, filth, and the like prohibited
93.03    Excessive growth or accumulation of weeds and rubbish prohibited; wildlife habitat area exempted
93.04    Abatement required; notice
93.05    Service of notice
93.06    Correction or removal of conditions by city
93.07    Filing of statement of expenses incurred
93.08    Collection of expenses; lien

93.99    Penalty

## § 93.01  STAGNANT WATER PROHIBITED.

It shall be unlawful for the owner of any lot or other real property in the city to allow or permit holes or places where water may accumulate and become stagnant to be or remain on such lot or premises or to allow or permit the accumulation of stagnant water thereon, or to permit the same to remain thereon.
('73 Code, § 18-69) (Ord. 60-22, passed, 8-3-60; Am. Ord. 60-34, passed 12-21-60)  Penalty, see § 93.99

## § 93.02  ACCUMULATION OF CARRION, FILTH, AND THE LIKE PROHIBITED.

It shall be unlawful for any person who shall own or occupy any house, buildings, establishment, lot or yard, or other real property in the city to permit or allow any carrion, filth, or other impure or unwholesome matter to accumulate or remain thereon.
('73 Code, § 18-70) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)  Penalty, see § 93.99

### § 93.03  EXCESSIVE GROWTH OR ACCUMULATION OF WEEDS AND RUBBISH PROHIBITED; WILDLIFE HABITAT AREA EXEMPTED.

(A) *Generally.* It shall be unlawful for any person, firm, or corporation who shall own or occupy any lot or other real property within the city to allow weeds, rubbish, brush, or other unsightly, objectionable, or insanitary matter to accumulate or grow on such lot or property. Any person owning a parcel of property of one acre or more and whose property abuts a lot on which is maintained a single- or multi-family residence adjacent to which there is no dedicated street or alley can remedy or remove the condition by mowing of 150 feet in depth along that portion of the parcel that fronts upon the residential property line.

(B) *Wildlife habitat area; exemption.* In addition, any person owning a parcel of one acre or more can request in writing to the City Commission that the parcel be designated a wildlife habitat area and thus will be exempt from the requirements of this section regarding the removal of weeds and brush. The criteria and requirements are as follows:

(1) *Definitions.* For the purposes of this division, the following terms are hereby defined:

(a) *MANAGEMENT PLAN.* A detailed plan describing what steps the property owner will take to maintain the wildlife habitat area.

(b) *QUALIFIED WILDLIFE OR PLANT EXPERT.* A person recognized by both the private parcel owner and the city as an expert on local wildlife or plant life.

(c) *WILDLIFE HABITAT AREA.* A parcel so designated by a majority vote of the City Commission.

(d) *WILDLIFE HABITAT AREA SIGN.* An official on-site sign that will be used to designate an approved wildlife habitat area. The design and wording of this official sign will be subject to a majority vote of the City Commission.

(2) *Designation as a wildlife habitat area; criteria.*

(a) The parcel must be a minimum of one acre in size.

(b) The parcel must be clear of rubbish, junk, or litter.

(c) Property taxes on the parcel must be current.

(3) *Procedures.*

(a) The applicant must submit a written request to the City Secretary's office. This request must include a written statement from a qualified wildlife or plant expert detailing the reasons why the parcel should be designated as a wildlife habitat area and a detailed management plan addressing the maintenance of the habitat area.

(b) The City Secretary shall schedule a City Commission hearing on the request and notify all property owners within 200 feet of the parcel. The qualified wildlife or plant expert shall represent the applicant at this hearing. The City Commission may designate the parcel as a wildlife habitat area by a majority vote.

(c) If the parcel is so designated, the City Manager shall cause to be erected wildlife habitat area signs on the parcel. A sign must face each public street. All costs incurred during the construction and installation of the signage will be paid by the parcel owner.

(d) Once designated as a wildlife habitat area, the Health Department shall periodically inspect the property to ensure compliance with the approved maintenance plan. If noncompliance is found, the wildlife habitat designation can be removed by a majority vote of the City Commission, and the owner of the parcel shall thereafter comply with the requirements of this section by removing weeds and brush thereon. Property owners may make a written request to the City Commission to remove the wildlife habitat area designation, and the removal of such designation shall be granted by the Elective Commission.

(e) The owner of any wildlife habitat area must maintain the area clear of all rubbish, junk, and litter.
('73 Code, § 18-71) (Ord. 60-34, passed 12-21-60; Am. Ord. 86-82, passed 11-5-86; Am. Ord. 90-45, passed 5-2-90; Am. Ord. 91-50, passed 10-15-91) Penalty, see § 93.99

## § 93.04 ABATEMENT REQUIRED; NOTICE.

Whenever any condition described in this chapter is found to exist on any premises or real property within the city, the owner of such premises or real property shall be notified by the city, in writing, to correct, remedy, or remove the conditions within ten days after such notice and it shall be unlawful for any person to fail to comply with such notice.
('73 Code, § 18-72) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60) Penalty, see § 93.99

## § 93.05 SERVICE OF NOTICE.

The notice provided for in this section shall be served personally on the owner to whom it is directed or shall be given by letter addressed to such owner at his last known post office address. In the event personal service cannot be made and the owner's address is unknown, such notice shall be given by publication at least two times within ten consecutive days in a newspaper of general circulation published within the city.
('73 Code, § 18-73) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)

## § 93.06  CORRECTION OR REMOVAL OF CONDITIONS BY CITY.

In the event the owner of any lot, premises, or real property upon which a condition described in this chapter exists fails to correct, remedy, or remove such condition within ten days after notice to do so is given in accord with this chapter, the city may do such work or make such improvements as are necessary to correct, remedy, or remove such conditions, or cause the same to be done, and pay therefor and charge the expenses incurred thereby to the owner of such lot. Such expenses shall be assessed against the lot or real estate upon which the work was done or the improvements made. The doing of such work by the city shall not relieve such person from prosecution for failure to comply with such notice in violation of § 93.04.
('73 Code, § 18-74) (Ord. 60-22, passed 8-3-60; Am. Ord. 60-34, passed 12-21-60)

