United States District Court
Southern District of Texas
FILED

OCT 1 8 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOHN OCIE ROBERTS       §
        Plaintiff       §
                   §
vs.                 §       CAUSE NO. B-01-034
                   §
CITY OF HARLINGEN, TEXAS,     §
ET.AL.              §
        Defendants     §

## CITY DEFENDANTS' MOTION TO STRIKE
## PLAINTIFF'S EXPERT JOHN ROBERTS

---

MAY IT PLEASE THE COURT:

COMES NOW CITY OF HARLINGEN, TEXAS, INSPECTOR DAN SERNA, INSPECTOR RUBEN MARES, and INSPECTOR SAM GUTIERREZ (collectively "CITY DEFENDANTS"), in their Individual capacities, and file this their Motion to Strike Plaintiff's Expert John Roberts and would show the Court as follows:

### I.
### NATURE OF THE CASE

This controversy arises out of the CITY OF HARLINGEN's (hereafter "CITY") enforcement of two environmental ordinances, one related to clean up of trash, debris, and rubbish (Chap. 93), and another related to clean up of junked vehicles (Chap. 94), after a fire devastated the structure on the lot in question.

Plaintiff, a lessee of the lot on which the fire occurred, and which was cleaned up under the direction of the Environmental Health Department of the CITY, contends that the CITY and several individual City employees deprived him of his

personal property in violation of his state and federal rights without due process of law.

## II.
## ARGUMENT & AUTHORITIES

First, City Defendants reiterate each of its claims in its Motion to Strike Plaintiff's Designation of Experts, and pursuant to such Motion, continue to pray that this Court strike Plaintiff's designation of experts in its entirety and that Plaintiff be precluded from calling any expert witnesses in this case.

Without waiving its request to strike Plaintiff's designation of experts in its entirety and still insisting that Roberts has not properly designated himself as an expert pursuant to the Federal Rules of Civil Procedure and this Court's order, City Defendants hereby additionally request that expert John Ocie Roberts be struck as an expert because his testimony is not reliable and Roberts is not qualified as an expert.

First, although Plaintiff did not, and has not, submitted a required signed, written expert report, he did submit a damages report/fair market value schedule with his expert designation.  See attached as Exhibit A.  Pursuant to this "report", Plaintiff lists various items, and a listed "fair market value" for each such item.  However ,the "report" completely fails to identify the basis for the listed value of each such item, how such was calculated, the reasons for such values, and any data or information used to form the "fair market value" for each item.

## A. Roberts Not Qualified as an Expert

A court should exclude the testimony of an expert witness who is not qualified. Fed.R.Evid. 702. An expert should have a higher degree of knowledge, skill, experience, training or education about the subject of testimony than an ordinary person. Fed.R.Evid. 702. Plaintiff's expert John Ocie Roberts is not qualified as an expert in the valuation of antiques and hard to find items. Specifically, Roberts possesses no antique dealers license. See Exhibit B at 11-12. Furthermore, Roberts presently does not possess a vehicle dealers license, and has not had such a license in over 30 years. See Exhibit B at 12. In addition, Roberts does not possess a junk dealer license. See Exhibit B at 12-13. Lastly, Roberts does not qualify as a motor vehicle collector as that term is defined in the Texas Transportation Code 683.077(b)(2), as he has not even attempted to restore or preserve a vehicle for historic interest since the middle seventies, a period exceeding twenty years. See Exhibit at 18-19.

Furthermore, Roberts has no education in antique dealing, as evidenced by his resume, attached to his designation of experts. See Exhibit A. However, as evidenced by the condition of the items and the condition of the property as previously documented in City Defendants' Motion for Summary Judgment, Roberts' experience in dealing with "antique" or special "hard to find items" appears limited essentially to the running of a junkyard, and there is no evidence that Mr. Roberts has ever dealt in antique and one-of-a-kind items whatsoever. Thus Roberts does not have the experience or knowledge necessary to qualify as an expert in the valuation of antiques. Mr. Roberts has never had any experience or training dealing and valuing

antiques and specialty items, but only experience dealing with junk.

Lastly, Roberts does not qualify as an expert and his opinion is not reliable because when he was previously deposed, and during such deposition, he was completely unable to estimate the valuation of various "antique" vehicles that were removed from his premises. See Exhibit B at 52; 54; 58; 66; 69; 72; 74; 77; 79; 83; 86; and 90.

Of particular importance regarding the lack of qualifications of Mr. Roberts as an expert in antiques, particularly antique vehicles, City Defendants would point to Roberts previous deposition in which he was asked to estimate the value of a 1950 Studebaker truck when it was removed, to which he responded: "I couldn't give an estimation. It's a one-of-a-kind. I'd have to consult—I'd have to consult some experts on it." See Exhibit B at 79, lines 17-21. Thus, when asked to estimate the value of an antique vehicle, Roberts himself admitted he is not an expert, and he would have to consult experts in order to properly estimate its value. Given Roberts' complete lack of qualifications as an expert in the valuation of antiques and specialty hard-to-find items, the Court should exclude his expert testimony.

## B.  Roberts Testimony Not Reliable

A court should exclude the testimony of an expert whose testimony is not reliable. Scientific evidence that is not grounded "in the methods and procedures of science" is no more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591, 113 S.Ct. 2786, 2795 (1993). *Daubert's* "general holding-setting forth the trial judge's gatekeeping obligation-applies not only testimony based on 'scientific' knowledge, but also to testimony based on

'technical and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171 (1999).

The Court should exclude the testimony of Roberts as an expert because the testimony will not be reliable. First, Roberts, whether in his deposition or with his "report", gives no indication of the reasoning and methodology underlying the opinions contained in the "report", thus Defendants cannot even test whether any such reasoning or methodology can be applied to the facts of this case. See Exhibit A; Exhibit B(entire deposition of Roberts previously produced with City Defendants Motion for Summary Judgment); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, at 593. Thus, as required by *Daubert*, the reasoning or methodology used by Roberts cannot be tested, as no reasoning or methodology is even indicated. *Id.* at 593-594. No theory or technique used by Roberts in his valuations contained in his report can be tested or subject to peer review, as Roberts apparently has no theory or technique regarding valuations of "antique" items, and cannot even place a value on certain items. *Id.* at 593-594; Exhibit A; Exhibit B at 52; 54; 58; 66; 69; 72; 74; 77; 79; 83; 86; and 90.

Given Roberts' random assigning of values to so-called antique items in his "report" with no mention of theories or methodologies used, and his failure to even assign valuations to certain "antique" items when questioned, Roberts opinions, techniques and theories do not lend themselves to verification by testing, have not been subjected to peer review or publication and cannot be applied to the facts of this case. Therefore Roberts expert testimony and "report" should be stricken.

Furthermore, Roberts' expert opinion has been generated solely for this litigation and should be excluded. *Daubert*, 43 F.3d at 1317 (on remand)(research conducted independently of the litigation provides important objective proof that the research comports with the dictates of good science.)    Roberts has produced no record, or testified as to no records of valuation of these items prior to this litigation.

A Court should exclude the opinion of an expert if the probative value of the opinion is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. Fed.R.Evid. 403.  The court should exclude the testimony of Roberts as an expert because Roberts is the Plaintiff in this case and as so situated, has apparently simply given random values to various items he alleges were taken from his property, with no indications of the theories he has used to come up with the values for these items.

## CONCLUSION & PRAYER

While Roberts' entire designation of experts should be stricken for reasons identified in the City Defendants' Motion to Strike Plaintiff's Designation of Experts, the testimony of John Roberts as expert should be excluded for the reasons identified above.

Thus CITY DEFENDANTS pray that John Roberts be excluded from testifying as an expert as to "antique" or hard-to-find item valuations.   CITY DEFENDANTS also pray for such other and further relief to which they may show themselves justly entitled.

Signed on the _18th_ day of October, 2002.

Respectfully submitted,

**DENTON, NAVARRO & BERNAL**
A Professional Corporation
Bank of America Building
222 East Van Buren, Suite 405
Harlingen, Texas 78550
956/421-4904
956/421-3621 (Fax)

By: _____
RICARDO J. NAVARRO
State Bar No. 14829100
So. Dist. ID No. 5953
ROBERT DRINKARD
State Bar No. 24007128
Fed. Dist. No. 29288

**CERTIFICATE OF CONFERENCE
WITH RESPECT TO MOTION TO STRIKE
EXPERT JOHN ROBERTS**

Counsel for CITY DEFENDANTS' hereby apprizes the Court that he conferred with Plaintiff'S counsel regarding this issue and Plaintiff's counsel was opposed to said Motion, thereby necessatating the filing of this Motion.

_____
RICARDO J. NAVARRO
ROBERT L. DRINKARD

## CERTIFICATE OF SERVICE

I certify that a true copy of this document has been sent by regular U.S. Mail, unless otherwise indicated, to the persons listed below on the _16th_ day of October, 2002.


Hugo Xavier De Los Santos    **By CMRRR#:7002 1000 0004 8591 0195**
LAW OFFICE OF HUGO XAVIER DE LOS SANTOS
6800 Park Ten Blvd. Ste. 123-N
San Antonio, Texas 78213
**COUNSEL FOR PLAINTIFF**


Mr. Michael R. Ezell
LAW OFFICE OF MICHAEL R. EZELL
312 E. Van Buren
P.O. Box 2878
Harlingen, Texas 78551
**COUNSEL FOR CROSS-DEFENDANT LA FERIA WRECKER SERVICE**

Mr. Curtis Bonner
BONNER & BONNER
103 S. Third
P.O. Box 288
Harlingen, Texas 78551-0288
**COUNSEL FOR CROSS-DEFENDANT T&T TOWING SERVICE**


_____
RICARDO J. NAVARRO
ROBERT L. DRINKARD

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS | § | |
|      Plaintiff | § | |
| | § | |
| vs. | § | CAUSE NO. B-01-034 |
| | § | |
| CITY OF HARLINGEN, TEXAS, | § | |
| ET.AL. | § | |
|      Defendants | § | |

ORDER ON CITY DEFENDANTS' MOTION TO STRIKE
EXPERT JOHN OCIE ROBERTS

On this day the Court considered the City Defendants' Motion to Strike Expert JOHN OCIE ROBERTS. After due consideration of matters raised in that motion, any responses thereto, and the pleadings in this cause, the Court is of the opinion that the motion is meritorious and should be GRANTED.

It is, therefore ORDERED, ADJUDGED, and DECREED that the City Defendants Motion to Strike Expert John Ocie Roberts, is hereby GRANTED, and John Ocie Roberts is excluded from testifying as an expert as to valuations of antique or specialty hard-to-find items.