## § 93.07  FILING OF STATEMENT OF EXPENSES INCURRED.

Whenever any work is done or improvements are made by the city under the provisions of § 93.06, the City Manager or City Health Officer, on behalf of the city, shall file a statement of the expenses incurred thereby with the County Clerk. Such statement shall give the amount of such expenses and the date or dates on which the work was done or the improvements were made.
('73 Code, § 18-75) (Ord. 60-22, passed 8-3-60)

## § 93.08  COLLECTION OF EXPENSES; LIEN.

After the statement provided for in § 93.07 is filed, the city shall have a privileged lien on the lot or real estate upon which the work was done or improvement made, to secure the expenses thereof. Such lien shall be second only to tax liens and liens for street improvements, and in accord with TEX. HEALTH & SAFETY CODE §§ 342.001 through 342.007. For any such expenditures and interest, suit may be instituted and recovery and foreclosure of the lien may be had in the name of the city and the statement of expenses made in accord with § 93.07, or a certified copy thereof, shall be prima facie proof of the amount expended for such work or improvements.
('73 Code, § 18-76) (Ord. 60-22, passed 8-3-60)

## § 93.99  PENALTY.

Any person who shall violate any of the provisions of this chapter shall be guilty of an offense and upon conviction shall be fined as provided in § 10.99 of this code and each and every day's violation shall constitute a separate and distinct offense, in case the owner or occupant of any lot, lots, or premises under the provisions of this chapter shall be a corporation, and shall violate any provisions of this chapter, the president, vice-president, secretary, treasurer of such corporation, or any manager, agent, or employee of such corporation shall be also severally liable for the penalties herein provided.
('73 Code, § 18-77) (Ord. 60-22, passed 8-3-60)

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

1/08/99

CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

1726 N. COMMERCE
WEST CITY VIEW HTS LT31-5

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX. 78251

0005

DEAR PROPERTY OWNER

Under the provisions of City Ordinance #60-34, it shall be unlawful to allow weeds, rubbish, brush, or other objectionable matter to accumulate on any lot, tract, or parcel of land. These regulations were adopted for the purpose of protecting the health of all residents, and making Harlingen a more attractive place in which to live.

See reverse side for property in violation of Ordinance #60-34. This can be corrected by cutting the weeds or grass and removing all debris within ten (10) days upon receipt of this notice. Noncompliance will result in the city correcting the violation, a charge made, and a lien levied against your property until this amount is paid. An administrative service charge of $50.00 will be included in addition to any other cost incurred by the city.

If the information on reverse side is incorrect, please call the Health Department at 427-8812. Your cooperation in this matter is appreciated. **PLEASE DISREGARD THIS NOTICE IF PROPERTY HAS ALREADY BEEN CLEANED.**

Sincerely,
Dan Serna

HARLINGEN, TEXAS 78550

10/23/00

1726 N. COMMERCE
HGN-WEST CITY VIEW HTS,
LOTS 1-5.

25-5150-0000-0010-00
cc: John Roberts

SOUTHERN PACIFIC
1700 FARNAM ST. 10TH FLOOR
OMAHA, NE. 68102

City of Harlingen Health Department
P.O. Box 2207 / 502 East Tyler
Harlingen, TX  78550

10-23-00

1726 N. Commerce
Hgn. West City View Hghts.
Lots 1-5

25-5150-0000-0010-00

JOhn Roberts
Rt. 2, Box 300,  Rabb Rd.
La Feria, TX  78559

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

5/24/00

1726 N. COMMERCE
HGN-WEST CITY VIEW HTS,
LOTS 1-5.

25-5150-0000-0010-00

SOUTHERN PACIFIC
1700 FARNAM ST. 10TH FLOOR
OMAHA, NE.  68102

0006



4/08/99

1726 N. COMMERCE
WEST CITY VIEW HTS LTS1-5

CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

RETURNED TO SENDER

REASON CHECKED
Unclaimed   Refused
Attempted-Not Known
Insufficient Address
No such street       number
No such office in state
Not remail in this envelope

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX.   78251

77231+1313

CITY OF HARLINGEN   HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER AVE
HARLINGEN, TEXAS 79550

12/10/98

1726 N. COMMERCE
WEST CITY VIEW HTS LTS1-5

CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

REASON CHECKED

JOHN ROBERTS
P.O. BOX 1319
HOUSTON. TX.   78205

77231+1313

CITY OF HARLINGEN   HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST
HARLINGEN, TEXAS 78550

9/15/98

1726 N. COMMERCE   HOUSTON
WEST CITY VIEW HTS - 78205

RETURNED TO SENDER
UNDELIVERABLE AS ADDRESSED
UNABLE TO FORWARD
Please Advise your Correspondents
of your Correct Address

$ 0.20
U.S. POSTAGE

JOHN ROBERTS
P.O. BOX 1319
SAN ANTONIO, TX.   78251

front

0007

2/17/00

1726 N. COMMERCE
HGN-WEST CITY VIEW,
LOT 1 BLDG ONLY,
CLEAN-UP BURNED DEBRIS.

25-5150-0000-0015-00

INTERNATIONAL PAPER CO.
75 CHESTNUT RIDGE RD
MONTVALE, NJ.  07645



CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

1/11/00

1726 N. COMMERCE
HGN-WEST CITY VIEW HTS,
UP ON ENTIRE PROPERTY,
LOTS 1-5. GENERAL CLEAN
GRASS/WEEDS.
25-5150-0000-0010-00

REASON CHECKED
X Moved-Left No Address          __ Refused
__ Insufficient Address          __ Vacant
__ Moved-Not Forwardable         __ No Such Street,
__ Forwarding Order Expired      __ No Such No.
__ Attempted-Not Known           __ Unclaimed.
          Clerk T2-1

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX.  78251



CITY OF HARLINGEN   HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER
HARLINGEN, TEXAS 78550

4/16/??