SIGNED ON this the _____ day of _____, 2002.


_____
HON. HILDA G. TAGLE
U.S. DISTRICT COURT





# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS,<br>Plaintiff | §<br>§<br>§ | Civil Action |
| v. | §<br>§ | No. B-01-34 |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS,<br>INSPECTOR DAN SERNA, INDIVIDUALLY,<br>INSPECTOR RUBEN MARES, INDIVIDUALLY,<br>INSPECTOR SAM GUTIERREZ, INDIVIDUALLY,<br>LA FERIA WRECKER SERVICE,<br>DOUBLE A WRECKER CO.,<br>T & T TOWING SERVICE,<br>T AND T WRECKER SERVICE,<br>TIM WILKINSON IRON & METAL INC.,<br>Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br><br><br><br><br>JURY |

## PLAINTIFF JOHN OCIE ROBERTS'S
## DESIGNATION OF EXPERT WITNESSES

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, plaintiff JOHN OCIE ROBERTS, and submits the following initial list of potential testifying expert witnesses in this case, as follows:

The following list of potential testifying experts is based upon plaintiff's answers to defendant's discovery requests in this case, which have heretofore been served, and the same is submitted without prejudice to future supplementation and/or amendment of same:

*List of potential testifying expert witnesses:*

1.   JOHN OCIE ROBERTS
     c/o 6800 Park Ten Blvd, Ste. 123-N
     San Antonio, Texas 78213
     (210) 736-4227

Mr. Roberts is an expert in the business of buying, selling and restoring antiques and one-of-a-kind items, and in their valuation. Mr. Roberts has an opinion concerning the value of the inventories and assets, consisting largely of antiques and one-of-a-kind items that were taken from his business lot by the defendants without his consent. Specifically, Mr. Roberts has the opinion the items of personalty stolen by the defendants from him are set forth in the schedule report he has heretofore produced to the defendants. Mr. Roberts is further of the opinion that the fair market value of each item is also reflected in the attached schedule under the column entitled "fair market

value each". Mr. Roberts is further of the opinion that the total fair market value of the property stolen from him by the defendants is equal to $692,140.00 as of August 2000.[1]

2.      ROBERT BASFORD

Mr. Basford is an expert in the business of buying, selling and restoring heavy machinery, oil field equipment and logging equipment and other assets like those that were at Mr. Roberts' place of business which the defendants took without Mr. Roberts' consent, and in their valuation. Mr. Basford is believed to have an opinion concerning the value of the inventories and assets that were taken from Mr. Roberts' business lot by the defendants without Mr. Roberts' consent.

3.      ADELAIDO GONZALES
State Certified General Appraiser
302 E. Jackson, Suite 107
Harlingen, Texas 78550
(956) 412-1357

Mr. Gonzales is an expert in the appraisal and evaluation of properties and he is also an expert in evaluating lost profits of a business that has been damaged like Mr. Roberts' business was damaged by the wrongful taking of Mr. Roberts' property by the City of Harlingen and the other defendants in this action. Mr. Gonzales is expected to testify concerning Mr. Roberts' lost profits and the fair market value of the assets that were taken by the defendants from Mr. Roberts' place of business known as the Bargain Barn that was located at 1726 North Commerce Street, Harlingen, Texas.

4.      Dr. Robert Summerville
And His Records Custodian
712 N. 77 Sunshine Strip
Harlingen, Texas 78550
(956) 428-0757

5.      Dr. Miles (head surgeon)
And His Records Custodian

6.      Mercedes Medical Center
And Its Records Custodian
109 South Texas Boulevard
Mercedes, Texas 78570
(956) 514-1643

7.      Valley Diagnostic Clinic
And Its Records Custodian
2200 Haine Drive
Harlingen, Texas 78550
(956) 421-5180/425-7200


RECEIVED
SEP 1 9 2002

---

1.      Copies of Mr. Roberts's valuation schedule report, and his curriculum vita are attached hereto, marked Exhibit "1" and incorporated herein by reference.

<u>ROBERTS'S DESIGNATION OF EXPERT WITNESSES</u>        <u>Case No. B-01-34</u>

8.    Dr. Savvac Poulos
      And His Records Custodian
      1601 Treasure Hills Boulevard
      Harlingen, Texas 78550
      (956) 421-2663

9.    Dr. Cynthia Garcia
      And Her Records Custodian
      1205 N. Ed Carey Drive, Ste 2B
      Harlingen, Texas
      (956) 412-2200

10.   Dr. Frank Morales
      Heart Clinic
      And Its Records Custodian
      Progresso, Mexico
      Phone Number Unknown

11.   Dr. Jim Lowery
      And His Records Custodian
      636 N. Ed Carey Drive
      Harlingen, Texas 78550
      (956) 440-8704

        The above health care providers may be called upon to testify as to the nature of the stress, mental anguish and emotional distress injuries suffered by the plaintiff, the health care rendered for the treatment, the dates of treatment, the various diagnostic tests and studies done, histories, evaluation and diagnosis of the injuries, the disability or incapacity caused the plaintiff, the reasonable and customary charges for such health care services, the amounts of the reasonable bills for health care services necessarily rendered for the treatment of such injuries and all other related aspects of health care as it may pertain to the plaintiff, the injuries plaintiff suffered and/or plaintiff's claim. The various opinions of these experts is reflected in the medical records involved in this action. In addition, x-rays, MRI films, CT-Scans, and other radiographic films and the medical records may be made available for defendants' inspection at the plaintiff's attorney's office at a mutually agreeable time and date, with at least two weeks' advance notice. Moreover, the medical and health care expenses necessitated and caused by the injuries plaintiff has suffered are of a continuing nature. Accordingly, additional bills for health care services will be made available for defendants' inspection at plaintiff's attorney's office at a mutually agreeable time and date, with at least two weeks' advance notice.

ROBERTS'S DESIGNATION OF EXPERT WITNESSES         Case No. B-01-34

Respectfully submitted,

**_HUGO XAVIER DE LOS SANTOS_**
**_Attorney at Law & C.P.A._**

Date:  September 10, 2002

By: _____

        HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227        FAX# (210) 737-1556

Texas Bar Identification Number 05653300
U.S. Southern District Identification Number 11259

Attorney for John Ocie Roberts, Plaintiff

<u>ROBERTS'S DESIGNATION OF EXPERT WITNESSES</u>    <u>Case No. B-01-34</u>

## CERTIFICATE OF SERVICE

I, HUGO XAVIER DE LOS SANTOS, ESQ., attorney for John Ocie Roberts, Plaintiff, hereby certify that I served all other parties in this action with a correct copy of the PLAINTIFF JOHN OCIE ROBERTS'S DESIGNATION OF EXPERT WITNESSES on September 10, 2002, in a manner consistent with the Texas Rules of Civil Procedure as designated hereinbelow.

*City of Harlingen, Cameron County, Texas, Inspector Dan Serna, Individually, Inspector Ruben Mares, Individually and Inspector Sam Gutierrez, Individually, Defendants*:
c/o Mr. Ricardo J. Navarro, Esq.
222 E. Van Buren, Suite 405
Harlingen, Texas 78550-6804

*Method*:    U.S. Certified Mail, Return Receipt Requested
USPS Postal Receipt #7001 2510 0009 2698 2262

*La Feria Wrecker Service, Inc., Defendant*:
c/o Mr. Michael R. Ezell, Esq.
312 East Van Buren/P.O. Box 2878
Harlingen, Texas 78551

*Method*:    U.S. Certified Mail, Return Receipt Requested
USPS Postal Receipt #7001 2510 0009 2698 2255

*Double A Wrecker Co., T & T Towing Service, T and T Wrecker Service, Defendant(s)*:
c/o Mr. Curtis Bonner, Esq.
P.O. Box 288
Harlingen, Texas 78551-0288

*Method*:    U.S. Certified Mail, Return Receipt Requested
USPS Postal Receipt #7001 2510 0009 2698 2248

Respectfully submitted,

*HUGO XAVIER DE LOS SANTOS*
*Attorney at Law & C.P.A.*

COPY    Date:    September 10, 2002

By: _____
HUGO XAVIER DE LOS SANTOS, ESQ., C.P.A.

6800 Park Ten Blvd., Suite 123-N
San Antonio, Texas  78213
(210) 736-4227        FAX# (210) 737-1556

Texas Bar Identification Number 05653300
U.S. Southern District Identification Number 11259

Attorney for John Ocie Roberts, Plaintiff

*************************************************************************

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JOHN OCIE ROBERTS,<br>     Plaintiff | §<br>§<br>§ | Civil Action |
| v. | §<br>§<br>§ | No. B-01-34 |
| CITY OF HARLINGEN, CAMERON COUNTY, TEXAS,<br>INSPECTOR DAN SERNA, INDIVIDUALLY,<br>INSPECTOR RUBEN MARES, INDIVIDUALLY,<br>INSPECTOR SAM GUTIERREZ, INDIVIDUALLY,<br>LA FERIA WRECKER SERVICE,<br>DOUBLE A WRECKER CO.,<br>T & T TOWING SERVICE,<br>T AND T WRECKER SERVICE,<br>TIM WILKINSON IRON & METAL INC.,<br>     Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br><br><br><br><br><br><br><br>JURY |