1726 N. COMMERCE
WEST CITY VIEW HTS LTS1-5
GRASS/WEEDS INSIDE FENCE
AREA,
CHNG PER RUBEN 11-12-96
25 5150 0000 0010-00

REASON CHECKED
__ Moved-Left No Address          __ Refused
__ Insufficient Address           __ Vacant
X Moved-Not Forwardable           __ No Such Street,
__ Forwarding Order Expired       __ No Such No.
__ Attempted-Not Known            __ Unclaimed.
          Clerk T3-1

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX.  78251

front

0008

3/24/98

1726 N. COMMERCE
WEST CITY VIEW HTS LTS1-5
GRASS AND WEEDS FENCED IN
AREA
CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX   78251

---

CITY OF HARLINGEN   HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

10/10/97

1726 N. COMMERCE
WEST CITY VIEW HTS LTS1-5
GRASS AND WEEDS FENCED IN
AREA.
CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX   78251

---

CITY OF HARLINGEN   HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

7/10/97

1726 N. COMMERCE
WEST CITY VIEW HTS LTS1-5
GRASS/WEEDS INSIDE FENCED
AREA. BY JUNK EQUIPMENT.
CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX   78251

P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

8/09/97

1726 N. COMMERCE
WEST CITY VIEW PTS LTS1-5
GRASS/WEEDS INSIDE FENCED
AREA. BY JUNK EQUIPMENT.
CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

          JOHN ROBERTS
          1726 N. COMMERCE
          HARLINGEN, TX.  78550

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

10/29/96

1726 N. COMMERCE
HGN-WEST CITY VIEW LOTS
1-2-3 & PTS 4-5.
GRASS/WEEDS AROUND EQUIP-
MENT, INSIDE FENCE AREA
25-5150-0000-0010-00

          SOUTHERN PACIFIC
          4099 MCEWEN STE 600
          DALLAS, TX.  75244

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

9/13/96

1726 N. COMMERCE
HGN-WEST CITY VIEW LOTS
1-2-3 & PTS 4-5.

25-5150-0000-0010-00
          SOUTHERN PACIFIC
          4099 MCEWEN STE 600
          DALLAS, TX.  75244

0010

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 562-8006
HARLINGEN, TEXAS 78550

7/08/96

1726 N. COMMERCE
HGN-WEST CITY VIEW LOTS
1-2-3 & PTS. 4-5. GRASS &
WEEDS INSIDE FENCED AREA

25-5150-0000-0010-00

           SOUTHERN PACIFIC
           4099 MCEWEN STE 600
           DALLAS, TX.         75244

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 1201 W. VAN BUREN
HARLINGEN, TEXAS 78550

3/27/96

1726 N. COMMERCE
HGN-WEST CITY VIEW LOTS
1-2-3 & PTS. 4-5. GRASS &
WEEDS INSIDE FENCED AREA
JUNK AND DEBRIS.
25-5150-0000-0010-00

           SOUTHERN PACIFIC
           4099 MCEWEN STE 600
           DALLAS, TX.         75244

front

0011

75244

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207, 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

7/08/96

1726 N. COMMERCE
HGN-WEST CITY VIEW LOTS
1-2-3 & PTS 4-5, GRASS &
WEEDS INSIDE FENCED AREA

25-5156-0000-0610-00

SOUTHERN PACIFIC
4099 MCEWEN STE 600
DALLAS, TX.

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

10/29/96

1726 N. COMMERCE
HGN-WEST CITY VIEW LOTS
1-2-3 & PTS 4-5.
GRASS/WEEDS AROUND EQUIP--
MENT INSIDE FENCE AREA
25-5150-0000-0010-00

SOUTHERN PACIFIC
4099 MCEWEN STE 600
DALLAS, TX. 75244

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

0013

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

6-09-97

1726 N. COMMERCE
WEST CITY VIEW HTS 5751-5
GRASS/WEEDS DEEMS FENCED
AREA. BY JOHN EQUIPMENT.
CHRG PER RUBBH 11 12-94.
25-5150-0000-0490-00

JOHN ROBERTS
P.O. B. COMMERCE
HARLINGEN, TX. 73550

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

6-09-97

1726 N. COMMERCE
WEST CITY VIEW HTS 5751-5
GRASS/WEEDS DEEMS FENCED
AREA. BY JOHN EQUIPMENT.
CHRG PER RUBBH 11 12-94.
25-5150-0000-0490-00

JOHN ROBERTS
P.O. BOX 1369
HARLINGEN, TX. 73551

0014

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207, 602 E. TYLER ST.
HARLINGEN, TEXAS 78550

0015

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

9/15/98

1725 N. COMMERCE
BEST CITY VIEW HTS LTS1-5

CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX. 78251

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

12/10/98

1726 N. COMMERCE
WEST CITY VIEW HTS LTS1-5

CHNG PER RUBEN 11-12-96
25-5150-0000-0010-00

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX. 78251

0016

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

1/08/99

1726 N. COMMERCE
WEST CITY WTED HTS LTS1-5

CHRG PER RMEST 11-12-96
29-5365 0000-0010-00

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX. 78231

4.00/??

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

1726 N. COMMERCE
WEST CITY WTED HTS LTS1-5

CHRG PER RMEST 11-12-96
29-5365 0000-0010-00

JOHN ROBERTS
P.O. BOX 1319
HOUSTON, TX. 78231

0017

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

4/20/99

TXA N. COMMERCE
HFY/ CITY UTTL HTS LT81-5
SEAN-AFTER INSIDE FENCE
AREA
HARD CTY CLERK 11-12-92
60 DAYS EXPD 2G16-90

JOHN ROBERTS
P.O. BOX 1314
HOUSTON, TX. 78551

CITY OF HARLINGEN  HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

1/28/00

TXA N. COMMERCE
HARLINGEN, CITY VIEW HTS.
HF OR SERIAL PROPERTY,
LOTS 1-5, AFTER CLEAN
INSIDE FENCE
60 DAYS (xxxx xxxxx)

JOHN ROBERTS
P.O. BOX 1314
HOUSTON, TX.  78551

0018

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207, BOX 2, TILER ST.
HARLINGEN, TEXAS 78550

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207, BOX 2, TILER ST.
HARLINGEN, TEXAS 78550

SOUTHERN PACIFIC
1740 Forest St. 10TH FLOOR
OMAHA, NE, 68102

City of Harlingen Health Department
P.O. Box 2207 / 502 East Tyler
Harlingen, TX  78550

10-23-00

1726 N. Commerce
Hgn. West City View Hghts.
Lots 1-5

25-5150-0000-0010-00

John Roberts
Rt. 2, Box 300,  Rabb Rd.
La Feria, TX  78559

CITY OF HARLINGEN HEALTH DEPARTMENT
P.O. BOX 2207 / 502 E. TYLER ST.
HARLINGEN, TEXAS 78550

10/23/00

1726 N. COMMERCE
HGN-WEST CITY VIEW HTS.
LOTS 1-5.

25-5150-0000-0010-00
cc: John Roberts

SOUTHERN PACIFIC
1700 FARNAM ST., 10TH FLOOR
OMAHA, NE.  68102

0020

Approved as to Form
By General Counsel
October 30, 1987

SPTCo
LEASE
No. 208312 N
     106 3754

COMMERCIAL LEASE

M.P. TBE-173.05-R-N

                                    19ᵗʰ              May
THIS LEASE is made and entered into this ~~1st~~ day of ~~August~~,
1998, by and between SOUTHERN PACIFIC TRANSPORTATION COMPANY, a Delaware
corporation, (herein "Lessor"), and JOHN ROBERTS, an individual, (herein
"Lessee").