PLAINTIFF JOHN OCIE ROBERTS'S
DESIGNATION OF EXPERT WITNESSES

# EXHIBIT "1"

## DAMAGES REPORT / FAIR MARKET
## VALUE SCHEDULE
## OF
## STOLEN ITEMS

## and

## CURRICULUM VITAE OF
## JOHN OCIE ROBERTS

# John Ocie Roberts

# The Bargain Barn -- Stolen Inventory

1726 North Commerce
Harlingen, Texas

| Ref No. | Quantity | Description | Fair Market Value Each | Extended Total |
|---|---|---|---|---|
| 1 | 1 | 1966 International Bus | $15,000.00 | $15,000.00 |
| 2 | 1 | 1974 Dodge Box Van | $1,800.00 | $1,800.00 |
| 3 | 1 | 1974 Ford Wench Truck | $5,500.00 | $5,500.00 |
| 4 | 1 | 1962 Falcon Station Wagon | $3,500.00 | $15,000.00 |
| 5 | 1 | 1949 Chevy Cabover Wench Truck | $3,500.00 | $12,000.00 |
| 6 | 1 | 1974 Ford Car Carrier | $1,200.00 | $6,000.00 |
| 7 | 1 | 1972 Toyota Pickup | $1,200.00 | $2,500.00 |
| 8 | 1 | 1978 Plymouth | $2,500.00 | $2,500.00 |
| 9 | 1 | 1963 Ford T-Bird | $9,000.00 | $12,000.00 |
| 10 | 1 | 1969 Buick | $1,000.00 | $1,000.00 |
| 11 | 1 | 1950 Studebaker Pickup | $8,000.00 | $25,000.00 |
| 12 | 1 | 1948 Dodge Truck With Loader Frame | $4,500.00 | $4,500.00 |
| 13 | 1 | 1862 Church Bell | $20,000.00 | $20,000.00 |
| 14 | 1 | 15 Fishnets (Hoopnets) | $800.00 | $800.00 |
| 15 | 1 | 35 Truck (Semi) Tires | $40.00 | $1,400.00 |
| 16 | 1 | 1200 Pounds of Aluminum | Spot Price | |
| 17 | 1 | 2000 Pounds of Copper Wire | Spot Price | |
| 18 | 1 | 2 Metal Farm Gates (12-Foot) | $90.00 | $90.00 |
| 19 | 1 | 5 Wire Gates | $200.00 | $200.00 |
| 20 | 1 | 19 Antique Iron Farm Machinery Wheels | $200.00 | $3800.00 |
| 21 | 4 | Lightplants | $3,500.00 | $3,500.00 |
| 22 | 7 | Trailers | $7,500.00 | $7,500.00 |
| 23 | 1 | Tank Prototype Trailer | $10,000.00 | $10,000.00 |
| 24 | 2 | Highrise Electric Rig Up Machines | $20,000.00 | $20,000.00 |
| 25 | 2 | Boats and Trailers | $1,500.00 | $1,500.00 |
| 26 | 1 | Cadillac Cowboy Pickup | $3,500.00 | $3,500.00 |
| 27 | 3 | High Volume Blowers | $17,000.00 | $17,000.00 |
| 28 | 1 | Fleco Feller Buntcher | $10,000.00 | $10,000.00 |
| 29 | 1 | Fleco Blush Rake | $10,000.00 | $10,000.00 |
| 30 | 1 | Miscellaneous Farm Equipment | $2,500.00 | $2,500.00 |
| 31 | 1 | Truck Winchbed Complete | $3,500.00 | $3,500.00 |
| 32 | 1 | Steam Cleaner | $1,200.00 | $1,200.00 |
| 33 | 1 | Onan Air Cooled Diesel Engine | $2,400.00 | $2,400.00 |
| 34 | 2 | Toyota Diesel Engines | $1,200.00 | $1,200.00 |
| 35 | 1 | Misc. Gas Engines | $1,500.00 | $1,500.00 |
| 36 | 1 | 1964 Malibu Chevrolet | $3,500.00 | $3,500.00 |
| 37 | 1 | 1946 Ford Car | $3,500.00 | $3,500.00 |
| 38 | 1 | 1964 Chevrolet Pickup | $2,500.00 | $2,500.00 |
| 39 | 1 | 1979 Dodge Pickup | $800.00 | $800.00 |
| 40 | 12 | Antique Bathtubs | $3,600.00 | $3,600.00 |
| 41 | 1 | Lawn Mowers and Parts | $1,200.00 | $1,200.00 |
| 42 | 1 | Walk-in Cooler | $800.00 | $800.00 |
| 43 | 1 | Portable Car Sprayer | $500.00 | $500.00 |
| 44 | 1 | Portable Acoustic Sprayer | $750.00 | $750.00 |

John Ocie Roberts
Bargain Barn -- Stolen Inventory

| | Quantity | Description | Fair Market Value Each | Extended Total |
|---|---|---|---|---|
| 45 | 1 | Hydraulic Lift | $350.00 | $350.00 |
| 46 | 1 | Frontend Lift | $1,200.00 | $1,200.00 |
| 47 | 105 | Steel Forklift Racks | $21,000.00 | $21,000.00 |
| 48 | 1 | 1 Tiltbed Flat Trailer | $3,500.00 | $3,500.00 |
| 49 | 10 | Wire Forklift Baskets | $2,500.00 | $2,500.00 |
| 50 | 5 | Cyclone Fence Gates | $400.00 | $400.00 |
| 51 | 1 | Wisconsin Engine | $1,500.00 | $1,500.00 |
| 52 | 1 | Misc. Antique Corn Shellers & Iron Pieces | $800.00 | $800.00 |
| 53 | 2 | Complete Silver Ware Serving Sets | $5,000.00 | $5,000.00 |
| 54 | 6 | Bulldozer Points | $1,200.00 | $1,200.00 |
| 55 | 1 | 28 Ft. Shrimp Boat and Gray Trailer and Marine Motor | $25,000.00 | $25,000.00 |
| 56 | 1 | 1400 Ft. Chainlength Fence In Place | $8,400.00 | $8,400.00 |
| 57 | 1 | Antique Farm Machinery | | |
| 58 | 20 | Sweepstocks Circa 1920-1940 | $250.00 | $5,000.00 |
| 59 | 5 | Ford Cultivators 11 Point | $300.00 | $1,500.00 |
| 60 | 26 | 1945 Antique Kiddie Car Motor Turnstile-Tent and Rail | $20,000.00 | $20,000.00 |
| 61 | 20 | Antique Ice Saws (Cross-Cut) | $100.00 | $2,000.00 |
| 62 | 5 | Antique Cross Cut Saw | $150.00 | $750.00 |
| 63 | 1 | Antique 10 Ft. Flower Pot Ferris Wheel | $1,000.00 | $1,000.00 |
| 64 | 1 | Large Antique Bottle Collection consisting of many thousands of bottles collected on the King Ranch and other areas of Texas and Mexico, Including Two complete collections sold to me by other collectors | $20,000.00 | $25,000.00 |
| 65 | 1 | Collection of Antique Pewter Gate and Fence Ornaments | $1,000.00 | $1,000.00 |
| 66 | 1 | Complete Woodshop with Plainers, Saws and Knives | $10,000.00 | $10,000.00 |
| 67 | 18 | Antique Upright Scales | $7,200.00 | $7,200.00 |
| 68 | 25 | Antique Steel Beds | $5,000.00 | $5,000.00 |
| 69 | 9 | Antique Cider Press | $450.00 | $450.00 |
| 70 | 5 | Antique Corn Grinders | $50.00 | $250.00 |
| 71 | 300 | Collection of Deer Antlers, Collected from King Ranch | $75.00 | $22,500.00 |
| 72 | 5 | 100% Pure Silver Dinner Sets | $2,300.00 | $11,500.00 |
| 73 | 1 | Hundreds of Aztec Indian Artifacts and Thousands of Indian Arrowheads | $13,000.00 | $13,000.00 |
| 74 | 2 | Water Pump Windmills - Brand Aero Motor | $2,500.00 | $5,000.00 |
| 75 | 12 | High Volume Transfer Blowers | $1,200.00 | $14,400.00 |
| 76 | 1 | 1922 Slate Pool Table | $6,500.00 | $6,500.00 |
| 77 | 1 | Antique Parts to 1960 Edsel | $2,500.00 | $2,500.00 |
| 78 | 1 | 1917 Ford Car Model T | $5,000.00 | $5,000.00 |
| 79 | 1 | 1926 Ford Car Model TT | $3,000.00 | $3,000.00 |
| 80 | 1 | 1962 American Rambler Convertible | $2,500.00 | $2,500.00 |
| 81 | 1 | 1973 Buick Convertible | $2,500.00 | $2,500.00 |

John Ocie Roberts
Bargain Barn -- Stolen Inventory

| Quantity | | Description | Fair Market Value Each | Extended Total |
|---|---|---|---|---|
| 82 | 1 | 1974 Cadillac Convertible | $2,500.00 | $2,500.00 |
| 83 | 1 | 1950 Desoto | $4,500.00 | $4,500.00 |
| 84 | 1 | 1956 Citereon Station Wagon | $3,500.00 | $3,500.00 |
| 85 | 1 | 1956 Crown Victoria Ford | $3,500.00 | $3,500.00 |
| 86 | 1 | 1956 Batman Boat and Trailer | $4,500.00 | $4,500.00 |
| 87 | 1 | 1-2 Plane Solar Tracker | $43,000.00 | $43,000.00 |
| 88 | 1 | Hundreds of Model A & Motel T Ford parts, fenders, motors, boxes, bolts, seats and doors | $8,500.00 | $8,500.00 |
| 89 | 1 | 1725 Stradivarius Violin in a fireproof container | $15,000.00 | $15,000.00 |
| 90 | 1 | Solar Kilm for Mesquite Lumbar | $7,500.00 | $7,500.00 |
| 91 | 28 | Antique Refrigerator on 29 Ft. Trailer | $200.00 | $5,600.00 |
| 92 | 1 | 29 Foot Trailer | $4,500.00 | $4,500.00 |
| 93 | 1 | Oilfield Prototype Tank Hauler that Pivots in the middle | $25,000.00 | $25,000.00 |
| 94 | 1 | Meadows Model A Sawmill with a 36" Blade | $8,500.00 | $8,500.00 |
| 95 | 1 | Tree Slasher with a 42" Blade | $12,000.00 | 12,000.00 |
| 96 | 1 | Vermeer Stump Grinder | $7,500.00 | $7,500.00 |
| 97 | 6 | Steamer Trunks (upright) | $400.00 | $$2,400.00 |
| 98 | 1 | Water Purification Plant (Navy Design) used by City of Harlingen to purify their water for many years | $2,500.00 | $2,500.00 |
| 99 | 1 | A-Frame to Fit Large Rig-up | | |
| 100 | | Oilfield Truck | $2,500.00 | $2,500.00 |
| 101 | 10 | Heavy Antique Cast Iron Bathtubs from year 1928 | $100.00 | $1,000.00 |
| 102 | 30 | Bathroom Sinks | $25.00 | $750.00 |
| 103 | 40 | Bath Commodes | $25.00 | $1,000.00 |
| 104 | 5 | Heavy Duty Towbars | $125.00 | $625.00 |
| 105 | 1 | Hydynamo Transmission Tester year 1900 | $4,500.00 | $4,500.00 |
| 106 | 5000 | Feet Antique Barbwire @ $1.00/ft, | $1.00 | $5,000.00 |
| 107 | 300 | Antique Cast Iron Window Weights | $150.00 | $4,500.00 |
| 108 | 50 | Antique Pine Panel Doors | $125.00 | $7,500.00 |
| 109 | 105 | Antique Wood-Glass Windows | $25.00 | $2,625.00 |
| 110 | 75 | Antique Steel Traps for Large Predators | $100.00 | $7,500.00 |
| 111 | 1 | Antique Bedpan Washer (one of a kind) | $2,500.00 | $2,500.00 |
| 112 | 1 | Marble Collection | $500.00 | $500.00 |
| 113 | 1 | Set of Heavy Duty Scales | $2,500.00 | $2,500.00 |
| 114 | 400 | Yards of Rock-Calishe Black Top | $10.00 | $4,000.00 |
| 115 | 1 | Steel Bander-Machine | $1,500.00 | $1,500.00 |
| 116 | 1 | Shrimping Equipment - Nets | $1,200.00 | 1,200.00 |
| 117 | 5 | Large Cement Fish Tanks and Motors | $400.00 | $2,000.00 |
| | TOTAL | | | $692,140.00 |

*****************************************************************************

JOHN OCIE ROBERTS

GRADUATED HIGH SCHOOL
1954

1.    Basketball scholarship

2.    Several sports honors

1954        Attended Sam Houston State  - Basketball Scholarship

1954-1955    Attended Allen Military Academy
             Obtained Associate in Arts Degree

1955-1957    Attended Baylor University
             26 Hour Major - Speech Radio & Television

1951-1954    School Bus Driver
             Timber Industry

1954-1955    Sold Furniture
             Lab Tec International Rubber Co.