PART I
BASIC LEASE TERMS

A. **PREMISES:** The land and any improvements and facilities located thereon, at
or near Harlingen, County of Cameron, State of Texas, as shown on Drawing
No. RED-87-500, Sheet No. 1 of 1, dated October 5, 1987, and made a part
hereof.

B. **EFFECTIVE DATE:** This Lease shall take effect on August 1, 1987, ("Effective
Date").

C. **TERM:** This Lease shall be for a term of thirty (30) days ("Lease Term")
from Effective Date hereof and shall continue on a month-to-month tenancy
basis until terminated hereunder.

D. **TERMINATION:** This Lease shall be terminable by either party at any time
without cause on thirty (30) days' advance written notice to the other.

E. **USE:** The Premises shall be used by Lessee solely and exclusively for
storage and sale of refrigeration parts, household goods, and receipt by
mail of mortar, sand, rock and mesquite wood chips.

F. **RENT:** Commencing as of the Effective Date hereof, Lessee shall pay to
Lessor as rent for the Premises the sum of FIVE HUNDRED AND 00/100 DOLLARS
($500.00) per month, payable monthly in advance.

G. **BASIS OF RENT ADJUSTMENT:** Rent shall be adjusted based on the higher of the
CPI Factor (defined in Section 5 of the General Lease Terms) as indicated on
the Consumer Price Index, Urban Wage Earners and Clerical Workers, U. S.
City Average, All Items (1967 = 100), ("Index"), published by the United
States Department of Labor, Bureau of Labor Statistics; or any successor or
substitute index published as a replacement for the Index by any United
States governmental agency; or the fair rental value of the Premises at the
time of said revision.

MAY 19 1988   

0021
Document 0012
Page 1 of 10

H.  **INSURANCE:** Subject to the requirements of Section 13 of the General Lease Terms, Lessee shall furnish the following insurance to Lessor:

(1)  Comprehensive General Liability Insurance and Automobile Liability Insurance, each with limits of $1,000,000 or more combined single limit per occurrence.

(2)  Workers' Compensation Insurance in at least the statutory amount.

(3)  Employers' Liability Insurance with limit of $1,000,000 or more.

Items (2) and (3) shall be automatically waived if Lessee does not have any employees working for Lessee upon the Premises.

I.  **ADDRESSES FOR NOTICES:** All notices to either Lessor or Lessee shall be addressed as follows:

To Lessor:      SOUTHERN PACIFIC TRANSPORTATION COMPANY
                Dallas Regional Office - Real Estate
                4099 McEwen, Suite 600
                Dallas, Texas  75234

To Lessee:      JOHN ROBERTS
                Route 2, Box 300-B
                La Feria, TX  78559

J.  **ADDRESS FOR PAYMENTS TO LESSOR:** Checks shall be made payable to Lessor and shall be mailed to P. O. Box 44240, San Francisco, California 94144.

K.  **TRACK SERVICE:** The specific terms, covenants, and conditions relating to the use or ownership of track by Lessee upon or adjacent to the Premises are covered under a separate agreement between the parties hereto.

The foregoing Basic Lease Terms and the General Lease Terms set forth in attached Part II are incorporated into and made parts of this Lease.

IN WITNESS WHEREOF, the parties hereto have executed, or have caused to be executed, this Lease in duplicate the day and year first above written.

                        SOUTHERN PACIFIC TRANSPORTATION COMPANY
                        Original Signed
                        _____

                   By _____
                        Regional Director - Real Estate


                        _____
                        JOHN ROBERTS

PLM/KAH/bd

4. **PAYMENT/REFUND OF RENT**

Lessee shall pay to Lessor as rent for the Premises the amount shown as rent in the Basic Lease Terms, payable at the times set forth therein, without deduction, setoff, prior notice or demand.

Upon termination of this Lease, unless Lessee is then in default, any unearned portion of the rent paid in advance shall be refunded to Lessee upon Lessee's written demand therefor if made within thirty (30) days after termination.

5. **RENTAL REVISION**

The rent shall automatically and without notice to Lessee be adjusted, upwards only, on each anniversary of the Effective Date, by the CPI Factor. The "CPI Factor" is the percentage of adjustment stated in the Consumer Price Index (indicated in the Basic Lease Terms) established during the last available twelve-month period immediately preceding each anniversary of the Effective Date, adjusted to the nearest one-tenth of one percent.

In lieu of the above, Lessor may, at any time, increase the rent without reference to the CPI Factor by giving Lessee thirty (30) days' notice of such adjustment and its effective date.

The rent, as so increased, shall be effective as of each anniversary of the Effective Date if increased by the CPI Factor and as of the effective date of any other increase, notwithstanding Lessor's acceptance of a lesser amount and notwithstanding any billing by Lessor for a lesser amount.

6. **TAXES**

A. Lessee shall pay, before they become delinquent, all taxes, charges, and assessments which are levied upon, or assessed against any improvement or personal property placed upon the Premises by Lessee.

B. In addition to the taxes and assessments specified above, Lessee shall pay to Lessor any privilege, sales, gross income or other tax (not including federal or state income tax) imposed upon the rent received by Lessor by any agency having the authority to do so.

7. **UTILITIES**

Lessee shall arrange and pay for all utilities, including without limitation, water, power, heat, garbage, communications and sewer services, to be used in connection with this Lease.