1955- 1957   Waco, Texas
             Contract Refueling - James Connally A.F.B
             Assistant Field Manager for H. B. Zacary Refueling Division

1957-1959    Manager Contract Refueling
             Naval Airstation - Pensacola, Fla.

1959-1960    Contractor in Texas Timber Industry

1960- 1962   School Teacher Rio Grande Valley

1962 -1969   District Manager 13 South Texas Counties for Fish and Wildlife Service.

1969-1976    King Ranch Incorp.  Kleberg County, Texas  As a Wildlife Manager
             King Ranch Incorp., Kleberg County, Texas  Observation Pilot

**BUSINESS RECORD**

1991-1997    Antique and Equipment Auction and Appraisal Service.

1948-2000    Ranching

1958-2000    Heavy Equipment
             Special Hard to find parts and Equipment
             Logging Equipment
             Oilfield Equipment
             Farming Equipment
             Airplane Parts
             Antique Cars, Truck and Farm Tractor Equipment
             Household antiques
             All kinds of collectable
             Boats and Barges
             Real state many single family homes, 2 motels, 2 restaurants
             41 lots sub-division
             John Roberts sub-division, Raymondville, Texas
             12 Roberts International Tampico Mexico, - Land Clearing

**BUSINESS LOCATIONS**

Timber Polk County, Texas
Heavy Machinery Farm Machinery and Antiques, San Benito, Texas
Motels, La Feria and Lyford, Texas
Restaurants, San Benito and Raymondville, Texas
Household items Antiques, Antiques Cars, Trucks, Antique Parts and Hard
to find items, San Bentio, Raymondville, La Feria, Weslaco, Texas and 2
locations fro Bargain Barn -South Commerce and 1726 North Commerce,
Harlingen, Cameron County, Texas.
Heavy Equipment Machinery, Tampico, Mexico

**AWARDS AND HONORS**

Highschool Diploma
Associate in Arts Degree
Basketball Scholarship for College
Interscholastic Awards
         4 gold baseballs
         2 silver basketballs
         2 Gold Interscholastic medals
         3 Silver interscholastic medals
         All State Team member

**Allen Military Academy**
     **Honor Cadet officer**
     **Appointment to West Point**
     **Alternate appointment to the Annapolis Naval Academy**
**Teacher certificate**
     A certificate from Baylor University and the Southern Baptist connection to go into all the world and teach the gospel of our Lord and Savior Jesus Christ.

.

EXHIBIT " *B* "

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JOHN OCIE ROBERTS,       )(
        Plaintiff        )(
                         )(
VS.                      )(  CIVIL ACTION NO. B-01-34
                         )(
CITY OF HARLINGEN, TEXAS,)(
ET AL.,                  )(
        Defendants       )(

- - - - - - - - - - - - - - - - - - - -

ORAL AND VIDEOTAPED DEPOSITION OF
JOHN OCIE ROBERTS
JUNE 20, 2002
VOLUME 1

- - - - - - - - - - - - - - - - - - - -

REPORTED BY STEPHANIE GARRETT
CERTIFIED COURT REPORTER

APPEARANCES

COUNSEL FOR PLAINTIFF:

HUGO XAVIER DE LOS SANTOS
ATTORNEY AT LAW
6800 Park Ten Blvd., Suite 123 N.
San Antonio, Texas  78213

COUNSEL FOR DEFENDANTS CITY OF HARLINGEN, TEXAS,
DAN SERNA, RUBEN MARES AND SAM GUTIERREZ:

ROBERT DRINKARD
RICARDO J. NAVARRO
DENTON, NAVARRO & BERNAL
Bank of America Building
222 East Van Buren, Suite 405
Harlingen, Texas  78550-6804

**Page 2**

COUNSEL FOR DEFENDANT JOSE A. GARCIA:

CURTIS BONWER

BONWER & BONNER

103 South 3rd Street

Harlingen, Texas  78551

COUNSEL FOR DEFENDANT LA FERIA WRECKER SERVICE:

MICHAEL R. EZELL

LAW OFFICE OF MICHAEL R. EZELL

312 East Van Buren

Harlingen, Texas  78551

ALSO PRESENT:

DAN SERNA

RENE ORTIZ, Videographer

ORAL AND VIDEOTAPED DEPOSITION of JOHN OCIE
ROBERTS, who resides in Cameron County, Texas, taken by
ROBERT DRINKARD, Attorney for Defendants City of
Harlingen, Texas, Dan Serna, Ruben Mares and Sam
Gutierrez, reported by STEPHANIE GARRETT, Certified
Court Reporter in and for the State of Texas, on JUNE
20, 2002, between the hours of 1:49 p.m. and 5:10 p.m.,
in the offices of Denton, Navarro & Bernal, Bank of
America Building, 222 East Van Buren, Suite 405,
Harlingen, Texas.

**Page 3**

INDEX

| | | |
|---|---|---|
| Appearances | | 1 |
| Examination | | |
| By Mr. Drinkard | | 4 |
| Errata Sheet/Signature Page | | 105 |
| Reporter's Certificate | | 106 |
| Attached to the end of the transcript: Stipulations | | |

DOCUMENTARY EVIDENCE

| Ex. No. | Description | Iden. |
|---|---|---|
| 1 | Laser-Copied Photographs of Vehicles, Nos. 1-4 | 38 |
| 2 | Laser-Copied Photographs of Vehicles, Nos. 5-8 | 38 |
| 3 | Laser-Copied Photographs of Vehicles, Nos. 9-12 | 38 |
| 4 | Laser-Copied Photographs of Vehicles, Nos. 13-16 | 38 |
| 5 | Laser-Copied Photographs of Vehicles, Two Pictures | 38 |
| 6 | Laser-Copied Photographs of Vehicles, Two Pictures | 38 |
| 7 | Laser-Copied Photographs of Vehicles, Two Pictures | 38 |
| 8 | Notice Sent to Southern Pacific Transportation Dated 02-02-00 from Dan Serna | 87 |
| 9 | Notice Sent to Southern Pacific Dated 07-28-00 from Dan Serna | 101 |

CERTIFIED QUESTIONS

| NUMBER | PAGE/LINE |
|---|---|
| 1 | 6/8 |
| 2 | 35/6 |

**Page 4**

1        JOHN OCIE ROBERTS,
2  having been duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. DRINKARD:
5    Q. Would you give me your name, please, sir?
6    A. John Ocie Roberts.
7    Q. Mr. Roberts, my name is Robert Drinkard.  I
8  represent the City of Harlingen, along with the
9  individual defendants Dan Serna, Ruben Mares and Sam
10  Gutierrez, in a lawsuit that you filed.  You're here
11  today pursuant to a notice of deposition that my office
12  issued; is that correct?
13    A. That's correct.
14    Q. Okay.  Have you ever had your deposition taken
15  before, Mr. Roberts?
16    A. One time.
17    Q. Okay.  So you know generally what the procedure
18  is?
19    A. (Witness nodded head.)
20    Q. Let me -- let me run through with you, just in
21  case.  I'm going to ask you a series of questions,
22  along with Mr. Ezell and Mr. Bonner here.  The court
23  reporter here is going to be taking down everything you
24  say, so it's important that you verbalize whatever you
25  say.  In other words, you can't just shake your head or

Page 9

```
 1   Q. Yeah.  Where each of these children live
 2  presently.
 3   A. Dale lives on Perk Lane in Harlingen.
 4   Q. Okay.  Just, actually, is Dale -- if you can
 5  you give me something so that I know which one may
 6  correspond with the ages that you gave me.  Is Dale the
 7  44-year-old?
 8   A. 44-year-old.
 9   Q. Okay.
10   A. John, I believe I gave his age as 42.  He's
11  Route 2, Box 80, Raymondville, Texas.
12   Q. Okay.
13   A. Anthony, 24, would be Hidalgo Street in
14  Raymondville.
15   Q. And how about the four-and-a-half-year-old
16  child?
17   A. He lives with me.
18   Q. And what's his name?
19   A. Martin.
20   Q. Martin?
21   A. Martin.
22   Q. What is your current occupation?
23   A. I'm retired on Social Security.
24   Q. How long have you been retired?
25   A. I don't recall.
```

Page 10

```
 1   Q. You have no idea?  Can you give me an estimate;
 2  years, months?
 3   A. I don't recall.
 4   Q. What was the last occupation that you had
 5  before you retired?
 6   A. Bargain Barn Specialty Items, Harlingen, Texas.
 7   Q. Okay.  And this is a -- this is a store that
 8  sold specialty items --
 9   A. Yes.
10   Q. -- is that correct?  And you were the owner of
11  the store; is that correct?
12   A. Yes.
13   Q. Do you still presently own it?
14   A. No.
15   Q. Okay.  And what's the reason for that?
16   A. City Hall, they took everything away from me.
17   Q. I'm going to ask you a little bit about your
18  educational history, Mr. Roberts.  Are you a high
19  school graduate?
20   A. Yes, I am.
21   Q. What high school?
22   A. Big Sandy High School.
23   Q. What year was that?
24   A. 1953.
25   Q. Did you have any schooling after high school?
```