If Lessor contracts with a utility company to provide access for service to Lessee at the Premises for Lessee's sole use, Lessee shall pay to Lessor a minimum sum of $350 upon receipt of a bill therefor to partially defray administrative costs.

0023

8. MAINTENANCE AND REPAIR

Lessee, at Lessee's expense and to Lessor's satisfaction, shall keep and maintain the Premises and all improvements thereon in good repair and in a neat and safe condition, and shall promptly make all repairs and replacements that may become necessary to the Premises or improvements thereon, whether structural or nonstructural, ordinary or extraordinary.

9. ALTERATIONS

Lessee shall make no alteration or improvement to the Premises without Lessor's prior written consent. All repairs, alterations and improvements to or on the Premises shall become the property of Lessor, without payment by Lessor of any compensation therefor.

10. LIENS

Lessee shall not commence any repairs (except emergency repairs), changes or alterations on the Premises until fifteen (15) days after Lessor has received notice from Lessee stating the date the installation of the alterations is to commence. Lessor shall have the right to enter the Premises to post notices of nonresponsibility.

Lessee shall not permit any mechanics' or materialmen's liens or other liens to be filed against the Premises nor against Lessee's leasehold interest therein by reason of labor or materials furnished to the Premises at Lessee's instance or request. If any such liens are filed against the Premises, Lessee shall remove the same at Lessee's own expense, and shall pay any judgment which may be entered thereon or thereunder. Lessee shall indemnify, hold harmless, and defend Lessor from and against any such liens.

11. INDEMNIFICATION

Lessee shall release, defend (with counsel satisfactory to Lessor) and indemnify Lessor from and against all liability, cost and expense for loss of or damage to property and for injuries to or death of any person (including, but not limited to, the property and employees of each party hereto) when arising or resulting from:

(a)  the use of the Premises by Lessee, its agents, employees, or invitees;

(b)  breach of this Lease by Lessee; or

(c)  the location or condition of the Premises or any part thereof;

regardless of whether such liability, cost or expense is caused or contributed to by the negligence, active or passive, of Lessor.

The term "Lessor," as used in this Section 11 and Sections 12, 13 and 14, shall include the successors, assigns and affiliated companies of Lessor,

0024

and, if applicable, any other railroad company that may be lawfully operating on Lessor's tracks.

12. COMPLIANCE WITH LAW AND ENVIRONMENTAL IMPAIRMENT

Lessee, at Lessee's expense, shall comply with all applicable laws, regulations, rules and orders with respect to the use of the Premises, regardless of when they become or became effective, including, without limitation, those relating to construction, grading, signage, health, safety, noise, environmental protection, waste disposal, and water and air quality, and shall furnish satisfactory evidence of such compliance upon request of Lessor.

Should any discharge, leakage, spillage, emission, or pollution of any type occur upon or from the Premises due to Lessee's use and occupancy thereof, Lessee, at Lessee's expense, shall clean all property affected thereby, to the satisfaction of Lessor (insofar as the property owned or controlled by Lessor is concerned) and any governmental body having jurisdiction thereover.

Lessee shall indemnify, hold harmless, and defend Lessor from and against all liability, claim, cost or expense (including, without limitation, any fines, penalties, judgments, litigation costs, attorneys' fees, and consulting, engineering and construction costs) incurred by Lessor as a result of Lessee's breach of this section, or as a result of any such discharge, leakage, spillage, emission or pollution, regardless of whether such liability, cost or expense arises during or after the Lease Term and regardless of whether such liability, cost or expense is caused or contributed to by the negligence, active or passive, of Lessor.

13. INSURANCE

While this Lease is in effect, Lessee, at Lessee's expense, shall maintain and furnish evidence of insurance written through an insurance company having a Best's rating of B + 13 or better and licensed to do business in the state in which the Premises are located, meeting the requirements stated below in form satisfactory to Lessor, for each of the following types of insurance in amounts not less than the amounts shown on the Basic Lease Terms:

A. Comprehensive General Liability Insurance shall:

    (1) be primary, without right of contribution from other insurance which may be in effect;

    (2) not be invalidated by the acts or omissions of other insureds;

    (3) not be modifiable or cancellable without 30 days' prior written notice to Lessor (except in the case of cancellation for nonpayment of premium in which case cancellation shall not take effect until at least 10 days' notice has been given to Lessor), herein referred to as "Notice of Modification or Cancellation";

    (4)  name Lessor as additional insured;

    (5)  provide for contractual liability coverage;

    (6)  provide for broad form property damage, products/completed operations, and personal injury endorsements; and

    (7)  include a severability-of-interest clause.

B.  Automobile Liability Insurance shall:

    (1)  be primary, without right of contribution from other insurance which may be in effect;

    (2)  not be invalidated by the acts or omissions of other insureds;

    (3)  provide for Notice of Modification or Cancellation; and

    (4)  name Lessor as additional insured.

C.  Workers' Compensation Insurance (if required under this Lease) shall cover all persons employed by Lessee in the conduct of Lessee's operations on the Premises and shall be endorsed to provide for waiver of subrogation against Lessor and to provide for Notice of Modification or Cancellation.

D.  Employer's Liability Insurance (if required under this Lease) shall be endorsed to provide for Notice of Modification or Cancellation.

E.  Any umbrella or excess liability insurance shall provide that if the underlying aggregate is exhausted, the excess coverage shall drop down as primary insurance.

A properly completed certificate of insurance shall be furnished to Lessor for approval.

14. NOISE LEVELS NEAR RAILROAD TRACKS

Lessee hereby recognizes and acknowledges that railroad tracks are located on or adjacent to the Premises.

Lessee recognizes that the operation of trains over the tracks does and shall produce noise levels which may be considered objectionable by the employees, agents, tenants, or invitees of Lessee. Therefore, Lessee agrees that no legal action or complaint of any kind whatsoever shall be instituted against Lessor on Lessee's behalf as a result of such noise levels and to indemnify and save harmless Lessor against any loss, damage, liability or expense either might incur as a result of such action being taken by Lessee's employees, agents, tenants or invitees.

If the Premises are classified by Lessor as non-operating property, this Section 14 shall not apply.