Page 11

```
 1   A. Yes.
 2   Q. Okay.  Where at?
 3   A. Sam Houston State Teacher's College.
 4   Q. Did you graduate from Sam Houston?
 5   A. Allen Military Academy.
 6   Q. Okay.  Did you graduate from Sam Houston?
 7       MR. DE LOS SANTOS:  Objection.  Will you
 8  allow him to finish his answer?
 9       MR. DRINKARD:  Sure.
10   Q. Go ahead, Mr. Roberts.
11   A. And the University of Baylor.
12   Q. I'm sorry.  You said what?
13   A. University of Baylor.
14   Q. Is that the same thing as Baylor University?
15   A. Yes.
16   Q. Did you get any degrees from any of these
17  schools?
18   A. Associate of arts from Allen Military Academy.
19   Q. Mr. Roberts, are you a licensed antique dealer?
20       MR. DE LOS SANTOS:  Objection; form.
21   A. I'm as close to a licensed antique dealer as
22  you could come.
23   Q. Okay.  If you could explain that for me.
24   A. Lifetime experience.
25   Q. Is there a license that an antique dealer gets
```

Page 12

```
 1  or do you not need a license in order to operate an
 2  antique business?
 3   A. There's no particular license, that I know of.
 4   Q. So then you don't have any particular license.
 5  You just have personal experience; is that correct?
 6   A. Correct.
 7   Q. Okay.  Are you a licensed vehicle dealer?
 8   A. Not now.
 9   Q. Have you ever been a licensed vehicle dealer?
10   A. Yes, I have.
11   Q. Okay.  When was that?
12   A. 1964 to 1969.
13   Q. Okay.  And this license was issued by whom?
14   A. State of Texas.
15   Q. So you've not been a licensed vehicle dealer
16  since 1969?
17   A. No.
18   Q. Are you a licensed junk dealer?
19   A. Surely, you jest.
20   Q. No, Mr. Roberts, I'm --
21   A. No.
22   Q. -- completely serious.  Is there a license that
23  is issued for junk dealers or for junkyards?
24       MR. DE LOS SANTOS:  Objection; form.
25   A. There is one.
```

Page 13

1  Q. Okay. And have you ever held this license?
2  A. No, I haven't.
3  Q. Mr. Roberts, do you collect motor vehicles?
4  A. Yes.
5  Q. How many motor vehicles do you presently have?
6  A. Probably 12 or 15 at this time.
7  Q. I'm sorry. Between 12 and 15?
8  A. Twelve. Twelve.
9  Q. Twelve vehicles?
10 A. Yes.
11 Q. And where do you keep these vehicles?
12 A. La Feria.
13 Q. When you say La Feria, can you give me a
14 physical address where you keep these vehicles?
15 A. Tio Cano Road, 506.
16 Q. Can you spell that road for me?
17 A. T-I -- capital T-I-O, capital C-A-N-O.
18 Q. Do you own this property where the vehicles are
19 kept?
20 A. Yes.
21 Q. How long have you owned it?
22 A. Since 1983.
23 Q. What kind of vehicles do you have on this
24 property?
25 A. Three Metropolitan Nashes, a 1931 Ford Model A

Page 14

1  truck, 1966 camper, Dodge, 1966 bus, school bus, 1962
2  Chevrolet Impala, 1984 Toyota 4X4, 1957 Ford truck,
3  1957 GMC truck.
4  Q. Are any of these vehicles operable?
5  A. They're restorable.
6  Q. That's not the question I asked.
7  A. Yes. Yes. The answer is yes.
8  Q. Okay. So each one of these vehicles is
9  operable, then; is that correct?
10    MR. DE LOS SANTOS: Objection; form.
11 A. All of them -- some of them are operable. All
12 of them are restorable.
13 Q. Okay. I didn't ask you about restorable,
14 though. Can you tell me which of these vehicles are
15 operable presently?
16 A. The school bus, the Dodge -- the Dodge camper.
17    THE WITNESS: May I ask for an
18 explanation, sir?
19    MR. DE LOS SANTOS: If you don't
20 understand the question, just tell him you don't
21 understand.
22 A. Explain to me what you're talking about
23 operable. Are you talking about getting them and
24 driving them down through the city of Harlingen, or
25 what do you --

Page 15

1  Q. Yeah. Do any of these cars run?
2  A. Will run or do run?
3  Q. Do run.
4  A. Yes.
5  Q. Okay. And were those the ones you just told me
6  about; the school bus and the Dodge camper?
7  A. Yes. There's two school buses, that I recall.
8  Q. Okay. And both of those school buses are
9  presently operable?
10 A. Yes.
11 Q. And then the Dodge camper. Was there any other
12 ones?
13 A. Not ready to run at this time.
14 Q. And what are you doing with these vehicles?
15 A. Economically, now, I'm holding the vehicles,
16 hoping to restore them.
17 Q. You're hoping to restore them yourself or to
18 sell them to somebody to be restored?
19 A. I can restore them or I can have them restored.
20 Q. Okay. So at this point you don't know whether
21 you plan to restore them yourself or sell them to be
22 restored?
23    MR. DE LOS SANTOS: Objection; form.
24 A. Either of those two might be a possibility.
25 Q. Have you ever stored any of these vehicles at

Page 16

1  the property you identified previously as the Bargain
2  Barn?
3  A. Yes, I have.
4  Q. Okay. Which vehicles were stored there?
5  A. The Metropolitans, the Dodge, both buses, the
6  '84 Toyota, the '64 Impala, along with many other
7  vehicles.
8  Q. I'm sorry. Did you say many other vehicles?
9  A. Yes.
10 Q. Okay. Can you tell me when you moved these
11 vehicles from the Bargain Barn to the present location?
12 A. Sometime after 2000, January of 2000.
13 Q. Okay. Can you be a little more specific for
14 me?
15 A. They were all prepared to be moved, tires aired
16 up, ready to go, some put on trailers, motors put on
17 trailers, ready to be hauled out. Some would have been
18 tow-barred out with a special tow bar that fits on
19 antique cars, rolled out.
20 Q. Okay. But my question -- Mr. Roberts, if
21 you'll listen to my question. Can you tell me
22 specifically when these vehicles were moved from the
23 Bargain Barn to their present location?
24 A. I don't recall specifically, but after January
25 of 2001, sometime between that date and October of that

## Page 17

1 year.
2 Q. Can you tell me, Mr. Roberts, if these vehicles
3 were moved from the Bargain Barn to the present
4 location before or after certain vehicles were moved
5 from your property at the request of the city?
6 A. Moved before.
7 Q. They were moved before? Can you tell me why
8 you moved these vehicles?
9 A. Because the -- I needed the space, plus the
10 building had been burned out, no protection from the
11 city police in Harlingen nor any of the officials,
12 including the Health Department, after many calls for
13 help. I was being robbed nightly and daily.
14 Q. At the time you moved these vehicles, did you
15 have other vehicles on the Bargain Barn premises?
16 A. Yes, I did.
17 Q. Okay. Why didn't you move those vehicles?
18 A. Most cases, I didn't see the need for it, but
19 the main case was we -- I had four heart attacks during
20 that year.
21 Q. Okay. You say heart attacks at the end of that
22 year. Can you --
23 A. During that year.
24 Q. During that year?
25 A. Yes.

## Page 18

1 Q. Okay. So the reasons are because you didn't
2 see a need for it and because you had heart attacks?
3     MR. DE LOS SANTOS: Objection; form.
4 A. I had a business there.
5 Q. I understand that.
6 A. I sold from there.
7 Q. I understand that. I guess the question I'm
8 trying to get at is why you saw fit to move the
9 vehicles that you did but leave other vehicles there.
10     MR. DE LOS SANTOS: Objection; form.
11 A. Because I wanted the three Metropolitans in an
12 area where I could start working on them and develop at
13 least one, which is a convertible, from either one or
14 -- or the other two, and some other Metropolitans that
15 I have access to and know where are and so forth.
16 Q. Have you performed any work on any of the
17 Metropolitans since they were moved?
18 A. Yes, some, but not -- not in a restoration way.
19 Q. What kind of work have you performed on them?
20 A. Just working on the windows, the door closures.
21 Q. Have you ever restored an antique vehicle on
22 your own before?
23 A. Yes, I have.
24 Q. Okay. When was the last time you did this?
25 A. It's been several years. In the middle '70s.

## Page 19

1 Q. What kind of vehicle did you restore?
2 A. Two 1948 Straight 8s, a 1952 Packard, a 1956
3 Packard, a 1946 Chrysler.
4     MR. DE LOS SANTOS: Counsel, can we take a
5 short break?
6     MR. DRINKARD: Sure.
7     (Recess taken)
8     THE VIDEOGRAPHER: We're back on the
9 record.
10 Q. Okay. Mr. Roberts, I believe the last thing we
11 were discussing before the break was you were telling
12 us about the vehicles that you last restored and you
13 mentioned that that was in the '70s and you listed off
14 a couple of vehicles.
15 A. Yes. I listed off two Buick Straight 8s.
16 Q. Okay. And I think you mentioned a 19 --
17 A. 1948 Straight 8 Buick, '52 Packard, '47
18 Chrysler.
19 Q. Okay. And you restored all these vehicles in
20 the 1970s; is that correct?
21 A. That's correct, yes.
22 Q. Okay. And haven't restored any since then?
23 A. No, I haven't.
24 Q. What did you do with these vehicles once you
25 restored them?

## Page 20

1 A. These vehicles were vandalized by kids.
2 Q. Okay. But what did you do with the vehicles?
3 A. Traded them to a machinery company for two
4 heavy pieces of machinery.
5 Q. Do you remember when that was?
6 A. I don't recall.
7 Q. Would that have been in the '70s?
8     MR. DE LOS SANTOS: Objection; form.
9 A. I don't recall.
10 Q. Have you sold vehicles since the '70s, when you
11 restored these vehicles?
12 A. Not -- not many antiques.
13 Q. Okay. But have you sold any vehicles at all
14 since that time?
15 A. I recall selling a 1938 Oldsmobile touring car.
16 Q. When did you sell that '38 Oldsmobile?
17 A. I don't recall the time but it was an area
18 of -- I don't recall, really.
19 Q. So you don't recall -- you couldn't tell me if
20 that was in the 1990s, if that was recently, the '80s?
21 A. Well, I can give you '98.
22     MR. DE LOS SANTOS: Objection; form.
23 Q. 1998? And that was the last vehicle that
24 you've sold?
25 A. Last antique.

Page 49

1  A. In the sense that those of us with experience,
2  it's operable.
3  Q. Mr. Roberts, could somebody get into that car
4  at the time it was removed and start it up and drive
5  it?
6  A. They did it.
7  Q. So you're saying this car was started. Have
8  you ever personally driven this vehicle?
9  A. Many hundreds of miles.
10  Q. Okay. And when was the last time you drove it?
11  A. I don't recall.
12  Q. Okay. Within three years?
13  A. I don't recall.
14  Q. When was the last time anybody drove it, to
15  your knowledge?
16  A. Sometime in July of 2000.
17  Q. And who drove the vehicle in July of 2000?
18  A. Whoever you hired to drive it off. I don't --
19  I don't know who they are. I don't recall.
20  Q. Okay. So you're saying that when this car was
21  removed from your premises, it was driven off; is that
22  what you're saying?
23  A. No, I'm not saying that.
24  Q. How was the vehicle in Picture Number 4 removed
25  from your premises?