15. RESERVATIONS

Lessor hereby excepts and reserves the right, to be exercised by Lessor and by any other who have obtained or may obtain permission or authority from Lessor so to do, to

(1) operate, maintain, review and relocate any and all existing pipe, track (if any), power and communication (including without limitation fiber optic) lines and appurtenances and other facilities of like character upon, over or under the surface of the Premises; and

(2) construct, operate, maintain, review and relocate such additional facilities of the same character as shall not unreasonably interfere with Lessee's use of the Premises as specified in Section 8 of the Basic Lease Terms.

Any such construction, operation, relocation or maintenance shall not be done at Lessee's expense unless such work is requested by Lessee or done for the benefit of Lessee.

16. MINERAL RIGHTS

Lessor also reserves for itself and those to whom it grants such right the title and exclusive right to all of the minerals and mineral ores of every kind and character now known to exist or hereafter discovered upon, within or underlying the Premises, or that may be produced therefrom, including, without limiting the generality of the foregoing, all petroleum, oil, natural gas and other hydrocarbon substances and products derived therefrom, together with the exclusive and perpetual right thereto, without, however, the right to use or penetrate the surface of, or to enter upon the Premises within five hundred feet (500') of the surface thereof to extricate or remove the same.

17. BARRICADES

In addition to any barricades, fences or gates which may be specified elsewhere in this Lease, Lessee, if requested by Lessor, shall install and maintain barricades, fences, and fence gates of a size and form satisfactory to Lessor at such locations as may be designated by Lessor at any time while this Lease is in effect, all at Lessee's expense and to Lessor's satisfaction.

18. SURRENDER OF THE PREMISES

Upon termination of this Lease, Lessee shall leave the Premises in a neat and clean condition satisfactory to Lessor and free of all personal property of Lessee.

Under Section 9 hereof, all repairs, alterations and improvements made by Lessee shall become the property of Lessor. However, Lessor may, by written notice, require Lessee to remove any such alterations and improvements from the Premises and to restore the Premises to their original condition (normal

wear and tear excepted) prior to termination of this Lease. If Lessee fails to do so, Lessor may perform such removal and restoration work in which case Lessee shall pay Lessor within thirty (30) days after demand therefor (1) an amount equal to the rent (as in effect immediately before termination) for the period during which such removal is accomplished to compensate Lessor for the loss of rent to Lessor resulting from the unavailability of the Premises for leasing to another tenant during such time and (2) the cost of removal of such improvements. Lessor shall use reasonable diligence in the removal of such improvements.

19. TERMINATION OF LEASE

Termination of this Lease for any reason whatsoever shall not release either party from any liability or obligation hereunder resulting from an event which may have occurred before termination, or thereafter in case by the terms of this Lease it is provided that certain things shall or may have to be done after termination hereof.

20. CONDEMNATION

If all or part of the Premises is acquired by eminent domain or by purchase in lieu thereof, Lessee shall have no claim to any compensation awarded for the taking of the Premises or any portion thereof, including Lessee's leasehold interest therein, or to any compensation paid as severance damages, or for loss of or damage to Lessee's improvements.

21. DEFAULT

If Lessee fails to pay the rent or to make any other payment required to be made by Lessee hereunder within three (3) days after written notice by Lessor or fails to perform any other term or condition of this Lease within fifteen (15) days after written notice by Lessor or abandons or vacates the Premises, then Lessor may, in addition to any other remedies Lessor may have at law or equity, terminate this Lease forthwith.

22. ASSIGNMENT AND SUBLETTING

Lessee shall not assign or encumber Lessee's interest in this Lease or in the Premises, or sublease all or any part of the Premises.

23. DISPOSSESSION

If Lessee is lawfully deprived of the possession of all or any part of the Premises by a party other than Lessor, Lessor may, upon receipt of notice from Lessee setting forth the circumstances, either install Lessee in possession of the Premises or terminate this Lease and refund to Lessee the pro rata amount of any prepaid but unearned rent after receipt of such notice. Lessor shall not be liable to Lessee for any loss, damage or claim resulting from such deprivation of possession.

Document 0012
Page 9 of 10

0028

24. NOTICES

All notices shall be in writing and shall be deemed to have been given when delivered personally or deposited in the United States mail, registered or certified, postage prepaid, and addressed to the party to whom the notice is directed at the address set forth in the Basic Lease Terms. Payments to Lessor shall be made at the address for payments set forth in the Basic Lease Terms. Either party may change the address for notices or Lessor may change the address for payments by giving the other party notice to that effect.

25. ATTORNEYS' FEES

If either party brings any action against the other to enforce or collect any sum due under this Lease or if Lessor brings an action for unlawful detainer of the Premises, the losing party shall pay the reasonable attorneys' fees of the prevailing party in addition to the judgment and court costs.

26. LESSOR'S RIGHT-OF-ENTRY

Lessee shall permit Lessor and the agents and employees of Lessor to enter into and upon the Premises at all reasonable times for the purpose of inspecting, posting notices of nonresponsibility, or exhibiting the Premises to prospective tenants or buyers.

27. NON-WAIVER

Lessor's failure to enforce or exercise its rights with respect to any provision hereof shall not be construed as a waiver of such rights or of such provision. Acceptance of rent or any other sum shall not be a waiver of any preceding breach by Lessee of any provision hereof, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent; nor shall such acceptance be a waiver in any way of Lessor's right to terminate at any time under Section D of the Basic Lease Term.

28. TIME OF ESSENCE

Time is of the essence of each provision of this Lease.

29. ENTIRE AGREEMENT AND AMENDMENT

This Lease sets forth the entire agreement between the parties with respect to the leasing of the Premises and supersedes all prior agreements, communications, and representations, oral or written, express or implied, since the parties intend that this be an integrated agreement. This agreement shall not be modified except by written agreement of the parties.