Page 50

1  A. I don't know.
2  Q. So you don't know if anyone actually drove it
3  off; is that correct?
4  A. No, I don't.
5  Q. Going back to Exhibit Number 2, if you could
6  take a look at Picture Number 5. Can you identify that
7  vehicle?
8  A. Number 5?
9  Q. Right.
10  A. I cannot positively identify it because of the
11  positioning of it.
12      MR. DE LOS SANTOS: If the photograph
13  isn't good enough, just tell him that. Let's just move
14  on, okay?
15  A. I cannot identify it.
16  Q. Okay. So you don't know if this vehicle was
17  removed from your premises; is that correct?
18  A. I know it had to have been moved from my
19  premises.
20  Q. At the time it was removed from your premises,
21  was the title to this vehicle in your name?
22  A. Yes.
23      MR. DE LOS SANTOS: Objection; form.
24  Q. Do you presently have that title?
25      MR. DE LOS SANTOS: Objection; form.

Page 51

1  A. The title is burned.
2  Q. So you don't have the title; is that correct?
3      MR. DE LOS SANTOS: Objection; form.
4  Q. Mr. Roberts, do you know how you acquired this
5  vehicle?
6  A. Yes, I do.
7  Q. Okay. And how was that?
8  A. May I -- may I ask my attorney a question or
9  two here? Am I allowed to?
10      MR. DE LOS SANTOS: Do we need to take a
11  break?
12  A. Yes.
13      MR. DE LOS SANTOS: Just ask for a break.
14  A. Yes.
15      (Recess taken)
16      THE VIDEOGRAPHER: We're back on the
17  record.
18  Q. Okay. Mr. Roberts, we're going to go back
19  to -- we were looking at Exhibit Number 2, Picture
20  Number 5, the school bus there, and I was asking you
21  when you acquired this vehicle.
22      MR. DE LOS SANTOS: Is there a question?
23  Q. Yes. When did you acquire this vehicle?
24  A. During the '80s.
25  Q. Where did you get it from?

Page 52

1  A. Rio Hondo school district.
2  Q. How was it delivered to your premises?
3  A. Driven over.
4  Q. Okay. At the time this vehicle was removed,
5  was it operable?
6  A. Yes.
7  Q. When was the last time you had driven it?
8  A. It had been -- I don't recall the last time I
9  drove it.
10  Q. Do you recall the last time anybody drove it?
11  A. No, I don't.
12  Q. Did this vehicle have a valid license plate at
13  the time it was removed?
14  A. No.
15  Q. Valid motor safety inspection sticker?
16  A. No.
17  Q. At the time it was removed, Mr. Roberts, how
18  much do you estimate this vehicle was worth?
19  A. I don't have an estimate for it at this time.
20  Q. You have no estimate on how much this vehicle
21  was worth at the time it was removed?
22      MR. DE LOS SANTOS: Objection; form.
23  A. No, I don't have.
24  Q. If we could go to Picture Number 6 on that same
25  exhibit, could you identify this vehicle?

Page 53

1  A. Not a definite 19o., but in the '80s, Dodge
2 cargo van.
3  Q. Do you recognize this vehicle as one that was
4 stored on your premises there at 1726 North Commerce?
5  A. Yes.
6  Q. Was this vehicle removed from the premises?
7  A. Yes.
8  Q. Was the title to this vehicle in your name at
9 the time it was removed from the premises?
10      MR. DE LOS SANTOS: Objection; form.
11  A. Open title, but a title, yes.
12  Q. You said open title. Was the title in your
13 name at the time it was removed from the premises?
14      MR. DE LOS SANTOS: Objection; form.
15  A. I had title but the title was not in my name.
16  Q. Do you have possession of this title today?
17  A. No, I don't.
18      MR. DE LOS SANTOS: Objection; form.
19  Q. Was this title burned up in the fire?
20  A. Yes.
21      MR. DE LOS SANTOS: Objection; form.
22  Q. How did you acquire this vehicle?
23  A. From a San Benito salvage dealer.
24  Q. Okay. And when did you acquire it?
25  A. And collector. Say it again, please.

Page 54

1  Q. When did you acquire the vehicle?
2  A. Approximately 1993 or '4.
3  Q. And how much did you pay for the vehicle?
4  A. I don't recall.
5  Q. At the time the vehicle was removed from the
6 premises, was it operable?
7  A. No, it wasn't.
8  Q. At the time it was removed, did the vehicle
9 have a valid license plate?
10  A. No.
11  Q. Did it have a valid motor safety inspection
12 sticker?
13  A. No.
14  Q. Okay. Mr. Roberts, how much do you feel this
15 vehicle was worth at the time it was removed from the
16 premises?
17  A. I don't have an estimate at this time.
18  Q. If we could go to Picture Number 7 on the same
19 exhibit, can you identify this vehicle?
20  A. Yes, I can.
21  Q. Okay. What kind of vehicle is it?
22  A. In the area of time of a 1974 Ford car carrier.
23  Q. Do you recognize this as a vehicle that was
24 stored on your premises?
25  A. Yes.

Page 55

1  Q. Ok..y. Was this vehicle removed from your
2 premises?
3  A. Yes, it was.
4  Q. At the time the vehicle was removed from the
5 premises, was the title to it in your name?
6  A. Open title. I had title to it but it was open
7 title. I had the title.
8  Q. I'll ask the question again. Was the title in
9 your name at the time the vehicle was removed from the
10 premises?
11      MR. DE LOS SANTOS: Objection; form.
12  A. I had title to it but it was not totally -- it
13 was not in my name.
14  Q. From whom did you acquire this vehicle?
15  A. 1990 or 1991.
16  Q. Okay. The question was, from whom did you
17 acquire this vehicle?
18  A. I don't recall the name.
19  Q. And your answer '90 or '91, was that an answer
20 to when you acquired the vehicle?
21  A. That's correct.
22  Q. How much did you pay for the vehicle?
23  A. I don't recall.
24  Q. How was the vehicle delivered to your premises?
25  A. By my own equipment, equipment hauler.

Page 56

1  Q. It was not driven to the premises?
2  A. No, it wasn't.
3  Q. At the time it was removed from your premises,
4 was this vehicle operable?
5  A. Put a radia --
6      MR. DE LOS SANTOS: Objection; form.
7  A. Put a radiator in it and drive it off.
8  Q. Was the vehicle operable, without doing any
9 work to it, at the time it was removed from the
10 premises?
11      MR. DE LOS SANTOS: Objection; form.
12  A. No.
13  Q. I'm sorry. I didn't hear your answer.
14  A. No.
15  Q. Okay. Have you ever driven this vehicle?
16  A. Yes, I had driven it.
17  Q. Okay. When did you drive it?
18  A. In the yard in the '90s.
19  Q. So the last time you drove it was in the '90s?
20  A. During the '90s.
21  Q. Okay. But that was the last time you drove it?
22  A. That was the last time, yes.
23  Q. Are you aware of anybody else driving it since
24 then?
25  A. I believe I see it in Mercedes hauling cars. I

Page 57

1 believe that's the one.
2 Q. Excuse me? I'm sorry. I didn't hear that.
3 A. I believe it's in Mercedes, Texas hauling cars.
4 Q. You've seen this vehicle in Mercedes hauling
5 cars; is that what you said?
6 A. A comparable vehicle to it.
7 Q. When was the last time you saw this vehicle in
8 Mercedes hauling cars?
9 A. I don't recall the time, but sometime six
10 months to a year ago.
11 Q. Do you know who was driving the vehicle when
12 you saw it?
13 A. I don't know.
14 Q. And how did you identify this -- the same
15 vehicle that's in the picture as the one you saw in
16 Mercedes hauling cars?
17 A. The bed that's on it.
18 Q. Okay. And what about the bed that's on it?
19 What?
20 A. It has a dropped winch but they still haven't
21 -- had not put a winch in.
22 Q. And that's the only -- the only thing on the
23 car that told you it was the same vehicle as the one in
24 the picture?
25     MR. DE LOS SANTOS: Objection; form.

Page 58

1 A. No.
2 Q. Okay. What else was there?
3 A. The risers up on the side, the headache rack.
4 Q. And those two things were the only two things
5 that tipped you off this was the same vehicle?
6     MR. DE LOS SANTOS: Objection; form.
7 A. The drop deck in the back where I put -- where
8 I put some antique cars one time to haul.
9 Q. Mr. Roberts, at the time this vehicle was
10 removed from the premises, did it have a valid license
11 plate?
12 A. No.
13 Q. Did it have a valid motor safety inspection
14 sticker?
15 A. No.
16 Q. At the time this vehicle was removed from the
17 premises, how much would you say that it was worth,
18 Mr. Roberts?
19 A. I won't estimate it at this time.
20 Q. If we could move to Picture Number 8 on the
21 same exhibit. Can you identify this vehicle?
22 A. 1973 Toyota -- yellow Toyota pickup.
23 Q. Do you recognize this as a vehicle that was
24 stored on the premises at 1726 North Commerce?
25 A. Yes.

Page 59

1 Q. An. do you recognize this as a vehicle that was
2 removed from the premises at the request of the city?
3 A. I don't know who requested the removal of it,
4 but it was removed.
5 Q. At the time this vehicle was removed in Picture
6 Number 8, was the title to the vehicle in your name?
7 A. Yes. No, the title was not in my name but I
8 had title.
9 Q. The title was not in your name?
10 A. No.
11     MR. DE LOS SANTOS: Objection; form.
12 Q. Do you know when you acquired this vehicle,
13 Mr. Roberts?
14 A. I don't recall.
15 Q. Did you have possession of this vehicle for
16 more than five years before it was removed?
17 A. I don't recall.
18 Q. Do you know where you acquired the vehicle
19 from?
20 A. Yes.
21 Q. Okay. Would you tell me that, please?
22 A. Ramsey Street in Harlingen, or Ramsey Road.
23 They don't call it Ramsey Street.
24 Q. Is this the name of a business?
25 A. No, it wasn't.