*

*



REV. 1-26-93

**CITY OF HARLINGEN HEALTH DEPARTMENT**
**REMOVAL OF JUNKED VEHICLE – INFORMATION SHEET**

NOTE: THIS INFORMATION SHEET IS REQUIRED IN ORDER TO KEEP AN ACCURATE
RECORD OF THE NUMBER OF VEHICLES THE CITY OF HARLINGEN HEALTH DEPART-
MENT REMOVES AFTER OWNERS HAVE RECEIVED PROPER NOTIFICATION AND THEY
DO NOT COMPLY. (STAPLE ALSO ALL COPIES OF LETTERS PERTAINING TO THIS
CASE, AS WELL AS PICTURES)

ADDRESS VEHICLE WAS REMOVED FROM: 1706 N. Commerce
DATE/TIME OF REMOVAL: 1-25-2000
LICENSE OR VIN#: Texas Title Act
MAKE & MODEL: Studebaker
YEAR:
COLOR: Gree

WRECKER SERVICE USED: Double "A" Wrecker Service
ADDRESS: 501 W. Jackson
PHONE: 440-0903 - 428-0256
CONTACT PERSON: Tony Garcia Jr
WHERE VEHICLE TRANSPORTED: 501 W. Jackson
DATE VEHICLE INFORMATION
PICKED UP BY STAFF: 1-17-2000
DATE LETTER SIGNED FOR OR RET.: 2-14-2000

VEHICLE TO BE STORED: Yes/No
TRANSFER TO DEMOLISHER ISSUED: Yes/No

_Ruben Mares_
Health Inspector

7-25-2000
Date/Time

_Tony Dueñez_
Witness

7-25-2000
Date/Time/phone#

0039



CITY OF HARLINGEN
502 E. TYLER
P.O. BOX 2207
HARLINGEN, TX 8550
(956)
(956) 430-6691 FAX

| | |
|---|---|
| TO: | Marc Stevenson |
| COMPANY NAME: | Southern Pacific |
| DATE: | 7-28-00 |
| FAX NUMBER: | |
| NO. OF PAGES (INCL. COVER SHEET): | 2 |
| IF YOU HAVE ANY QUESTIONS, OR DID NOT RECEIVE ALL OF THE PAGES, PLEASE CONTACT: | 956-427-8812 |
| FROM: | Dan Serna |
| DEPARTMENT: | City Health Dept. |
| COMMENTS: | |

0069



## CAPITAL OF THE LOWER RIO GRANDE VALLEY
"WORKING AS A TEAM TO PROVIDE QUALITY SERVICE WITH RESPECT AND FAIRNESS TO ALL CITIZENS"

July 28, 2000

SOUTHERN PACIFIC
1700 FARNAM ST 10TH
OMAHA, NE.  68102

Dear Property Owner

Under the provisions of Ordinance #93-03, it is unlawful to permit any rubbish, brush, or other objectionable matter to accumulate on any lot, tract, or parcel of land.  Furthermore, this ordinance requires property owners to keep their property clean.  These regulations were adopted for the purpose of protecting the health of all residents, eliminating the breeding sites for rodents, insects, and other vermin, and making Harlingen a more attractive place in which to live.

Your property located at____1726 N. COMMERCE____reveals an apparent violation of this ordinance.  This can be corrected by cutting the weeds or grass and removing all debris within ten (10) days upon receipt of this notice.  If the violation is not corrected within the allotted time, it will be necessary for the City to correct the violation and a charge will be made and a lien levied against your property until this amount is paid.  An administrative service charge of $50.00 will be included in addition to any other cost incurred by the City.
Our tax records indicate that you are the owner of this property:
Legal Description:    **HARLINGEN WEST CITY VIEW HEIGHTS, LOTS 1-5**_____
**CLEAN UP ENTIRE AREA, REMOVE JUNK/DEBRIS, SCRAP METAL,**_____
**REFRIGERATORS, RUBBLE AND OTHER OBJECTIONABLE MATTER.**_____
Account #25-5150-0000-0010-00_____
However, if this information is incorrect we ask for your cooperation by calling the Health Department at (956) 427-8812.  Notification can also be given in writing or by visiting our office at 502 E. Tyler.

We feel sure that you will do your part in helping make your City more attractive by complying with Ordinance #93.03.  Your cooperation in this matter will be greatly appreciated.

PLEASE DISREGARD THIS NOTICE IF PROPERTY HAS ALREADY BEEN CLEANED.

Very truly yours,

Dan Serna
Environmental Health Director

cc:    John Roberts--Rt 2 Box 300, Rabb Rd, La Feria Tx.  78559

*"Recipient Of Keep Texas Beautiful Governor's Achievement Award"*

118 E. TYLER    •    P.O. BOX 2207    •    HARLINGEN, TEXAS 78551    •    (956) 427-8700

CITY OF HARLINGEN

# CAPITAL OF THE LOWER RIO GRANDE VALLEY
### "WORKING AS A TEAM TO PROVIDE QUALITY SERVICE WITH RESPECT AND FAIRNESS TO ALL CITIZENS"

July 28, 2000

SOUTHERN PACIFIC
1700 FARNAM ST 10TH
OMAHA, NE. 68102

Dear Property Owner

Under the provisions of Ordinance #93-03, it is unlawful to permit any rubbish, brush, or other objectionable matter to accumulate on any lot, tract, or parcel of land. Furthermore, this ordinance requires property owners to keep their property clean. These regulations were adopted for the purpose of protecting the health of all residents, eliminating the breeding sites for rodents, insects, and other vermin, and making Harlingen a more attractive place in which to live.

Your property located at _____1726 N. COMMERCE_____ reveals an apparent violation of this ordinance. This can be corrected by cutting the weeds or grass and removing all debris within ten (10) days upon receipt of this notice. If the violation is not corrected within the allotted time, it will be necessary for the City to correct the violation and a charge will be made and a lien levied against your property until this amount is paid. An administrative service charge of $50.00 will be included in addition to any other cost incurred by the City.

Our tax records indicate that you are the owner of this property:
Legal Description: ___HARLINGEN WEST CITY VIEW HEIGHTS, LOTS 1-5___
CLEAN UP ENTIRE AREA, REMOVE JUNK/DEBRIS, SCRAP METAL,
REFRIGERATORS, RUBBLE AND OTHER OBJECTIONABLE MATTER.
Account #25-5150-0000-0010-00

However, if this information is incorrect we ask for your cooperation by calling the Health Department at (956) 427-8812. Notification can also be given in writing or by visiting our office at 502 E. Tyler.

We feel sure that you will do your part in helping make your City more attractive by complying with Ordinance #93.03. Your cooperation in this matter will be greatly appreciated.