Page 60

1 Q. Well, you've given me the name of a road. Was
2 there a business on this road that sold you the
3 vehicle?
4 A. No.
5 Q. Okay. What is Ramsey Road, then?
6 A. It's a road --
7 Q. So your testimony is that a road sold you the
8 vehicle?
9     MR. DE LOS SANTOS: Objection; form. If
10 you wouldn't cut him off and let him finish his answer,
11 maybe you would get the answer.
12 A. It's a road off of Wilson Road to the south.
13 Q. Okay. Again, who sold you the vehicle, though?
14 A. I don't recall the names.
15 Q. Was it an individual or was it a business?
16 A. It was an individual.
17 Q. Do you know how much you paid for the vehicle?
18 A. I don't recall.
19 Q. Do you know how the vehicle was delivered to
20 your premises?
21 A. Yes.
22 Q. Okay. And how was that?
23 A. The son of the owner pulled it there.
24 Q. Do you know the name of the son of the owner?
25 A. No, I don't.

|  | Page 65 |
| --- | --- |
| 1 | Q. And was this vehicle removed from the premises |
| 2 | at North Commerce? |
| 3 | A. Yes. |
| 4 | Q. At the time the vehicle was removed from the |
| 5 | premises, was title to it in your name? |
| 6 | A. I had a bill of sale on this, on this car. |
| 7 | Q. Okay. But the question I asked you was, was |
| 8 | title to the vehicle in your name at the time it was |
| 9 | removed from the premises? |
| 10 | A. The title to the vehicle was -- it was my |
| 11 | vehicle by title of a bill of sale. |
| 12 | Q. When did you acquire this vehicle, Mr. Roberts? |
| 13 | A. I don't recall. |
| 14 | Q. Do you know who you acquired the vehicle from? |
| 15 | A. I don't recall. |
| 16 | Q. At the time the vehicle in Picture Number 10 |
| 17 | was removed from the premises, was it operable? |
| 18 | MR. DE LOS SANTOS: Objection; form. |
| 19 | A. It could have been started and I would call it |
| 20 | operable. |
| 21 | Q. Okay. Have you ever started the engine in this |
| 22 | vehicle? |
| 23 | A. Yes. |
| 24 | Q. When was the last time you did that? |
| 25 | A. I don't recall. |

|  | Page 66 |
| --- | --- |
| 1 | Q. Would you say that it was more than two years |
| 2 | ago? |
| 3 | A. Yes. |
| 4 | Q. Would you say that it was more than five years |
| 5 | ago? |
| 6 | A. I don't recall. |
| 7 | Q. Okay. At the time the vehicle in Picture |
| 8 | Number 10 was removed from the premises, did it have a |
| 9 | valid license plate? |
| 10 | A. No. |
| 11 | Q. Did it have a valid motor safety inspection |
| 12 | sticker? |
| 13 | A. No. |
| 14 | Q. And how was this vehicle delivered to your |
| 15 | premises? |
| 16 | A. By trailer. |
| 17 | Q. In your estimation, Mr. Roberts, how much was |
| 18 | this vehicle worth at the time it was removed from the |
| 19 | premises? |
| 20 | A. I can't give you an estimation at this time. |
| 21 | Q. If we could move to Picture Number 11 on the |
| 22 | same exhibit. Can you identify this vehicle? |
| 23 | A. 1962 Falcon station wagon. |
| 24 | Q. Do you recognize this as a vehicle that was on |
| 25 | your premises at 1726 North Commerce? |

|  | Page 67 |
| --- | --- |
| 1 | A. Yes. |
| 2 | Q. And do you recognize this as a vehicle that was |
| 3 | removed from the premises? |
| 4 | A. Yes. |
| 5 | Q. At the time the vehicle was removed from the |
| 6 | premises, was the title to it in your name? |
| 7 | MR. DE LOS SANTOS: Objection; form. |
| 8 | A. I don't recall -- all cars had either a title |
| 9 | or a bill of sale, but I don't recall the title of this |
| 10 | car. |
| 11 | Q. Do you presently have the title to this car? |
| 12 | MR. DE LOS SANTOS: Objection; form. |
| 13 | A. All titles were burned in the fire of 2001 -- |
| 14 | in 2000, January of 2000. |
| 15 | Q. Do you know when you acquired this vehicle? |
| 16 | A. I don't recall. |
| 17 | Q. Do you remember who you acquired the vehicle |
| 18 | from? |
| 19 | A. Only by location in Harlingen. |
| 20 | Q. Okay. And where is the location? |
| 21 | A. I don't remember the street address that it's |
| 22 | -- that it's from. |
| 23 | Q. So just you know you acquired it in Harlingen? |
| 24 | A. Yes. |
| 25 | Q. Do you know how the vehicle was delivered to |

|  | Page 68 |
| --- | --- |
| 1 | your premises? |
| 2 | A. This vehicle was driven. |
| 3 | Q. Have you ever driven this vehicle? |
| 4 | A. No. |
| 5 | Q. Okay. To your knowledge, when was the last |
| 6 | time this vehicle was driven? |
| 7 | A. I have -- I don't have knowledge of the last |
| 8 | time. |
| 9 | Q. At the time the vehicle was removed from the |
| 10 | premises, was it operable? |
| 11 | MR. DE LOS SANTOS: Objection; form. |
| 12 | A. Operable mechanically, but the window was |
| 13 | knocked out of it, windshield window. |
| 14 | Q. At the time the vehicle was removed from the |
| 15 | premises, would the engine start? |
| 16 | A. Put a battery in it and start it and drive it |
| 17 | off. |
| 18 | Q. Okay. So it's your testimony that this engine |
| 19 | would have started with just a new battery? |
| 20 | MR. DE LOS SANTOS: Objection; form. |
| 21 | A. Yes. |
| 22 | Q. At the time this vehicle in Picture Number 11 |
| 23 | was removed from the premises, did it have a valid |
| 24 | license plate? |
| 25 | A. No. |

Page 69

1 Q. Okay. Did the vehicle have a valid motor
2 safety inspection sticker?
3 A. No.
4 Q. Mr. Roberts, in your estimation, how much was
5 this vehicle worth at the time it was removed from the
6 premises?
7 A. I can't give an estimate at this time.
8 Q. Okay. If we could go to Picture Number 12 on
9 the same exhibit, can you identify this vehicle?
10 A. Yes.
11 Q. Okay. Please identify it for me.
12 A. 1952 International three-quarter-ton pickup.
13 Q. Do you recognize this as a vehicle that was
14 stored on the premises of the Bargain Barn?
15 A. Yes.
16 Q. Okay. And do you also recognize this as a
17 vehicle that was removed from those premises?
18 A. Yes.
19 Q. At the time the vehicle was removed from the
20 premises, was the title to it in your name?
21 A. I had title to it, yes.
22 Q. The title was in your name?
23 A. Not signed into my name but I had title
24 ownership.
25     MR. DE LOS SANTOS: Objection; form.

Page 70

1 Q. Was the title to this vehicle burned in the
2 fire, Mr. Roberts?
3 A. Yes, it was.
4     MR. DE LOS SANTOS: Objection; form.
5     MR. DRINKARD: What's the objection on
6 that?
7     MR. DE LOS SANTOS: The form goes to the
8 issue of your use of the word "title." Are you talking
9 about the title certificate paper or are you talking
10 about legal title and ownership of the vehicle?
11     MR. DRINKARD: Okay. Let me rephrase it.
12     MR. DE LOS SANTOS: So it's a vague
13 question.
14 Q. Any ownership document you might have had
15 regarding this vehicle, was it -- were they all burned
16 in the fire?
17 A. Documents?
18 Q. Correct.
19 A. Document, yes.
20 Q. Okay. Who did you acquire this vehicle from?
21 A. An antique collector and dealer in San Benito.
22 Q. Do you know the name of the collector?
23 A. I have -- I have his name. I don't have it
24 with me.
25 Q. Do you know when you acquired this vehicle?

Page 71

1 A. I don't recall.
2 Q. Do you know how much you paid for the vehicle?
3 A. I don't recall.
4 Q. Do you know how it was delivered to your
5 premises?
6 A. I don't recall.
7 Q. At the time the vehicle was removed from the
8 premises, was it operable?
9 A. In the sense of --
10     MR. DE LOS SANTOS: Objection; form.
11 A. In the sense of it only needing a battery and a
12 radiator, it was operable.
13 Q. Had you ever driven this vehicle, Mr. Roberts?
14 A. No, I haven't.
15 Q. Do you have knowledge of anybody else driving
16 this vehicle?
17 A. No.
18 Q. At the time this vehicle was removed from the
19 premises, did it have a valid license plate?
20 A. No, it did not.
21 Q. Okay. At the time it was removed, did it have
22 a valid motor safety inspection sticker?
23 A. No, it did not.
24 Q. Okay. In your estimation, this vehicle, at the
25 time it was removed from the premises, how much was it

Page 72

1 worth?
2 A. It was worth from 8 to $12,000.00 restored.
3 Q. Okay. You just said "restored." I asked at
4 the time it was removed from the premises, how much was
5 it worth?
6 A. It's in a package. When you ask about a price
7 about a vehicle like this, it comes in a package.
8 Q. So your testimony is that the vehicle was
9 restored at the time it was removed from the premises?
10 A. It was not restored.
11 Q. Okay.
12 A. Restoration had been started.
13 Q. Okay. And when had that restoration been
14 started?
15 A. I don't recall.
16 Q. Okay. Maybe I can ask it another way. At the
17 time it was removed from the premises, how much would
18 you say the vehicle was worth?
19 A. I can't give that estimate at this time.
20 Q. There's different values on International pickups.
21 Q. I'm going to hand you what's been marked as
22 Exhibit Number 4. Could you take a look at the picture
23 of the vehicle under which it's identified Number 13?
24 Can you identify that vehicle for me?
25 A. It's a Buick. I believe it's a -- those --

Page 73

1 those models are classics. It's a Buick.
2  Q. Okay. But you don't know what year it is?
3  A. No, I don't.
4  Q. Okay. Do you recognize this as a vehicle that
5 was stored on your premises at 1726 North Commerce?
6  A. Yes, it was.
7  Q. And do you recognize this as a vehicle that was
8 removed from those premises?
9  A. Yes.
10  Q. Okay. At the time the vehicle was removed from
11 the premises, was the title to such in your name?
12  A. No.
13  Q. When did you acquire this vehicle?
14  A. I don't recall.
15  Q. Who did you acquire the vehicle from?
16  A. I don't recall.
17  Q. How much did you pay for it?
18  A. It was given to me.
19  Q. Okay. Do you know how it was delivered to your
20 premises?
21  A. I do remember he pulled it.
22  Q. Okay. Mr. Roberts, have you ever driven this
23 vehicle?
24  A. No.
25  Q. Are you personally aware of anybody that's ever