PLEASE DISREGARD THIS NOTICE IF PROPERTY HAS ALREADY BEEN CLEANED

Very truly yours,

Dan Serna
Environmental Health Director

cc:     John Roberts--Rt 2 Box 300, Rabb Rd, La Feria T

*"Recipient Of Keep Texas Beautiful Gover*

118 E. TYLER   ●   P.O. BOX 2207   ●   HARLINGEN

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Prov

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

0072

Postmark Here

Recipient's Name (Please Print Clearly) (To be completed by

Street, Apt. No.; or PO Box No.

City, State, ZIP+4

7000 0520 0023 5700 5323



UNITED STATES POSTAL SERVICE

OMAHA NE 68108
PM
31 JUL
2000

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

CITY OF HARLINGEN
HEALTH DEPARTMENT
P.O. BOX 2207
HARLINGEN, TEXAS 78550

## SENDER: *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

SOUTHERN PACIFIC
1700 FARNAM ST. 10TH FLOOR
OMAHA, NE. 68102

## *COMPLETE THIS SECTION ON DELIVERY*

A. Received by (Please Print Clearly)   *M - Sweet*   | B. Date of Delivery

C. Signature   X *M - Sweet*
☐ Agent
☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
7000-0520-0023-5700-5323

0074

PS Form 3811, July 1999          Domestic Return Receipt          102595-00-M-0952



CITY OF
HARLINGEN

## CAPITAL OF THE LOWER RIO GRANDE VALLEY
"WORKING AS A TEAM TO PROVIDE QUALITY SERVICE WITH RESPECT AND FAIRNESS TO ALL CITIZENS"

July 28, 2000

SOUTHERN PACIFIC
1700 FARNAM ST 10TH
OMAHA, NE. 68102

Certified Mail
I.D.#7000-0520-0023-5700-5330

Dear Property Owner

Under the provisions of Ordinance #93-03, it is unlawful to permit any rubbish, brush, or other objectionable matter to accumulate on any lot, tract, or parcel of land.  Furthermore, this ordinance requires property owners to keep their property clean.  These regulations were adopted for the purpose of protecting the health of all residents, eliminating the breeding sites for rodents, insects, and other vermin, and making Harlingen a more attractive place in which to live.

Your property located at____**1726 N. COMMERCE**____reveals an apparent violation of this ordinance.  This can be corrected by cutting the weeds or grass and removing all debris within ten (10) days upon receipt of this notice.  If the violation is not corrected within the allotted time, it will be necessary for the City to correct the violation and a charge will be made and a lien levied against your property until this amount is paid.  An administrative service charge of $50.00 will be included in addition to any other cost incurred by the City.

Our tax records indicate that you are the owner of this property:

Legal Description:   **HARLINGEN WEST CITY VIEW HEIGHTS, LOTS 1-5**
**CLEAN UP ENTIRE AREA, REMOVE JUNK/DEBRIS, SCRAP METAL,**
**REFRIGERATORS, RUBBLE AND OTHER OBJECTIONABLE MATTER.**
Account #25-5150-0000-0010-00

However, if this information is incorrect we ask for your cooperation by calling the Health Department at (956) 427-8812.  Notification can also be given in writing or by visiting our office at 502 E. Tyler.

We feel sure that you will do your part in helping make your City more attractive by complying with Ordinance #93.03.  Your cooperation in this matter will be greatly appreciated.

PLEASE DISREGARD THIS NOTICE IF PROPERTY HAS ALREADY BEEN CLEANED.

Very truly yours,

Dan Serna
Environmental Health Director

cc:     John Roberts–Rt 2 Box 300, Rabb Rd, La Feria Tx.  78559

0075

*"Recipient Of Keep Texas Beautiful Governor's Achievement Award"*

118 E. TYLER   •   P.O. BOX 2207   •   HARLINGEN, TEXAS 78551   •   (956) 427-8700

UNITED STATES POSTAL SERVICE

‖‖‖‖

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •



CITY OF HARLINGEN
HEALTH DEPARTMENT
P.O. BOX 2207
HARLINGEN, TEXAS 78550

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

0076

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

JOHN ROBERTS
RT 2 BOX 300 RABB RD
LA FERIA, TX.  78559

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)  John Ocie Roberts   B. Date of Delivery  8-3-00

C. Signature

X   ☐ Agent   ☐ Addressee

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☐ Certified Mail   ☐ Express Mail
   ☐ Registered   ☐ Return Receipt for Merchandise
   ☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
7000-0520-0023-5700-5330

PS Form 3811, July 1999    Domestic Return Receipt    102595-00-M-0952

0077

MAY 26th 2000

Dan Serna EHD
502 East Tyler
Harlingen, Tx
             78550

RE: Corner of Markowsky & North Commerce

Dear Dan:

I have received numerous calls concerning an accumulation of vehicles

and dried up grass, at the bargain barn on North Commerce .

The owner of the property, has posted no trasspessing signs, however

we took some pictures from the adjacent property, I have enclosed them

for your records.

Please give me a call, so that can get together and see how we are going to

deal with this individual.

Frank Garcia
F/M City of Harlingen

May 1, 2000

*[handwritten notes: 7/19/00, Roy, Please Cktles Mr. Roberts states he has never received any notices at all — Thanks Comm.  797-0027]*

City of Harlingen
City Council
C/O City Manager Natalie Prim
118 E. Tyler Street
Harlingen, Texas 78550

Re: WAREHOUSE 1726 N. Commerce, Harlingen, Cameron County, Texas

Dear Sirs/Mesdames,

Please take notice that the above referenced property was completely burned to the ground, on January 1, 2000. I, John Ocie Roberts, was not given the proper protection from the thieves and arsonists that constantly threatened this area. Your motto s to protect and to serve apparently did not apply in this case

I am bringing this notice pursuant to section 101.101 of the Texas Civil Practice and Remedies Code. Please place this item for your next regular meeting and inform me of the agenda.

If you do not set this up in the agenda, I will conclude that you, as a governing body are not interested in addressing this matter. This is a most serious threat to our rights and our need to be protected. I have been damaged in an amount of not less than $500,000.00 U.S.C.

I will seek judicial intervention if I am not satisfied with your response. Also, would you please refrain from any requirement of clean up until the on-going investigation is over?

Thank you for your attention.

John Ocie Roberts
1726 N. Commerce
Harlingen, Texas 78550

0169