Page 74

1 driven the vehicle?
2  A. No.
3  Q. At the time it was removed from the premises,
4 was it operable?
5  A. No.
6  Q. At the time it was removed, did it have a valid
7 license plate?
8  A. No.
9  Q. At the time it was removed, did it have a valid
10 motor safety inspection sticker?
11  A. No.
12  Q. Okay. In your estimation, Mr. Roberts, at the
13 time this vehicle was removed, how much was it worth?
14  A. These type cars are not old enough for me to
15 know exactly and they're not new enough for me to know
16 exactly, so I would not be able to estimate.
17  Q. If we go to Picture Number 14 on this same
18 exhibit, could you identify the vehicle above Picture
19 Number 14 there? Or excuse me. Above the Number 14
20 there?
21  A. 1963 Ford T-Bird.
22  Q. Do you recognize this as a vehicle that was
23 stored on your premises?
24  A. Yes.
25  Q. Do you recognize it as a vehicle that was

Page 75

1 removed from your premises?
2  A. Yes.
3  Q. At the time this vehicle was removed from the
4 premises, was the title to such in your name?
5  A. Yes.
6  Q. From whom did you acquire this vehicle,
7 Mr. Roberts?
8  A. The car was stored -- they're very famous
9 people around this area but I -- I can't recall their
10 name but I know who they are.
11  Q. Can you tell me when you acquired the vehicle?
12  A. No, but I could get that information.
13  Q. Do you know how the vehicle was delivered to
14 your premises?
15  A. I don't recall.
16  Q. Have you ever driven the vehicle?
17  A. No.
18  Q. Are you personally aware of anybody ever
19 driving the vehicle?
20  A. No.
21  Q. At the time the vehicle was removed from the
22 premises, was it operable?
23  A. This car should have been able to have been
24 started, yes.
25  Q. Did you ever start it?

Page 76

1  A. It had been started in front of me. I've not
2 started it but I've heard it run before.
3  Q. Okay. And when was it started?
4  A. I don't recall.
5  Q. Do you know how much you paid for the vehicle?
6  A. I don't recall.
7  Q. At the time the vehicle was removed from the
8 premises, did it have a valid license plate?
9  A. No, it did not.
10  Q. At the time it was removed from the premises,
11 did it have a valid motor safety inspection sticker?
12  A. No, it did not.
13  Q. Do you recall, Mr. Roberts, who started the
14 vehicle in front of you?
15  A. I believe, if I recall, Junior Garcia.
16  Q. Junior Garcia?
17  A. Yeah. Jesus Garcia.
18  Q. And where does Mr. Garcia live; do you know?
19  A. I don't know.
20  Q. Okay. Is he an employee there at the Bargain
21 Barn?
22  A. He was. He was.
23  Q. Was the vehicle actually driven when he started
24 it?
25  A. I don't recall.

Page 77

1  Q. At the time this vehicle was removed from the
2  premises, Mr. Roberts, what's your estimate of how much
3  it was worth?
4  A. I don't have an estimate on that car at this
5  time.
6  Q. Okay. If we could take a look at Picture
7  Number 15 on this same exhibit. Can you identify that
8  vehicle?
9  A. 1950 model Studebaker pickup. Only three of
10 them in the state of Texas.
11 Q. Do you recognize this as a vehicle that was
12 stored on your premises?
13 A. Yes, I do.
14 Q. Do you recognize it as a vehicle that was
15 removed from your premises?
16 A. Yes.
17 Q. At the time this vehicle was removed from the
18 premises, was the title to it in your name?
19 A. I got that --
20     MR. DE LOS SANTOS: Objection; form.
21 A. I got that from one of the ex-fire chiefs here,
22 but I'm not sure. The title would have been open,
23 probably, on the car like the rest of them. Title -- I
24 have title to it but it was an open title.
25 Q. Do you know when you acquired this vehicle?

Page 78

1  A. No, I don't. I don't recall.
2  Q. Do you know who you acquired it from?
3  A. Gloria Campos' father. I can't remember his
4  name. I think it's Gus Campos.
5  Q. What did you say his name was?
6  A. Campos.
7  Q. Did you give a first name?
8  A. I believe it was Gus.
9  Q. Gus. Do you know where he lives?
10 A. Yes, I do.
11 Q. Okay. And where is that?
12 A. I don't recall the address by memory but I
13 could take you there.
14 Q. Is it in Harlingen?
15 A. Yes, Harlingen. Excuse me.
16 Q. Okay. And how much did you pay for this
17 vehicle?
18 A. It took me several years to pay it out. I
19 don't recall the total price.
20 Q. How was it delivered to your premises?
21 A. Driven.
22 Q. Have you ever driven this vehicle?
23 A. Yes.
24 Q. Okay. When was the last time you drove it?
25 A. 1995 or so.

Page 79

1  Q. Are you aware of anybody driving it since '95?
2  A. It was driven around the yard just for fun,
3  driven and started many times. It was driven, but I
4  don't recall the exact dates, no.
5  Q. Could you tell me -- or would you know who else
6  started the vehicle and drove it around?
7  A. I don't recall.
8  Q. So at the time this vehicle was removed from
9  the premises, was it operable?
10 A. Yes, it was.
11 Q. At the time it was removed from the premises,
12 did it have a valid license plate?
13 A. No, it did not.
14 Q. At the time it was removed from the premises,
15 did it have a valid motor safety inspection sticker?
16 A. No.
17 Q. At the time this vehicle was removed from the
18 premises, Mr. Roberts, how much would you estimate it
19 was worth?
20 A. I couldn't give an estimation. It's a
21 one-of-a-kind. I'd have to consult -- I'd have to
22 consult some experts on it.
23 Q. Okay. If we go to Vehicle Number 16 on this
24 same exhibit, do you recognize this vehicle?
25 A. Yes.

Page 80

1  Q. Okay. Can you identify it for me?
2  A. 1972 Oldsmobile hearse.
3  Q. Okay. Do you recognize this as a vehicle that
4  was stored on your premises?
5  A. Yes.
6  Q. And do you recognize it as a vehicle that was
7  removed from your premises --
8  A. Yes.
9  Q. -- at the request of the city?
10 A. Yes.
11 Q. At the time this vehicle was removed from the
12 premises, was the title to it in your name?
13     MR. DE LOS SANTOS: Objection; form.
14 A. It would have had a title. It would have had
15 an open title, with the title in my name.
16 Q. Who did you acquire this vehicle from?
17 A. Billy Torres, a missionary for one of the
18 ministries, End of the Road Ministry or --
19 Q. I'm sorry. End of the Road Ministry is who
20 you --
21 A. I think that's correct.
22 Q. Do you know when you acquired it from the End
23 of the Road Ministry?
24 A. In the area of time of 1992.
25 Q. Okay. And how much did you pay for the

Page 89

1  A. I had an El Camino, Ford El Camino, was one
2  thing traded.
3  Q. What year was that El Camino?
4  A. I believe it was a 19 -- 1976, I believe. Wait
5  a minute. '60 --
6  Q. Do you remember how that '74 blue Cadillac was
7  delivered to your premises?
8  A. Driven to me.
9  Q. Okay. And who drove it there?
10  A. The previous owner.
11  Q. Have you ever driven this vehicle?
12  A. Yes, I have.
13  Q. And when was the last time you drove it?
14  A. Are you talking about the Cadillac?
15  A. Yeah, we're still talking about the '74
16  Cadillac.
17  A. In the '90s.
18  Q. Late '90s, mid '90s?
19  A. I don't recall when. It was my personal car
20  when I lived in Victoria in '90 and '91. I drove it
21  there, so I -- I don't recall the other --
22  Q. To your knowledge, are you the last person that
23  had driven this vehicle?
24  A. I would say no, but possibly yes. I'm sure
25  others drove it.

Page 90

1  Q. At the time this vehicle was removed from the
2  premises, did it have a valid license plate?
3  A. No.
4  Q. Okay. And at the time it was removed from the
5  premises, did it have a valid safety inspection
6  sticker?
7  A. No.
8  Q. And at the time it was removed from the
9  premises, what would you estimate this vehicle's value
10  was?
11  A. Basically, a value was not really set on those
12  pickups, a general value. There's not really many of
13  them.
14  Q. So you're saying you don't have a value
15  estimate at this time?
16  A. No, I don't.
17  Q. Okay. If you go down on that list, any other
18  vehicles that were removed from the premises that we
19  haven't identified?
20  A. This is not my list.
21  Q. I understand that, but do you recognize any
22  vehicles on that list that you recognize as being
23  removed from your premises?
24  MR. DE LOS SANTOS: Other than the ones
25  we've gone through?

Page 91

1  MR. DRINKARD: Correct.
2  A. Ask your question again, please, so can I
3  clarify it.
4  Q. Other than the vehicles that we've already
5  identified here today and the '74 blue Cadillac that
6  you just told me about, do you recognize any other
7  vehicles contained on that list that were removed from
8  your premises?
9  MR. DE LOS SANTOS: To clarify further,
10  Counsel, are you talking about removal by the city in
11  the year 2000?
12  MR. DRINKARD: At the request of the city
13  in the year 2000, correct.
14  A. Not on this list.
15  Q. Okay. Can you think of any other vehicles that
16  were -- other than the vehicles we've identified that
17  were removed at the request of the city in the year
18  2000?
19  A. Right now, I cannot. However, I have -- I
20  believe there are more vehicles.
21  Q. Did you sell any vehicles from the Bargain Barn
22  after the fire?
23  A. I don't recall. I sold machinery and so forth
24  but I don't recall whether it was vehicles or not.
25  Q. Did you restore any vehicles after the fire at

Page 92

1  the Bargain Barn?
2  A. No.
3  Q. Okay. In addition to vehicles, were there
4  other items that were removed from the premises at
5  North Commerce at the request of or by the city in the
6  year 2000?
7  A. Yes.
8  Q. Okay. What other items were removed?
9  A. Thousands of parts that were collectibles or
10  hard-to-get items that went on the Maytag washing
11  machines as far back as 45 years ago. I had probably
12  the largest supply in maybe possibly even the state of
13  that stored there on the grounds. Parrillas and -- or
14  stovetop parts for the Chambers ranges, all of your old
15  antique stoves, a rock tumbler for a rock hound to use
16  to clean his rocks and so forth. And then -- may I
17  ask, are you asking for a detail? I can get pretty
18  detailed here.
19  Q. Yeah. Well, let me ask you this. Do you have
20  an inventory or a list of items that were removed by
21  the city or at the request of the city from the
22  premises?
23  A. A list of -- I have a list of items, yes.
24  Q. Okay. That were removed?
25  A. Yes, that were removed.